UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>                  Plaintiffs,<br>        v.<br><br>JAMAL BENOMAR,<br><br>                  Defendant. | Case No. 18-CV-6615<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiffs Broidy Capital Management LLC ("BCM") and Elliott Broidy, by and through their attorneys Boies Schiller Flexner LLP, bring this action seeking monetary damages and equitable relief against Defendant Jamal Benomar, as set forth below.

1. This litigation concerns the actions of an unregistered agent of a foreign power and former senior United Nations official who participated in an unlawful attack on a prominent United States citizen. The attack was orchestrated by the State of Qatar, which since 2017 has attempted to impact public policy with an expansive influence operation within the United States, as well as through a highly sophisticated, orchestrated effort to subvert our democracy by silencing its critics and chilling their free speech, thereby sending a clear warning to future potential critics about the dangers to those who dare to cross the tiny, but extraordinarily wealthy, nation.

2. As described below, parallel proceedings commenced in this District and in the Central District of California have unmasked parts of this unlawful Qatari influence operation and revealed that the State of Qatar has involved numerous foreign agents, both those registered

1

under the Foreign Agents Registration Act ("FARA") and illegal, unregistered agents -- of which Defendant Benomar is but one.

## THE PARTIES

3.  Plaintiff Broidy Capital Management LLC is an investment firm run by Plaintiff Elliott Broidy. BCM is a corporation duly organized under the laws of the State of California with its principal place of business in Los Angeles, California.

4.  Plaintiff Elliott Broidy is a citizen of the United States and the State of California who resides in Los Angeles, California. He is the Chief Executive Officer and Chairman of BCM. Until earlier this year, he was Deputy Finance Chair of the Republican National Committee.

5.  Defendant Jamal Benomar was born in Morocco. He is a citizen of the United Kingdom who resides in this District. According to his Wikipedia page, "Jamal Benomar (Arabic: جمال بنعمر; born c. April 1957) is the Special Adviser to the United Nations Secretary-General on Conflict Prevention, at the level of Under Secretary-General (USG). His 25-year diplomatic career at the UN has focused on peacebuilding and governance issues in conflict countries, including Yemen, Afghanistan and Iraq."[1] According to recent public reports concerning Benomar's role as a foreign agent, he left the United Nations sometime in 2017.[2]

6.  On information and belief, Benomar has for a long time served the interests of the State of Qatar. On information and belief, during his tenure at the United Nations, Benomar utilized his official position to advance the Qatari agenda. While serving as the United Nations

---

[1] https://en.wikipedia.org/wiki/Jamal_Benomar (last visited July 22, 2018).

[2] Ben Schreckinger, "Broidy accuses Ex-diplomat of being secret Qatari agent," Politico, July 20, 2018 (a U.N. official stating that Benomar left the organization in 2017).

envoy for Yemen, Benomar invariably sided with Houthi rebels backed by Qatar and Iran against the lawful Yemeni government.  As one media outlet described: " when he stepped down [as envoy for Yemen], it was amid a host of questions about his loyalty to the United Nations, his independence and his self-promotion into a lucrative job at the United Nations. The media in the Gulf region criticised Benomar after he left his position. Many articles questioned his faithfulness and sometimes accused him of being biased towards the Houthi rebels from Saada in the north of the country."[3]

7. During his tenure at the United Nations, his activities reflect a bias towards the interests of Qatar.  On February 3, 2013, while serving as United Nations envoy for Yemen, Benomar tweeted, "I had the honour to meet HH the Emir of Qatar today & enjoyed a fruitful discussion on #Yemen and the region."  On March 16, 2013, the *Gulf Times* (an English-language newspaper published in Qatar by Qatar's former deputy Prime Minister) reported that Benomar and the then-Crown Prince, now-Emir, of Qatar discussed topics including "co-operation between Qatar and the UN[.]" *See* http://www.gulf-times.com/story/352835/Heir-Apparent-meets-UN-adviser-on-Yemen. In 2014, Mr. Benomar spoke at a conference in Qatar sponsored by the Doha Institute, and in 2015 he selected Doha, Qatar as the location for high-level talks on Yemen.

8. The telephone records of Benomar show that he had frequent telephonic contact between October 2017 and June 2018 with senior Qatari officials and members of the conspiracy identified in the Amended Complaint in the action identified in Para. 15, *infra*, during times critical to the attack against Plaintiffs.

---

[3] http://www.middleeasteye.net/essays/did-former-un-special-envoy-yemen-legitimise-houthi-coup-1286094203.

9. Upon information and belief, Benomar has directly worked for Qatar since at least 2017. In that role, he serves as a secret and unregistered agent of a foreign power and has significant responsibility for coordinating Qatari influence operations in the United States.

## JURISDICTION

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

11. Additionally, this Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because Plaintiffs are all citizens of the state of California and Benomar is a resident of the state of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant resides in this district.

## STATEMENT OF FACTS

13. Plaintiffs in this action are also Plaintiffs in an action pending in the United States District Court for the Central District of California captioned *Broidy Capital Management, et al. v. State of Qatar, et al.*, Case No. 18-CV-2421 ("California Action").

14. The defendants in the California Action are the State of Qatar, Stonington Strategies LLC, Nicolas D. Muzin, Global Risk Advisors LLC, Kevin Chalker, David Mark Powell, Mohammed Bin Hamad Bin Khalifa Al Thani, Ahmed Al-Ruhmaihi, and certain Doe defendants.

15. The California Action alleges a conspiracy by which Qatar, acting through various agents, directed and orchestrated a sophisticated criminal hack of computer systems

belonging to Plaintiffs. The conspiracy further extended to the careful review, analysis, categorization, and distribution of hundreds of thousands of stolen documents to various media outlets for the purpose of harming Plaintiff Broidy. A full description of that conspiracy, in which dozens of individuals are believed to have been involved, is contained in the May 24, 2018 First Amended Complaint filed in the California Action ("California FAC"). A true and correct copy of the California FAC is attached as Exhibit A, and the allegations contained therein are incorporated herein as if set out in full.

16. Benomar is referred to in paragraph 7 of the California FAC filed on May 24, 2018 as "a retired Moroccan diplomat" and thus identified in that action as a participant in the conspiracy that targeted Plaintiffs.

17. This action is primarily concerned with the second phase of the conspiracy—the review, analysis, categorization, and distribution of stolen documents. On information and belief, Benomar was a key player in that work.

18. Plaintiffs in the California Action have commenced discovery. That discovery has included non-party subpoenas issued to Joseph "Joey" Allaham, who when subpoenaed had not been disclosed as an agent of Qatar. Allaham's failure to comply with the subpoena for his documents resulted in an enforcement action in this district before Judge Forrest, *Broidy Capital Management LLC and Elliott Broidy v. Joseph Allaham*, 18-MC-240 (S.D.N.Y.) ("Allaham Action"), since transferred to the Central District of California on July 5, 2018. *See* Allaham Action at Dkt. No. 19.

19. On June 6, Judge Forrest granted Plaintiffs' motion to compel the production of documents from Allaham. *See* Allaham Action at Dkt. No. 1. That same day, Nicolas D. Muzin, then one of most significant registered foreign agents of Qatar in the United States, claimed via

Twitter that his company (Stonington Strategies LLC) would no longer represent Qatar. As of the date of this filing, however, no FARA termination notice has been filed, and the Department of Justice's public records reflect that Stonington Strategies, LLC, is an "Active Registrant" and agent of Qatar.

20. Also the same day, June 6, Morton A. Klein, the President of the Zionist Organization of America ("ZOA"), which Allaham would later confirm received $100,000 from Qatar, issued a statement distancing himself from Qatar: "Qatar has taken some alarming steps backwards. I plan to discuss these serious concerns with my contacts with Members of the House and Senate and the Administration." After the public disclosures triggered by Judge Forrest's orders, Klein said ZOA would return the $100,000 the organization had received from Qatar.

21. Also on June 6, Allaham issued a statement to the media, published early the next morning, stating that he was "no longer affiliated" with Qatar, but that he would nonetheless belatedly register under FARA as a foreign agent of the State of Qatar.  He further stated publicly that "Qatar enjoys portraying themselves as the purveyor of peace in the region, but this could not be further from the truth."

22. On June 11, Judge Forrest issued two additional orders, both requiring immediate disclosure of documents by Allaham. *See* Allaham Action at Dkt. Nos. 4, 10.

23. Four days later, on June 15, Allaham registered as a foreign agent of the State of Qatar with the Department of Justice's National Security Division.

24. The Allaham and California Actions also appear to have driven Benomar into hiding. In connection with the California Action, Plaintiffs have been attempting to serve a non-party subpoena upon Benomar. The first such attempt was made on June 12, 2018, one day after Judge Forrest's second and third orders requiring immediate production of documents from

6

Allaham. In total, Plaintiffs have made six attempts at personal service on Benomar, during which time Plaintiffs' process servers have been offered various excuses by Benomar's wife and domestic employee as to his whereabouts.

25. As set forth more fully in Exhibit A, the State of Qatar sponsors and supports terrorism. Qatar has allowed and continues to allow itself to serve as a sanctuary for terrorist leaders and organizations, including but not limited to Al Qaeda (and its affiliates including Al-Shabab and Al Qaeda in Syria, also known as Al-Nusra Front or Jabhat Al-Nusra), Hamas, the Taliban, and the Muslim Brotherhood.

26. Numerous individuals residing in Qatar have been sanctioned by the United States Department of Treasury for raising funds for Al Qaeda.

27. On June 5, 2017, neighboring Middle Eastern states severed diplomatic relations with Qatar and imposed an economic embargo against it because of its support for terrorism and its close ties to Iran. Other governments quickly followed. The sanctioning states issued a set of demands to Qatar including that Qatar curb ties with Iran and stop funding terrorist organizations. Those demands were rejected.

28. President Trump denounced Qatar and sided with the efforts to embargo Qatar, tweeting on June 6, 2017: "During my recent trip to the Middle East I stated that there can no longer be funding of Radical Ideology. Leaders pointed to Qatar - look!"

29. Although Qatar is a nation rich in natural gas resources, it relies heavily on imports to sustain its economy. Consequently, the international sanctions—and the support the President Trump expressed for them—threatened to devastate Qatar's economy and plunged Qatar into crisis.

30. Qatar responded to the sanctions by trying to build influence within the United States. On information and belief, Benomar helped to mastermind Qatar's strategy to build influence in the United States.

31. Part of this effort included work to build influence within the American Jewish community, which generally supported the sanctions as an appropriate reaction to Qatar's sponsorship of terrorism directed at Jews and the State of Israel. Benomar made repeated calls and sent multiple text messages to individuals that Qatar was seeking to influence, including ZOA President Mort Klein and Harvard Law School Professor Emeritus Alan Dershowitz.

32. Benomar spoke by phone with ZOA President Mort Klein on January 25, 2018. This was approximately two weeks after Klein returned from Qatar and two days after Allaham claimed to have given the second $50,000 payment from the State of Qatar to ZOA. Among the at least 25 calls and texts between Klein and Benomar, Klein called Benomar on the morning of June 6, 2018, the same day that Judge Forrest ordered discovery of Allaham and that Klein issued his statement claiming to break ties with the State of Qatar.

33. Benomar exchanged multiple text messages with Dershowitz, who also called Benomar on February 22, 2018, days before Dershowitz traveled to Qatar for his second visit to Qatar in 2018. On that visit, Dershowitz delivered a speech in Doha (the capital of Qatar) that was officially sponsored by the Qatar Foundation, which acts to further the interests of the State of Qatar and has had extensive affiliations with radical cleric Yusuf al-Qaradawi. The Qatar Foundation is owned or controlled by the Qatari ruling family.

34. A significant part of Qatar's strategy was to try to curtail the influence of prominent Americans, like Plaintiff Broidy, who were opposed to Qatar.

35. In 2017, Plaintiff Broidy became a vocal critic of Qatar's support for terrorists and Qatar's friendly relationship with Iran. Plaintiff Broidy, who views Qatar as a major threat to the security of the United States and its allies, began to provide financial support for public initiatives—such as conferences—to educate Americans about Qatar's support for terrorist organizations.

36. During 2017 and continuing into 2018, Plaintiff Broidy regularly conveyed his criticism of Qatar in meetings with United States Government officials, including President Trump.

37. As set forth more specifically in Exhibit A, Qatar was aware of Plaintiff Broidy's criticism of Qatar's policy and efforts to influence American opinion leaders, and specifically focused its efforts on him.

38. For example, as set forth in Exhibit A, Qatari officials believed that Plaintiff Broidy had prompted President Trump's public criticism of Qatar in June 2017. Similarly, Qatar was aware of Broidy's outspoken opposition to Qatar's efforts to invite prominent American Jewish leaders to visit Qatar or to meet with the Emir of Qatar when he visited the United States.

39. In late 2017 and early 2018, Qatar, acting through agents both in the United States and abroad, conducted a sophisticated computer hack on Plaintiffs' California-based computer systems.

40. The attack, which appears to have been executed from locations in at least Qatar and the United States, included thousands of instances where the attackers connected to Plaintiffs' computer systems, resulting in the theft of many gigabytes of data from Plaintiffs, including trade secrets and personal information.

41. After the documents and information were taken from Plaintiffs' computer systems, they were carefully reviewed and organized thematically for distribution to the media.

42. On information and belief, Benomar was a key participant in this process. On information and belief, Benomar was aware that the documents that were being reviewed, organized, and distributed had been stolen from Plaintiffs, but he nevertheless participated in the criminal hacking conspiracy.

43. On information and belief, as part of his participation in the hacking conspiracy, Defendant Benomar helped to mastermind the dissemination of stolen materials to the media and other third parties. On information and belief, as part of his involvement with the conspiracy, Defendant spoke regularly with senior Qatari officials about elements of the conspiracy.

44. On information and belief, co-conspirators in the United States converted the stolen documents from their native electronic format into PDFs and hard copy documents that were then disseminated to United States media outlets. PDFs were disseminated through email and hard-copies by hand-delivery within the United States.

45. As set forth in detail in Exhibit A, starting in late February 2018, and continuing to the present, members of the conspiracy in which Benomar participated distributed the stolen materials to media outlets in the United States, which subsequently published articles based on the stolen materials.

46. During all pertinent time periods – including during planning periods prior to the attack on Plaintiffs, during and just after the hack, during the media-focused portion of the attack, and as the parallel proceedings were launched and reached important milestones – Benomar engaged in increased frequency of contacts with key participants in the conspiracy and with individuals in Qatar. For example, on December 14, Benomar spoke with Muzin. On December

15, Muzin received a $500,000 payment from Qatar, days before the attack on Plaintiffs commenced. Benomar also spoke with then-undisclosed Qatari agent Allaham frequently at the end of November 2017, when the attack against Plaintiffs is believed to have been in its planning stages.

47. Benomar also engaged in over 80 calls and texts with at least four cell phone numbers for which extensive public records searching has not been able to identify a registered owner or user. Calls and texts between Benomar and those phone numbers coincide with key dates in the hack itself and the media phase of the conspiracy, as well as the $500,000 payment paid by Qatar to Muzin on December 15, 2017.

48. Moreover, Benomar had extensive interactions with California Action defendant Ahmed Al-Rumaihi, who as a former Qatari diplomat and executive with the Qatar Investment Authority has access to billions of dollars in capital. Benomar and Al-Rumaihi had at least 47 calls and texts in February and March 2018, as Broidy's e-mails were being prepared for dissemination and through the end of the first month of damaging media stories based on those e-mails.

49. On March 19, 2018, Plaintiffs, through counsel, formally requested that the State of Qatar take appropriate action to halt the attacks on Plaintiffs' emails, documents, and data, to stop the attackers from disseminating Plaintiffs' emails, documents, and data, and/or to assist Plaintiffs in halting dissemination if the hack had been conducted by a rogue agent of the State of Qatar. However, to date, no response has been received to that letter.

50. Media outlets in the United States and abroad continue to publish—and to represent that they will publish—materials stolen from Plaintiffs by the conspiracy in which Defendant Benomar is a participant.

## FOR A FIRST CAUSE OF ACTION:
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.

51.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

52.     The materials that the attackers stole from Plaintiffs' computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

53.     The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

54.     Plaintiffs take and have taken reasonable measures to keep this information secret. For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

55.     Plaintiffs' trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

56.     On information and belief, Benomar participated in the conspiracy to acquire and disseminate Plaintiffs' trade secrets knowing or having reason to know that the trade secrets were acquired by improper means.  On information and belief, Benomar also disclosed, or aided in the disclosure of, the trade secrets on multiple occasions by sharing those trade secrets with media organizations, as discussed herein, while knowing or having reason to know that the trade secrets were acquired by improper means.

57. As a direct consequence of Benomar's misappropriation, Plaintiffs have suffered damages, which include, but are not limited to, damage resulting from harm to Plaintiffs' computers and servers, loss in the value of Plaintiffs' trade secrets and business information, and harm to Plaintiffs' business, in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

58. Furthermore, on information and belief, as a direct consequence of Benomar's unlawful misappropriation, he has unjustly benefited from possession of Plaintiffs' trade secrets.

59. In misappropriating Plaintiffs' trade secrets, Benomar acted willfully and maliciously. Plaintiffs are thus entitled to exemplary damages and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

## FOR A SECOND CAUSE OF ACTION: CONVERSION OF STOLEN PROPERTY

60. Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

61. Plaintiffs had a possessory right and interest in the documents and information stolen during the hack on Plaintiffs' computer systems.

62. Among the rights Plaintiffs had over the stolen documents was the right of exclusion, preventing others from having access to those documents.

63. On information and belief, Benomar participated in the conspiracy that received and converted the stolen documents knowing that they had been stolen from Plaintiffs.

64. On information and belief, Benomar and/or his co-conspirators exercised dominion over the stolen documents, and derogated Plaintiffs' right to exclusion both through his own possession and through dissemination to various media outlets.

65. Plaintiffs were harmed thereby in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

## FOR A THIRD CAUSE OF ACTION:
## UNJUST ENRICHMENT

66. Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

67. On information and belief, Benomar received compensation for his services rendered to Qatar.

68. The purpose of the illegal hack and dissemination to the media of information stolen from Plaintiffs' computer servers were to cause Plaintiffs embarrassment, as well as financial and emotional harm.

69. The illegal hack and dissemination did in fact cause Plaintiffs embarrassment, as well as financial and emotional harm, including damaged business prospects and having to resign from certain positions of value to Plaintiff Broidy.

70. Equity and good conscience require restitution of the monies earned by Benomar from Qatar to Plaintiffs.

## FOR A FOURTH CAUSE OF ACTION:
## CIVIL CONSPIRACY

71. Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

72. On information and belief, Benomar willfully, intentionally, and knowingly agreed and conspired with the defendants in the California Action and with others known and unknown to engage in the wrongful conduct alleged herein, including but not limited to

possessing, analyzing, editing, compiling, and distributing to third-parties documents, information, and trade secrets stolen from Plaintiffs' computer systems.

73. On information and belief, Benomar knew that the documents, information, and trade secrets that the conspirators were involved in possessing, analyzing, editing, compiling, and distributing had been stolen from Plaintiffs' computer systems.

74. Plaintiffs were harmed thereby in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

## REQUEST FOR RELIEF

75. Plaintiffs repeat and re-allege the allegations contained in each and every preceding paragraph of this Complaint.

76. Plaintiffs request that this Court order the following relief:

   a. Grant judgment in favor of Plaintiffs and against Defendant;

   b. Enjoin Defendant against dissemination of the documents and information stolen from Plaintiffs;

   c. Award Plaintiffs an appropriate amount in monetary damages as determined at trial, including interest;

   d. Award Plaintiffs punitive damages under 18 U.S.C. § 1836(b)(3);

   e. Award Plaintiffs attorneys' fees and the costs of bringing this action; and

   f. Grant Plaintiffs such other relief as is just and appropriate.

Content:

Dated: July 23, 2018
      New York, New York

                */s/ Lee S. Wolosky*
                Lee S. Wolosky
                Robert J. Dwyer
                Joshua J. Libling
                BOIES SCHILLER FLEXNER LLP
                575 Lexington Avenue
                New York, NY 10022
                Phone: 212-446-2300
                Fax: 212-446-2350
                lwolosky@bsfllp.com
                rdwyer@bsfllp.com
                jlibling@bsfllp.com