## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BROIDY CAPITAL MANAGEMENT LLC
and ELLIOTT BROIDY,

Plaintiffs,

    v.

JAMAL BENOMAR,

Defendant.

Case No. 18-CV-6615-CS

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT JAMAL BENOMAR'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) <u>OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

      A.     Mr. Benomar's United Nations Diplomatic Career ................................. 3

      B.     Mr. Benomar's Diplomatic Career as a Moroccan Diplomat ................................ 5

      C.     The Complaint Through the Appropriate Geopolitical Lens ................................ 8

      D.     The California Action ....................................................................... 12

ARGUMENT ................................................................................................................... 13

I.      Standard Of Review ............................................................................... 14

II.     Mr. Benomar Is A Diplomat Immune From Suit ................................................ 14

      A.     Diplomatic immunity is effective the moment the United States is notified ........ 17

      B.     Diplomatic status immunity prohibits suits regarding acts committed prior to the diplomatic mission ........................................................................ 18

      C.     The commercial activities exception does not apply ........................................... 20

III.    Mr. Benomar Has Derivative Sovereign Immunity ........................................ 21

CONCLUSION ............................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdulaziz v. Metro. Dade County*,
   741 F.2d 1328 (11th Cir. 1984) ................................................................18, 19

*Ahmed v. Hoque*,
   No. 01 CIV. 7224 (DLC), 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002) ............................15

*Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigration Servs.*,
   No. 17-12709, 2018 WL 3660253 (11th Cir. Aug. 2, 2018) ..................................................17

*Brzak v. United Nations*,
   597 F.3d 107 (2d Cir. 2010)..................................................................... 15-16

*Butters v. Vance Int'l, Inc.*,
   225 F.3d 462 (4th Cir. 2000) ...................................................................23

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993)...................................................................22

*Chuidian v. Philippine Nat'l Bank*,
   912 F.2d 1095 (9th Cir. 1990) ...................................................................23

*Devi v. Silva*,
   861 F. Supp. 2d 135 (S.D.N.Y. 2012)................................................ 14, 16, 18-19

*Gonzalez Paredes v. Vila*,
   479 F. Supp. 2d 187 (D.D.C. 2007) ...........................................................20, 21

*Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to the United Nations in New York*, No. 15 CV 8693 (VB), 2016 WL 3351180, (S.D.N.Y. June 15, 2016) ................................................................................................20

*Luckett v. Bure*,
   290 F.3d 493 (2d Cir. 2002)..................................................................14

*MMA Consultants 1, Inc. v. Republic of Peru*,
   719 F. App'x 47 (2d Cir. 2017) ...............................................................22

*Montuya v. Chedid*,
   779 F. Supp. 2d 60 (D.D.C. 2011) ............................................................21

*Moriah v. Bank of China Ltd.*,
   107 F. Supp. 3d 272 (S.D.N.Y. 2015)..........................................................22, 23

ii

*Permanent Mission of India v. City of New York,*
    551 U.S. 193 (2007)..............................................................................................21-22

*Republic of Argentina v. NML Capital, Ltd.,*
    134 S. Ct. 2250 (2014)................................................................................................22

*Republic of Iraq v. Beaty,*
    556 U.S. 848 (2009).....................................................................................................21

*Republic of Philippines by Cent. Bank of Philippines v. Marcos,*
    665 F. Supp. 793 (N.D. Cal. 1987) ............................................................................18

*Sabbithi v. Al Saleh,*
    605 F. Supp. 2d 122 (D.D.C. 2009) ...........................................................................21

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ...............................................................................................22-23

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993).....................................................................................................22

*Swarna v. Al-Awadi,*
    622 F.3d 123 (2d Cir. 2010).......................................................................................15

*Tabion v. Mufti,*
    73 F.3d 535 (4th Cir. 1996) ......................................................................... 15, 16-17, 20

*Tabion v. Mufti,*
    877 F. Supp. 285 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996)...................21

*Tachiona v. Mugabe,*
    169 F. Supp. 2d 259 (S.D.N.Y. 2001)...................................................................17-18

*Tachiona v. United States,*
    386 F.3d 205 (2d Cir. 2004)........................................................... 14, 15, 17-18

*United States v. Khobragade,*
    15 F. Supp. 3d 383 (S.D.N.Y. 2014)..................................................................14, 15, 18

*Van Aggelen v. United Nations,*
    311 F. App'x 407 (2d Cir. 2009) ................................................................................15

*Whitehurst v. 230 Fifth, Inc.,*
    998 F. Supp. 2d 233 (S.D.N.Y. 2014)........................................................................24

*Yousuf v. Samantar,*
    699 F.3d 763 (4th Cir. 2012) .....................................................................................23

## Statutes and Treaties

22 U.S.C. § 254d...................................................................................................14

28 U.S.C. § 1602 *et al.*......................................................................................20

28 U.S.C. § 1604..................................................................................................21

61 Stat. 3416, 11 U.N.T.S. 11 (Oct. 21, 1947) .......................................................6, 14

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (Apr. 18, 1961)................... *passim*

## Federal Rules

Fed. R. Civ. P. 12(b)(1)..........................................................................................14

## United Nations Statements and Materials

Secretary-General, Note to Correspondents on Jamal Benomar Stepping Down as
  Special Adviser on Yemen, (Apr. 15, 2015), found at
  https://www.un.org/sg/en/content/sg/note-correspondents/2015-04-15/note-
  correspondents-jamal-benomar-stepping-down-special. .......................................4, 5

United Nations Blue Book, Protocol and Liaison Service,
  https://protocol.un.org/dgacm/pls/site.nsf/eBlueBook.xsp .....................................8

U.N. Press Release SG/A/-1365-BIO/4388, Secretary-General, Jamal Benomar
  Appointed Special Adviser to Secretary-General on Yemen, (August 1, 2012) ...................4

U.N. Press Release SG/A/1604- BIO/4780, Secretary-General Appoints Jamal
  Benomar of United Kingdom Special Adviser, (Nov. 9, 2015)............................................3, 4

U.N. Press Release SC/10460, Security Council Press Statement on Situation in
  Yemen, (Nov. 28, 2011). ...........................................................................................4

## Other Authorities

Al-Arabiya Video, YOUTUBE (Oct. 17, 2018), found at
  https://www.youtube.com/watch?v=KwiawheJjAA&feature=youtu.be ...............................11

Associated Press, *Guilty Plea in Fraud Case Tied to New York Pension*, N.Y.
  TIMES (Dec. 4, 2009),
  https://www.nytimes.com/2009/12/04/nyregion/04pension.html............................................2

Butler, D.  and LoBianco, T., *The Princes, the President and the Fortune Seekers*,
AP (May 21, 2018),
https://apnews.com/a3521859cf8d4c199cb9a8567abd2b71) ...............................................2, 9

DeYoung, K. and Nakashima, E., WASH. POST, *UAE Orchestrated Hacking of
Qatari Government Sites, Sparking Regional Upheaval, According to U.S.
Intelligence Officials* (Jul. 16, 2017),
https://www.washingtonpost.com/world/national-security/uae-hacked-qatari-
government-sites-sparking-regional-upheaval-according-to-us-intelligence-
officials/2017/07/16/00c46e54-698f-11e7-8eb5-
cbccc2e7bfbf_story.html?utm_term=.3666d05a8b5d. ......................................................10

Emmons, A., The Intercept, *Saudi Arabia Planned to Invade Qatar Last Summer,
Rex Tillerson's Efforts to Stop It May Have Cost Him His Job* (Aug. 1, 2018),
https://theintercept.com/2018/08/01/rex-tillerson-qatar-saudi-uae/.......................................10

Hassan, H., *Qatar Won the Saudi Blockade*, Foreign Policy (Jun 4, 2018),
https://foreignpolicy.com/2018/06/04/qatar-won-the-saudi-blockade/ ...................................11

JTA, *Jewish Republican donor took $2.7m from UAE lobbyist to influence Trump
– report*, THE TIMES OF ISRAEL (Mar. 22, 2018),
https://www.timesofisrael.com/jewish-republican-donor-took-2-7m-from-uae-
lobbyist-to-influence-trump-report/ ........................................................................................9

Katzman, K., *Qatar: Governance, Security, and U.S. Policy*, Cong. Research
Serv. (Aug. 13, 2018)..................................................................................................1, 10

Leonning, C., Barrett, D., Nakashima, E., & Dawsey, J., *GOP Fundraiser Broidy
Under Investigation for Alleged Effort to Sell Government Influence, People
Familiar with Probe Say*, WASH. POST (Aug. 17, 2018),
https://www.washingtonpost.com/politics/gop-fundraiser-broidy-under-
investigation-for-alleged-effort-to-sell-government-influence-people-familiar-
with-probe-say/2018/08/17/c9e55792-a185-11e8-8e87-
c869fe70a721_story.html?noredirect=on.&utm_term=.440138ceb144..................................9

*New report details extensive financial ties between Rick Gates and a top
Republican fundraiser*, Business Insider (Jul. 25, 2018),
https://www.businessinsider.com/financial-ties-rick-gates-elliott-broidy-2018-
7.....................................................................................................................................2

Rothfeld, M. and Palazzolo, J., *Top GOP Fundraiser to Stop Hush Payments
Over Affair*, WALL ST. J., (Jul. 1, 2018), ://www.wsj.com/articles/top-gop-
fundraiser-to-stop-hush-payments-over-affair-1530477047) ..................................................2

Strachan, M. and Schulberg, J., *Leaked Emails Appear to Show a Top Trump
Fundraiser Abusing His Power*, Huffington Post (Mar. 2, 2018),
https://www.huffingtonpost.com/entry/elliott-broidy-trump-malaysia-
doj_us_5a988471e4b0a0ba4ad18d65)...................................................................................2

@qatarileaks, TWITTER (Oct. 21, 2018, 9:00 PM), found at
    https://twitter.com/qatarileaks/status/1054220801937829888?s-12........................................11

U.S. Dep't of State, *Diplomatic and Consular Immunity: Guidance for Law
    Enforcement and Judicial Authorities* (June 2015),
    https://www.state.gov/documents/organization/150546.pdf ............................................ 16-17

*UN Yemen Envoy Jamal Benomar Resigns Amid Crisis*, Al Jazeera (Apr. 16,
    2015) https://www.aljazeera.com/news/2015/04/yemen-envoy-jamal-
    benomar-resigns-150416011826230.html ..............................................................................10

*UN Envoy to Yemen Resigns*, Reuters (Apr. 16, 2015),
    https://www.reuters.com/article/us-yemen-security-un/u-n-envoy-to-yemen-
    resigns-idUSKBN0N62O020150416 ......................................................................................10

*UN Mediator for Yemen Conflict Leaving Post*, N.Y. TIMES (Jan 22, 2018),
    https://www.nytimes.com/2018/01/22/world/middleeast/yemen-un-
    envoy.html ...............................................................................................................................10

Vogel, K. and Kirkpatrick, D., *Fund-Raiser Held Out Access to Trump as a Prize
    for Prospective Clients*, N.Y. TIMES (Mar. 25, 2018),
    https://www.nytimes.com/2018/03/25/us/politics/elliott-broidy-trump-access-
    circinus-lobbying.html)..............................................................................................................2

Wood, J. *How a Diplomatic Crisis Among Gulf Nations Led to a Fake News
    Campaign in the United States*, USA Today (July 25, 2018),
    https://www.usatoday.com/story/news/world/2018/07/25/how-diplomatic-
    crisis-among-gulf-nations-led-fake-news-campaign-united-states/831931002/......................11

*Why Saudis Derailed Imminent Yemen Deal with Airstrikes*, The Real News
    Network (Apr. 28, 2015) https://therealnews.com/stories/jlauria0427yemen ..........................9

Defendant Jamal Benomar ("Benomar") moves this Court to dismiss with prejudice the Complaint because (i) he has, and the United States received notice of his, diplomatic immunity, affording him, *inter alia*, immunity from civil suits under the Vienna Convention on Diplomatic Relations ("VCDR") and applicable U.S. law; and (ii) Mr. Benomar's alleged actions, accepting Plaintiffs' allegations as true, were at the request and on behalf of a sovereign and would therefore be protected under the doctrine of derivative sovereign immunity.

## INTRODUCTION

Jamal Benomar has been and continues to be a respected, internationally recognized diplomat who has devoted his life to the peaceful resolution of conflict. *See generally* Declaration of Jamal Benomar ("Benomar Decl."). For twenty-four years, Mr. Benomar worked as a dedicated public servant on behalf of the United Nations where he was entrusted with some of the most important and sensitive assignments of that international organization. *Id.* ¶¶ 7-30. In this capacity, he assisted more than forty governments in Africa, Latin America, the Middle East, Eastern Europe, and Asia to ensure that their laws, policies and institutions are protective of human rights. *Id.* ¶ 8. More recently, and of particular relevance here, Mr. Benomar is currently a Moroccan diplomat, with all the rights and privileges attendant to that status. *Id.* ¶¶ 30-36. In his role as a Moroccan diplomat, at Morocco's request, Mr. Benomar has provided foreign policy advice to a variety of Morocco's neighbors, including Qatar, with the hope that he may bridge differences among the States in the region—a goal shared by the United States. *Id.* ¶¶ 32-34.[1]

As the media has detailed and generally described in Mr. Benomar's Declaration, the countries in the Gulf Cooperation Council ("GCC") have been at odds for some time and have

---

[1] *See also* Katzman, K., *Qatar: Governance, Security, and U.S. Policy*, Cong. Research Serv. (Oct. 4, 2018).

been fighting with each other in world forums, in diplomatic actions, and in the media.  In what appears to be yet another front in which these countries are battling, in March of this year, Plaintiffs Elliot Broidy ("Broidy") and Broidy Capital Management commenced an action in the United States District Court for the Central District of California, alleging that Mr. Broidy's emails were stolen and then disseminated by the State of Qatar and their agents to members of the media, where embarrassing information about his personal and professional conduct was published, including references to his criminal record, his involvement with and agreement to pay a woman with whom he was having or had a relationship, and his solicitation of enormous sums of money from foreign entities or people to influence actions in the U.S.[2]  When the California court was on the verge of dismissing the lawsuit, ultimately dismissing each and every defendant, Mr. Broidy brought this action, blaming—falsely—this career diplomat not for the alleged hacking but for allegedly reviewing and disseminating his emails.

Mr. Broidy's allegations are not only false (Mr. Benomar neither was involved in hacking nor disseminating as alleged), but, as shown below, cannot even be heard in this forum.  Rather, Mr. Benomar is absolutely immune from suit in this country as a diplomat of the Kingdom of

---

[2] *See* Associated Press, *Guilty Plea in Fraud Case Tied to New York Pension*, N.Y. TIMES (Dec. 4, 2009), found at https://www.nytimes.com/2009/12/04/nyregion/04pension.html; Rothfeld, M. and Palazzolo, J., *Top GOP Fundraiser to Stop Hush Payments Over Affair*, WALL ST. J., (Jul. 1, 2018), found at https://www.wsj.com/articles/top-gop-fundraiser-to-stop-hush-payments-over-affair-1530477047); Vogel, K. and Kirkpatrick, D., *Fund-Raiser Held Out Access to Trump as a Prize for Prospective Clients*, N.Y. TIMES (March 25, 2018), found at https://www.nytimes.com/2018/03/25/us/politics/elliott-broidy-trump-access-circinus-lobbying.html); Strachan, M. and Schulberg, J., *Leaked Emails Appear to Show a Top Trump Fundraiser Abusing His Power*, Huffington Post (Mar. 2, 2018), found at https://www.huffingtonpost.com/entry/elliott-broidy-trump-malaysia-doj_us_5a988471e4b0a0ba4ad18d65); *New report details extensive financial ties between Rick Gates and a top Republican fundraiser*, Business Insider (Jul. 25, 2018), found at https://www.businessinsider.com/financial-ties-rick-gates-elliott-broidy-2018-7); Butler, D. and LoBianco, T., *The Princes, the President and the Fortune Seekers*, AP (May 21, 2018), found at https://apnews.com/a3521859cf8d4c199cb9a8567abd2b71).

Morocco. His enjoyment of "status" immunity protects him from legal actions of any kind, including civil lawsuits and discovery, from the moment the United States was notified of his diplomatic status. Separately, his conduct on behalf of the sovereigns for whom he has provided advice renders his conduct and communications derivatively immune as well. Plaintiffs' complaint should be dismissed with prejudice in its entirety.

## BACKGROUND

### A.    Mr. Benomar's United Nations Diplomatic Career

Mr. Benomar is a "veteran United Nations senior leader" whose long diplomatic career has been focused on peacebuilding and human rights.[3] He has served with distinction at the Office of the High Commissioner for Human Rights, the United Nations Development Programme, and the Department of Political Affairs.[4] At various times, he served as Interim Director of the Peacebuilding Support Office in the Executive Office of Secretary-General, as the Director of Rule of Law in the same office, and as a Senior Advisor to the UN Mission in Afghanistan and Iraq.

When Mr. Benomar served in the Office of the High Commissioner for Human Rights, he devoted his professional life to working with foreign governments to develop and enact domestic laws to ensure compliance with their international law human rights obligations. Benomar Decl. at ¶ 7-8. At the UN Development Programme, Mr. Benomar advised on governance, rule of law, and conflict issues. *Id.*

Mr. Benomar has also "played a key role in establishing the United Nations Peacebuilding Commission and Peacebuilding Support Office, which he also directed."[5] In this capacity, Mr.

---

[3] *See* Press Release, Secretary-General, Secretary-General Appoints Jamal Benomar of United Kingdom Special Adviser, U.N. Press Release SG/A/1604- BIO/4780 (Nov. 9, 2015).

[4] *Id.*

[5]  *See* U.N. Press Release SG/A/1604- BIO/4780, *supra* note 3.

Benomar's work took him to some of the most dangerous places in the world. He was deployed to Afghanistan where he advised on governance and rule of law issues, and the establishment of an interim government after the toppling of the Taliban government. Benomar Decl. at ¶ 11. He played an important role in Iraq, where he worked with various Iraqi factions and the U.S. to facilitate the establishment of the first post-war interim government. He also led the organization of the National Dialogue Conference—the body that elected the interim parliament after the war. *Id.*

In 2011, the UN Secretary-General appointed Mr. Benomar as his Special Adviser on Yemen, in which position Mr. Benomar successfully brokered a transition agreement for the country.[6] That agreement has the distinction of constituting the only agreement the UN successfully brokered during the entirety of the Arab Spring.[7] The UN Security Council commended Mr. Benomar by name for his tireless efforts to obtain an agreement.[8] For four years, Mr. Benomar worked "closely with the Yemenis to realise their legitimate aspirations for democratic change fulfilled."[9] In all, Mr. Benomar traveled to Yemen more than three dozen

---

[6] *See* Press Release, Secretary-General, Jamal Benomar Appointed Special Adviser to Secretary-General on Yemen, U.N. Press Release SG/A/-1365-BIO/4388 (August 1, 2012)("Mr. Benomar, who was served as the Special Adviser on Yemen since April 2011…").

[7] Benomar Decl. at ¶ 14; *see also* U.N. Press Release SG/A/1604- BIO/4780, *supra* note 3.

[8] *See* Press Release, Security Council, Security Council Press Statement on Situation in Yemen, U.N. Press Release SC/10460 (Nov. 28, 2011); Statement, Secretary-General, Note to Correspondents on Jamal Benomar Stepping Down as Special Adviser on Yemen, (Apr. 15, 2015), found at https://www.un.org/sg/en/content/sg/note-correspondents/2015-04-15/note-correspondents-jamal-benomar-stepping-down-special.

[9] *See* Statement, Secretary-General, Note to Correspondents on Jamal Benomar Stepping Down as Special Adviser on Yemen, (Apr. 15, 2015), found at https://www.un.org/sg/en/content/sg/note-correspondents/2015-04-15/note-correspondents-jamal-benomar-stepping-down-special.

times, ultimately facilitating the ten-month-long National Dialogue Conference in 2014 and mediating the Peace and National Partnership Agreement.  Benomar Decl. at ¶ 21.

In March 2015, during what was then understood to be the final stages of highly sensitive and fragile talks headed by Mr. Benomar among the various Yemeni stakeholders, Saudi Arabia and the UAE (supported by Qatar, Morocco, and other countries) launched a controversial military offensive in Yemen in the face of Mr. Benomar's adamant and repeated warnings not to do so.  *Id.* at ¶ 22.  This "dramatic escalation of violence" unsurprisingly disrupted the negotiations.[10]  Mr. Benomar objected to the escalation and even raised the issue of the commission of possible war crimes.  Benomar Decl. at ¶ 23.  It is in this context that Mr. Benomar chose to step down as the Special Envoy to Yemen.  *Id.*  Then, in July 2017, as Under-Secretary-General, he left the UN, bringing to an end his distinguished twenty-four-year career at the organization. *Id.* at ¶ 30.

### B.    Mr. Benomar's Diplomatic Career as a Moroccan Diplomat

After his tenure at the UN, Mr. Benomar initially returned to Morocco.  That respite proved short-lived, as he soon accepted Morocco's request that he serve in Morocco's Permanent Mission to the United Nations in New York.  *Id.*  Morocco appointed Mr. Benomar both as a Senior Advisor and as Minister Plenipotentiary for the Political Section of the Permanent Mission of Morocco. Declaration of Abbe Lowell ("Lowell Decl.") at Exs. 4, 6-9.  The title of "Senior Advisor" was intended to confer all of the rights and privileges of diplomats.  *Id.* at Ex. 6.  Only when the issue arose of that title not conforming to some list maintained by the U.S. did Morocco notify the U.S. that his status was that of "Minister Plenipotentiary."  *Id.* at Ex. 7.  Morocco had already issued Mr. Benomar a full Diplomatic Passport on September 16, 2016. *Id.* at Ex. 2.  That passport

---

[10] *See* United Nations, *Note to Correspondents on Jamal Benomar Stepping Down as Special Adviser on Yemen* (Apr. 15, 2015), found at https://www.un.org/sg/en/content/sg/note-correspondents/2015-04-15/note-correspondents-jamal-benomar-stepping-down-special.

remained operative until it was replaced this week by another full Diplomatic Passport, this one not expiring until 2022. *Id.* at Ex. 1.

One year ago, on November 1, 2017, in recognition of his diplomatic status, the U.S. granted Mr. Benomar a G-1 (diplomatic) visa. *Id.* at Ex. 3. That visa remains operative and does not expire until October 30, 2022. *Id.* For the last twelve months, Mr. Benomar has, without interruption, acted in his capacity as a Moroccan diplomat for Morocco's Permanent Mission to the UN, traveling on his Diplomatic Passport and returning to the U.S. on his diplomatic visa. Benomar Decl. at ¶ 31.

Never in Mr. Benomar's diplomatic career—either at the UN nor for Morocco—has his diplomatic status ever been called into question.

Numerous officials serve their countries by working for the UN, which of course physically resides in the United States. Because of its status as a host nation, unlike the role of the U.S. in reviewing the credentials for foreign officials being presented as diplomats from their country to their embassies here, the U.S.' role with respect to diplomats working at the UN is limited to acknowledging and confirming the appointment.[11]

After Plaintiffs filed their first lawsuit in California and continuing when Plaintiff brought the current action in New York (and even recently), Mr. Benomar and his family began to experience numerous acts of harassment, including surveillance of their house by a car or cars

---

[11] Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, 11 U.N.T.S. 11 (entered into force Oct. 21, 1947) ("[e]very person designated by a Member . . . as a resident representative with the rank of ambassador or minister plenipotentiary . . . *shall*, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it." (emphasis added)).

parked outside, the same cars following his children (sometimes for 80 miles), and repeated attempts to gain access to Mr. Benomar's or his family members' mobile phones and records. Benomar Decl. at ¶ ¶ 37-38.  Given the onset of these intrusive events, the Permanent Mission of Morocco sought to provide Mr. Benomar with a U.S. document that it hoped would afford Mr. Benomar the protection to which he was entitled and end the harassment he had been experiencing. *Id.* at ¶ 39.

To this end, on August 1, 2018, the Permanent Mission provided the UN Office of Protocol with formal, written notification of Mr. Benomar's appointment as Special Adviser.[12]  Lowell Decl. at Ex. 4.  On or about August 27, 2018, the U.S. State Department issued Mr. Benomar a diplomatic identification card, but the U.S. incorrectly identified him as "Support Staff" for Morocco's Permanent Mission to the UN.  *Id.* at Ex. 5.  Immediately, the Permanent Mission sent a clarification letter to the Diplomatic Accreditations Officer of Host Country Affairs for the United States Permanent Mission to the United Nations explaining that Mr. Benomar's "high rank of Special Adviser," which Morocco noted he has held since November 2017, was intended to place Mr. Benomar at the full diplomat level, commensurate with his seniority and responsibilities, evidencing his diplomatic status immunity.  *Id.* at Ex. 6.

The Diplomatic Accreditations Officer at the U.S. Mission informed Morocco that the title of Special Adviser did not comport with the list the U.S. prefers of titles of ranks matching the diplomatic status about which it had been notified.  In an effort to conform its appointment to the U.S. request and to confirm his position and responsibilities at the Moroccan Mission, and to ensure that Mr. Benomar's immunity status reflects the same, Morocco's Permanent Mission

---

[12] The initial title of Senior Advisor described Mr. Benomar's work and not his rank.  When that was noticed, Morocco also made his rank clear.  Lowell Decl. at Exs. 7-9.

formally advised the U.S. Mission on September 21, 2018, that Mr. Benomar enjoys the title of Minister Plenipotentiary at the Permanent Mission of Morocco. *Id.* at Ex. 7.

On October 5, 2018, the Moroccan Ministry for Foreign Affairs and International Cooperation reaffirmed Mr. Benomar's status in a letter to the U.S. Embassy in Rabat and the Minister Counselor of Host Country Affairs at the U.S. Mission. *Id.* at Ex. 8. This letter expressly advised that Mr. Benomar's designation as Minister Plenipotentiary reflects the fact that he serves, and has served since November 1, 2017, at the level of diplomat, consistent with Mr. Benomar's past positions. *Id.* ("This verbal note confirms the appointment of Mr. Jamal BENOMAR to the post of *Minister Plenipotentiary* at the Permanent Mission of the Kingdom of Morocco to the United Nations in New York, updating the previous communications on this topic regarding its mission *since* 1 November 2017.") (emphasis added). The letter confirms that Mr. Benomar advises the "head of the mission on political issues relating to the UN, as well as on regional and international conflicts." *Id.* On October 10, 2018, the Moroccan Mission forwarded the October 5, 2018 letter to the United Nations Office of Protocol. *Id.* at Ex. 9.

The UN immediately issued Mr. Benomar its blue identification card, given to diplomats, recognizing his title as "Morocco Minister Plenipotentiary," *id.* at Ex. 11, and the United Nations Blue Book, Protocol and Liaison Service lists Mr. Benomar as "Minister Plenipotentiary." *Id.* at Ex. 10.

### C. The Complaint Through the Appropriate Geopolitical Lens

It has been widely reported that Mr. Broidy enjoys close relationships with foreign powers, including the UAE and Saudi Arabia.[13] Arising from these close ties, reports also state that there

---

[13] *See* JTA, *Jewish Republican donor took $2.7m from UAE lobbyist to influence Trump – report*, THE TIMES OF ISRAEL (Mar. 22, 2018), found at https://www.timesofisrael.com/jewish-republican-donor-took-2-7m-from-uae-lobbyist-to-influence-trump-report/ (in a meeting with President Trump, "Broidy reportedly urged the president to meet informally with [ ], UAE Crown Prince

is an ongoing criminal investigation of Mr. Broidy that extends to his alleged efforts to enlist UAE officials "to pressure the United States" to assist yet another of Mr. Broidy's sovereign clients.[14]

The UAE and the Saudis have long been averse to and have found various ways to quarrel with Qatar or those who advise that country. They also have serious differences with Morocco and with Mr. Benomar, at least arising from his criticism of their military intervention in Yemen, which, in Mr. Benomar's view, interfered with his mediation efforts in that country. Benomar Decl. at ¶¶ 22-24; *see also Why Saudis Derailed Imminent Yemen Deal with Airstrikes*, The Real News Network (Apr. 28, 2015), found at https://therealnews.com/stories/jlauria0427yemen (reporting that Mr. Benomar was close to reconciling the warring parties until onset of a new Saudi bombing campaign prompted by Saudi fear that a "successful negotiation . . . would bring about a progressive and democratic government in their backyard."); *UN Envoy to Yemen Resigns*, Reuters (Apr. 16, 2015), found at https://www.reuters.com/article/us-yemen-security-un/u-n-envoy-to-yemen-resigns-idUSKBN0N62O020150416 (noting that Mr. Benomar resigned only after Saudi

---

Mohammed bin Zayed al-Nahyan. He also called on Trump to back the UAE's policies in the region".); *see also* Desmond Butler and Tom LoBianco, *The Princes, the President and the Fortune Seekers*, AP (May 21, 2018), found at https://apnews.com/a3521859cf8d4c199cb9a8567abd2b71. ("[Broidy] had ingratiated himself with the crown princes from Saudi Arabia and the United Arab Emirates, who were seeking to alter U.S. foreign policy and punish Qatar, an archrival in the Gulf that he dubbed "the snake.").

[14] Leonning, C., Barrett, D., Nakashima, E., & Dawsey, J., *GOP Fundraiser Broidy Under Investigation for Alleged Effort to Sell Government Influence, People Familiar with Probe Say*, WASH. POST (Aug. 17, 2018), found at https://www.washingtonpost.com/politics/gop-fundraiser-broidy-under-investigation-for-alleged-effort-to-sell-government-influence-people-familiar-with-probe-say/2018/08/17/c9e55792-a185-11e8-8e87-c869fe70a721_story.html?noredirect=on.&utm_term=.440138ceb144.

bombing intensified during final stages of mediation and that the Saudis were "irked" by Mr. Benomar's mediation efforts).[15]

Within these ongoing disputes, on June 5, 2017, Saudi Arabia and other States at its behest severed diplomatic relations with Qatar,[16] a decision predicated on what appeared to have been UAE-fabricated quotes of Qatar's Emir.[17]  The Saudis and the UAE then moved to the brink of a military strike against Qatar that came perilously close to plunging the region into chaos, and would have but for the aggressive but then-secret intervention of the United States.[18]

At Morocco's direction, Mr. Benomar has consulted with and offered foreign policy advice to Qatar, including on its relations with Saudi Arabia and the UAE and the tensions among those GCC nations.  Benomar Decl. at ¶¶ 34-35.  Moreover, Mr. Benomar continues his longstanding

---

[15] *See also UN Yemen Envoy Jamal Benomar Resigns Amid Crisis*, Al Jazeera (Apr. 16, 2015) found at https://www.aljazeera.com/news/2015/04/yemen-envoy-jamal-benomar-resigns-150416011826230.html (Mr. Benomar "had come under criticism" from "particularly Saudi Arabia"); *UN Mediator for Yemen Conflict Leaving Post*, N.Y. TIMES (Jan 22, 2018), found at https://www.nytimes.com/2018/01/22/world/middleeast/yemen-un-envoy.html (noting that Mr. Benomar's successor was resigning and Mr. Benomar had resigned "a month after a Saudi Arabia-led coalition began intensively bombing Yemen's Houthi rebels, who had dislodged the Saudi-backed government and seized much of the country, including the capital, Sana" and further noting that Saudi Arabia had recently "imposed what humanitarian groups described as a draconian blockade on Yemen ports, raising fears of famine in the country.").

[16] *See* Katzman, K., *Qatar: Governance, Security, and U.S. Policy*, Cong. Research Serv. (Oct. 4, 2018) (citations omitted).

[17] *See* DeYoung, K. and Nakashima, E., WASH. POST, *UAE Orchestrated Hacking of Qatari Government Sites, Sparking Regional Upheaval, According to U.S. Intelligence Officials* (Jul. 16, 2017), found at https://www.washingtonpost.com/world/national-security/uae-hacked-qatari-government-sites-sparking-regional-upheaval-according-to-us-intelligence-officials/2017/07/16/00c46e54-698f-11e7-8eb5-cbccc2e7bfbf_story.html?utm_term=.3666d05a8b5d.

[18] Emmons, A., The Intercept, *Saudi Arabia Planned to Invade Qatar Last Summer, Rex Tillerson's Efforts to Stop It May Have Cost Him His Job* (Aug. 1, 2018), found at https://theintercept.com/2018/08/01/rex-tillerson-qatar-saudi-uae/.

efforts to reconcile the warring parties in Yemen.  *Id.* at ¶ 35.  Mr. Benomar's efforts on these issues have not been well received in Riyadh and Dubai.

Saudi Arabia and the UAE continue to engage in an active public relations war against Qatar, having "long spent huge sums of money on Washington lobbyists and public relations firms."[19]  Since they "launched a boycott and blockade of the tiny peninsula state of Qatar," they have "initiated propaganda efforts in the US aimed at weakening Washington's alliance with Qatar . . . while also enhancing their own images."[20]  Among other vehicles, their efforts have extended to the creation of an active anti-Qatar website and other media outlets and magazines that deliver Saudi and Emirati propaganda while masking the sources of the allegations.  *See also* Hassan, H., *Qatar Won the Saudi Blockade*, Foreign Policy (Jun 4, 2018), found at https://foreignpolicy.com/2018/06/04/qatar-won-the-saudi-blockade/ ("[T]he Saudi camp initiated a massive public relations effort in Western capitals to increase diplomatic pressure on Qatar and turn public opinion against it").  Since this Court held its October 10, 2018 pre-motions conference, this effort has only intensified and has now specifically targeted Mr. Benomar.[21]  Someone

---

[19] Wood, J., *How a Diplomatic Crisis Among Gulf Nations Led to a Fake News Campaign in the United States*, USA Today (July 25, 2018), found at https://www.usatoday.com/story/news/world/2018/07/25/how-diplomatic-crisis-among-gulf-nations-led-fake-news-campaign-united-states/831931002/.

[20] *Id.*

[21] Just last week, the pro-Saudi news organization Al-Arabiya published a piece targeting Mr. Benomar and Qatar, which included many of the arguments being put forward by Plaintiff and his counsel, even directly quoting them.  Al-Arabiya Video, YOUTUBE (Oct. 17, 2018), found at https://www.youtube.com/watch?v=KwiawheJjAA&feature=youtu.be (transcript attached as Ex. A); *see also* @qatarileaks, TWITTER (Oct. 21, 2018, 9:00 PM), found at https://twitter.com/qatarileaks/status/1054220801937829888?s-12 (transcript attached as Ex. B).

continues to feed information, often demonstrably false, to media outlets attacking Mr. Benomar. Benomar Decl. at ¶ 40.

Because of the harassment experienced by the Benomar family since Plaintiffs brought their suits in California and New York and the new fierce campaign to focus media attention on him, Mr. Benomar believes all these actions are part of the efforts of some of GCC countries to penalize him for his diplomatic work. *Id.* at ¶ 41.

### D.    The California Action

On March 26, 2018, Broidy filed an action in the Central District of California against Qatar, Stonington Strategies LLC, and Nicholas Muzin.[22]   Compl. (Dkt. 1), *Broidy Capital Management, et al. v. State of Qatar, et al.*, Case No. 18-cv-2421 ("California Action").   The district court denied Broidy's application for extraordinary preliminary relief, noting that it had "serious concerns as to whether it ha[d] subject matter jurisdiction over this case with respect to Qatar" and that "Plaintiffs ha[d] failed to demonstrate a likelihood of success on the merits" because Plaintiffs failed to "provide admissible evidence demonstrating that any of the defendants . . . are responsible for the unauthorized access to Plaintiffs' email accounts or that any of the Defendants are in possession of or are responsible for disseminating the allegedly illegally-obtained emails and documents to various media outlets."  Op. (Dkt. 37), CA Action.

In response, Broidy filed an amended complaint with new defendants, all of whom (with the original defendants) moved to dismiss.  Dkts. 112, 129, 172, CA Action.  Broidy later opened a second front by filing this action against Mr. Benomar in this Court seeking to continue the discovery that he started in California but which is now denied to him there.  Dkt. 8.  On August

---

[22] Stonington Strategies LLC was a lobbying firm hired by Qatar.  FAC (Dkt. 47) at 8, CA Action. Nicholas Muzin is CEO of Stonington and registered as a lobbyist for Qatar. *Id.*

8, 2018, the California court dismissed Qatar, holding that "Plaintiffs' claims against Qatar fall outside any applicable exception for the [Foreign Sovereign Immunities Act] and, therefore, the Court lacks subject matter jurisdiction over Qatar." Qatar Op. (Dkt. 198), CA Action. The California court shortly thereafter dismissed Muzin and Stonington on August 16, 2018 because it lacked personal jurisdiction. Stonington Op. (Dkt. 209), CA Action. In its opinion on these grounds, the California court noted that "Plaintiffs have failed to sufficiently allege that the Stonington Defendants committed any of the intentional acts, such as hacking Plaintiffs' computer systems or accounts or disseminating Plaintiffs' confidential and private information – that are at issue in this action." *Id.* And again, on August 22, the California court dismissed Global Risk Advisors and Chalker. While dismissing the action for lack of personal jurisdiction, the California court again criticized the sufficiency of Broidy's allegations, noting that "[t]he few scant allegations referring to the Global Risk Defendants are based on information and belief and Plaintiffs fail to allege any factual basis for any of these allegations." Global Risk Order at 9 (Dkt. 212), CA Action.[23]

Mr. Benomar is now the only remaining defendant in any Broidy suit. For the reasons outlined below, this Court should dismiss this action in its entirety.

## ARGUMENT

This case should be dismissed for two independent reasons. *First*, Mr. Benomar is a foreign diplomat immune from suit who has provided proper notice of his status to the U.S. *Second*, as the California court correctly found, Qatar is immune from suit and thus Mr. Benomar, who

---

[23] On September 24, 2018, Plaintiffs dismissed without prejudice the unserved defendants. *See* Plaintiffs' Notice of Dismissal (Dkt. 223), CA Action. The California court thereupon entered a final judgment in favor of all the defendants and against Broidy and his management company. *See* Order of Final Judgment (Dkt. 227), CA Action. Broidy has since appealed the dismissal of Qatar. *See* Pls.' First Am. Notice of Appeal (Dkt. 228), CA Action.

Broidy's own Complaint alleges is an "agent" of Qatar, by extension is immune from suit under the doctrine of derivative sovereign immunity. The case should also be dismissed based on derivative sovereign immunity from Morocco, because Mr. Benomar counseled Qatar at the request of his native country.

## I.      STANDARD OF REVIEW

Plaintiffs have the burden to establish subject matter jurisdiction by a preponderance of the evidence. *Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings." *Id.* (internal quotations and citations omitted).

## II.     MR. BENOMAR IS A DIPLOMAT IMMUNE FROM SUIT

Mr. Benomar is entitled to diplomatic immunity under the VCDR, 23 U.S.T. 3227 (Apr. 18, 1961), and the Diplomatic Relations Act ("DRA"), 22 U.S.C. § 254d. The VCDR applies to members of Permanent Missions to the United Nations. *Tachiona v. United States*, 386 F.3d 205, 217 (2d Cir. 2004) (applying the VCDR immunity provisions to temporary UN representatives); *United States v. Khobragade*, 15 F. Supp. 3d 383, 385 (S.D.N.Y. 2014) (applying VCDR immunity to the Counselor to the Permanent Mission of India to the UN); *Devi v. Silva*, 861 F. Supp. 2d 135, 141 (S.D.N.Y. 2012) (noting that "the Second Circuit held that diplomats accredited to the United Nations are accorded the same diplomatic immunity as diplomats accredited to the United States"). The U.S. has acknowledged that UN officials like Mr. Benomar enjoy diplomatic immunity. Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, 11 U.N.T.S. 11 (entered into force Oct. 21, 1947) ("[e]very person designated by a Member . . . as a resident representative with the rank of ambassador or minister plenipotentiary . . . *shall*, whether residing inside or outside the

14

headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it." (emphasis added)).  Mr. Benomar is a member of Morocco's Permanent Mission to the United States with diplomatic agent status, and thus his immunity must be determined under the VCDR.

Under the VCDR, "[s]itting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government." *Swarna v. Al-Awadi*, 622 F.3d 123, 137 (2d Cir. 2010); *see also Van Aggelen v. United Nations*, 311 F. App'x 407, 409 (2d Cir. 2009) (affirming judgment dismissing high-level UN officials from the case because "diplomatic envoys are granted full immunity subject to narrow exceptions not relevant to this litigation."); *Tachiona*, 386 F.3d at 215 (noting that the VCDR, "with limited exceptions," "broadly immunizes diplomatic representative from the civil jurisdiction of the United States courts"); *Tabion v. Mufti*, 73 F.3d 535, 539 (4th Cir. 1996) (affirming dismissal of suit brought by domestic servant because of diplomatic immunity); *Khobragade*, 15 F. Supp. 3d at 385 (dismissing a case because "diplomatic officers may not be arrested, detained, prosecuted or sued unless their immunity is waived by the sending state"); *Ahmed v. Hoque*, No. 01 CIV. 7224 (DLC), 2002 WL 1964806, at *8 (S.D.N.Y. Aug. 23, 2002) (dismissing case brought by a domestic servant of a diplomat because the court "is without subject matter jurisdiction to consider the plaintiff's claims, for the defendants are immune from suit").

The DRA, with its primary purpose of ensuring that U.S. law is consistent with the VCDR, "makes pellucid that American courts must dismiss a suit against anyone who is entitled to

immunity under" the VCDR.  *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010);[24] *see also Devi*, 861 F. Supp. 2d at 141 (denying motion for reconsideration because "[t]he plain and mandatory language of the Diplomatic Relations Act—providing that an action against a covered diplomat 'shall be dismissed'—dictates dismissal of this case").

Diplomatic immunity is one of the "oldest elements of foreign relations."  U.S. Dep't of State, *Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities* (June 2015) at 3, *available at* https://www.state.gov/documents/organization/150546.pdf ("State Department Guidance").  The purpose of diplomatic immunity "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  VCDR at Preamble. That is why this particular immunity is conferred on the status without regard to when in a proceeding that status is conferred.  Due to the reciprocal nature of diplomatic immunity, the United States "benefits greatly from the concept as it protects U.S. diplomats assigned to countries with judicial systems far different than our own."  State Dep't Guidance at 5.  United States courts provide foreign diplomats with the "privileges and immunities to which they are entitled under international law" because "[a]ny failure to do so has the potential of casting doubt on the commitment of the United States to carry out its international obligations or of *negatively influencing larger foreign policy interests*." State Dep't Guidance at 28 (emphasis added).  As the Fourth Circuit explained:

> [I]t must be remembered that the outcome [of dismissal] merely reflects policy
> choices already made.  Policymakers in Congress and the Executive Branch clearly
> have believed that diplomatic immunity not only ensures the efficient functioning
> of diplomatic missions in foreign states, but fosters goodwill and enhances relations

---

[24] Under the VCDR, a "diplomatic agent is not obliged to give evidence as a witness."  VCDR Art. 31(2).  As such, and as discussed at the September 28, 2018 conference, Mr. Benomar is also formally moving to stay all discovery pending the Court's decision on this Motion.

among nations.  Thus, they have determined that apparent inequity to a private individual is outweighed by the great injury to the public that would arise from permitting suit against the entity or its agents calling for application of immunity.

*Tabion*, 73 F.3d at 539.

Mr. Benomar is immune from suit under the VCDR and DRA.  He is a diplomatic agent with the position of Minister Plenipotentiary at Morocco's Permanent Mission to the United Nations, as accredited by the Ministry of Foreign Affairs and International Cooperation of the Kingdom of Morocco, as acknowledged by the UN, and as notified to the U.S. through its Permanent Mission to the UN.  Lowell Decl. at Exs. 7-11.  In this role, Mr. Benomar carries out diplomatic duties, functions, and responsibilities within the Mission.  *Id.* at Exs. 6-9; Benomar Decl. at ¶ 31.  Among other responsibilities, Mr. Benomar provides foreign policy advice to Morocco and to several of Morocco's neighbors to further Morocco's peacebuilding efforts in the region.  Benomar Decl. at ¶ 32.  Mr. Benomar is uniquely qualified for this responsibility because of his long and respected experience at the UN.

### A.    Diplomatic immunity is effective the moment the United States is notified

Mr. Benomar's immunity has been effective from the moment the United States (in this case, through Morocco and the United Nations) received notification of his appointment.  Under Article 39 of the VCDR, "[e]very person entitled to privileges and immunities shall enjoy them . . . if already in its territory, *from the moment* when his appointment is notified to the Ministry of Foreign Affairs."  VCDR Art. 39 (emphasis added).  *See Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigration Servs.*, No. 17-12709, 2018 WL 3660253, at *3 (11th Cir. Aug. 2, 2018) (noting that the testimony of the Acting Director of the State Department's Office of Foreign Ministry policy is that "OFM affords the individual a presumption of immunity as of the date that the foreign embassy indicates the individual will assume new responsibilities."); *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 297 (S.D.N.Y. 2001), *aff'd in part, rev'd in part and remanded sub*

17

*nom. Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004) ("Under Article 39, the agents are entitled to immunity *at the moment of notification to the appropriate authorities* of the receiving state, even if they have already entered the territory.") (emphasis added); *Republic of Philippines by Cent. Bank of Philippines v. Marcos*, 665 F. Supp. 793, 799 (N.D. Cal. 1987) ("Further, Article 39 states that an agent is entitled to immunity *at the moment of notification to the proper authorities*, even if he or she is already in the receiving state's territory.") (emphasis added).

No later than September 21 and October 5, 2018, Morocco expressly notified the U.S. of Mr. Benomar's appointment as Minister Plenipotentiary.  Lowell Decl. at Exs. 7-9. Under the VCDR, Mr. Benomar has enjoyed diplomatic status immunity at least since those dates.  That status exists today and is dispositive.[25]

## B. Diplomatic status immunity prohibits suits regarding acts committed prior to the diplomatic mission

That the Ministry of Foreign Affairs notified the U.S. of Mr. Benomar's mission after the commencement of the suit is of no import.  Courts routinely dismiss cases relating to activities that occurred before the diplomatic appointment because they are required to do so under the law of immunity.  *See Tachiona*, 386 F.3d at 220 (upholding assertion of diplomatic immunity even though the lawsuit related to activities before the diplomatic mission); *Abdulaziz v. Metro. Dade County*, 741 F.2d 1328, 1329 (11th Cir. 1984) (Saudi Prince and his family obtained diplomatic status after the commencement of suit); *Khobragade*, 15 F. Supp. 3d at 388 (dismissing a case where defendant was arrested on December 12, 2013, for acts allegedly taken in 2012, but was appointed Counselor on January 8, 2014); *Devi*, 861 F. Supp. 2d at 141 (noting that "[n]othing in

---

[25] Plaintiffs' counsel's correspondence and statements concerning the type or color of any particular ID badge sent by the U.S. Department of State to Mr. Benomar elevates some bureaucratic issue for getting in and out of buildings into an amendment to Article 39 of the Vienna Convention and to the UN Headquarters Agreement.  No convention, treaty, law or case supports that attempt.

the language of the Diplomatic Relations Act or the governing treaties supports [an exception for acts committed before the diplomatic mission] to the scope of diplomatic immunity").

The *Abdulaziz* case is instructive on this point. There, a Section 1983 suit was filed *by* Prince Turki Bin Abdualaziz of the Kingdom of Saudi Arabia alleging Fourth and Fourteenth Amendment violations that occurred when police executed a search warrant on his property because he was allegedly holding a female there against her will. 741 F.2d at 1330. The foreign official actually invoked the jurisdiction of the U.S. courts to begin the process. The defendants counterclaimed, alleging injuries from the encounter caused by Prince Turki and his bodyguards. *Id.* Almost one month *after* Prince Turki filed his initial claim, papers were filed with the State Department "which qualified Prince Turki and his family for diplomatic status" and the prince moved to dismiss the complaint and counterclaims, which was granted by the district court. *Id.* Defendants appealed. *Id.* The Eleventh Circuit noted that even though immunity was sought only "after the action was commenced and the counterclaims were filed," "the action was properly dismissed when immunity was acquired and the court was so notified." *Id.* at 1331-32.

Likewise, here the Court must dismiss the Complaint because Mr. Benomar has diplomatic *status* immunity regardless of whether that status was granted before the acts alleged or before this litigation was initiated. And here, unlike in *Abdulaziz*, the formal notification to the U.S. of Mr. Benomar's diplomatic status is not some after-the-fact effort to cloak a non-diplomat in a diplomat's clothing. To the contrary, Mr. Benomar not only enjoyed a distinguished twenty-four-year career as one of the UN's most senior diplomats on the world stage, but he moved back to New York in November 2017 specifically to serve as a senior Moroccan diplomat at Morocco's Permanent Mission to the UN, a post at which he has served for the last year. Benomar Decl. at

19

¶ 30-31.  Mr. Benomar is immune from suit, whether or not the allegations relate to actions taken before the U.S. was notified of his current position in Morocco's Mission to the UN.

### C.      The commercial activities exception does not apply

Plaintiffs' allegations do not fall within the commercial activities exception of the VCDR, which allows for a suit to be brought against an immune party if it relates "to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  VCDR Art. 31(c).[26]  The purpose of this exception is to ensure that a country or its diplomats do not seek immunity from normal, money-making activities.  Courts construe the exception narrowly to business activity that the individual seeking immunity engaged in for personal, systematic profit.  *See Tabion v. Mufti*, 73 F.3d at 537. ("When examined in context, the term 'commercial activity' does not have so broad a meaning as to include occasional service contracts . . . but rather relates only to trade or business activity engaged in for personal profit.").  Courts have further restricted the reach of the commercial activity exception by deeming a diplomat's "official function" broadly.  For example, the renovation of an Ambassador's official residence is part of an official function, *Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to the United Nations in New York*, No. 15 CV 8693 (VB), 2016 WL 3351180, at *3 (S.D.N.Y. June 15, 2016), as is hiring domestic help.  *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 193 (D.D.C. 2007) (quoting Statement of Interest filed by the United States: "when diplomats enter into contractual relationships for personal goods or services incidental to residing in the host country, including the employment of domestic workers, they are not engaging in 'commercial activity' as that term is used in the Diplomatic Relations Convention.").

---

[26]  Although there is also a commercial activities exception to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et al.*, the case law interpreting that exception must not be used as "an interpretive guide for the Vienna Convention."  *Tabion v. Mufti*, 73 F.3d at 538 n.7.

Here, the commercial activity exception is inapposite for three reasons. *First*, Plaintiffs cannot allege commercial activity because Mr. Benomar did not engage in any systematic trade or business activity within the United States for personal profit.  Benomar Decl. at ¶ 31.  *Second*, the advice Mr. Benomar provided Qatar was at the request of Morocco and part of his official functions.  *Id.* at ¶ 34.  *Third*, the commercial activity exception has been used only where the counterparty is commercially "across the table" from the defendant-diplomat.  *See Montuya v. Chedid*, 779 F. Supp. 2d 60 (D.D.C. 2011); *Gonzalez Paredes*, 479 F. Supp. 2d at 193; *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 128–29 (D.D.C. 2009); *Tabion v. Mufti*, 877 F. Supp. 285 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).  Here, there is no allegation or hint that Mr. Benomar has ever engaged in commercial activity with Mr. Broidy or his company.  Plaintiffs were not parties to the business activity they now allege Mr. Benomar participated in.

As a diplomatic agent, Mr. Benomar is immune from suit and thus this case must be dismissed.

## III.    MR. BENOMAR HAS DERIVATIVE SOVEREIGN IMMUNITY

This case should also be dismissed under derivative sovereign immunity, also known as foreign official immunity, because, as was already found in the California Action, Qatar is immune under the Foreign Sovereigns Immunities Act ("FSIA"), and, accepting Plaintiffs' allegation as true for purposes of this Motion, Mr. Benomar was an "agent" of Qatar.  Compl. at ¶ 9.

The FSIA provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  "Under the venerable principle of foreign sovereign immunity, foreign states are ordinarily 'immune from the jurisdiction of [U.S.] courts.'"  *Republic of Iraq v. Beaty*, 556 U.S. 848, 851 (2009) (quoting 28 U.S.C. § 1604).  Thus, "a foreign state is presumptively immune from suit unless a specific [FSIA] exception applies."  *Permanent Mission*

*of India v. City of New York*, 551 U.S. 193, 197 (2007); *see also Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) ("Thus, if none of the exceptions to immunity applies, the court lacks both subject matter jurisdiction and personal jurisdiction."); *MMA Consultants 1, Inc. v. Republic of Peru*, 719 F. App'x 47, 51 (2d Cir. 2017) ("The statute broadly immunizes foreign state[s] . . . from the jurisdiction of the courts of the United States, subject to a number of specified exceptions.") (internal quotations omitted).  FSIA is "comprehensive" and applies "in every civil action against a foreign state."  *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (citation omitted).  FSIA "provides the sole basis for obtaining [subject-matter] jurisdiction over a foreign state in the courts of this country."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citations omitted).

As the California court correctly found, Qatar is immune from suit because it is a foreign state and neither the commercial nor any other FSIA exception applies to any of the allegations Broidy has made.  The Court held that the "FSIA establishes a fundamental rule that foreign sovereigns are not subject to the jurisdiction of the United States courts unless a specific statutory exception applies" and "Plaintiffs' claims against Qatar fall outside any applicable exception to the FSIA."  Qatar Order at 5-6 (Dkt. 198), CA Action.

The common law doctrine of derivative sovereign immunity, or foreign official immunity, similarly "provides broad protection" to sovereign agents from a domestic court's jurisdiction. *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015).  The underpinnings of the doctrine are substantively similar to the FSIA.  Sovereigns normally act through their agents and thus sovereign immunity without that same protection for the agents of sovereigns would be no protection at all.  Under the common law, while a "diplomatic representative *of the sovereign* could request a 'suggestion of immunity' from the State Department," a court has the authority to

decide for itself whether the immunity exists if such request is not sought. *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (emphasis added). In doing so, the district court must inquire "whether the ground of immunity is one which it is the established policy of the State Department to recognize." *Id.* (internal quotations omitted).

The "general contours of official-act immunity" are that "a foreign official may assert immunity for official acts performed within the scope of his duty, but not for private acts where 'the officer purports to act as an individual and not as an official. . . .'" *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990)); *Moriah,* 107 F. Supp. 3d at 277 (quoting *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000)) ("It is well-settled law that contractors and common law agents acting within the scope of their employment have derivative sovereign immunity."). Thus, the relevant inquiry for establishing immunity is whether the individual claiming immunity acted within the scope of his duty for a sovereign.

In *Moriah*, this Court considered whether an alleged Israeli agent was subject to discovery (not suit) regarding certain of his communications. 107 F. Supp. 3d at 274. The agent asserted derivative sovereign immunity and provided a declaration stating that the communications in question were made at the request of the Israeli Prime Minister's Office. *Id.* at 275. This Court found that the act was done "on behalf of the Israeli government, and therefore [the agent] has immunity with respect to this act." *Id.* The court noted, "[e]ven if the Israeli government wanted to avoid being seen as a part of this attempt, it does not change the fact that it was the government who instigated the call, and the government who was interested in the outcome." *Id.* at 279. The agent was immune.

Turning to Mr. Benomar, and accepting the Complaint's allegations as true,[27] Mr. Benomar is entitled to derivative sovereign immunity. The Complaint alleges that Mr. Benomar "serves as a secret and unregistered *agent* of a foreign power and has *significant responsibility* for coordinating Qatari influence operations in the United States." Compl. at ¶ 9 (emphasis added). According to the Complaint (and an obviously central aspect of the claims), after Qatar allegedly hacked into Plaintiffs' computer system, Mr. Benomar was a "key participant" in reviewing the documents in question and "mastermind[ed]" the dissemination of the materials Qatar allegedly stole. Compl. at ¶¶ 41-43. Nor are these allegations merely incidental to the gravamen of the Complaint; they instead serve as the lynchpin of the claims that *Qatar*, through others, acted unlawfully against them. What is more, the "evidence" on which Plaintiffs rely is Mr. Benomar's "increased frequency of contacts with key participants in the conspiracy," including Nicholas Muzin, another alleged identified Qatari agent, and Ahmed Al-Rumaihi, a former Qatari diplomat. *Id.* ¶¶ 46-48. In other words, according to Plaintiffs, Mr. Benomar acted as an agent of Qatar and at its direction. That Mr. Benomar allegedly acted as a "secret" agent is of no import. Like the court in *Moriah* found, an agent can act "at the behest the government even if he actively avoided making that representation when performing his task." 107 F. Supp. 3d at 279. Based on their own allegations, Mr. Benomar is derivatively immune from suit, and Plaintiffs' Complaint should be dismissed. *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 248 (S.D.N.Y. 2014) ("[A]llegations in the Complaint are judicial admission to which Plaintiffs are bound.").

Mr. Benomar would also be derivatively immune because he acted within the scope of his position for Morocco. As explained in Mr. Benomar's declaration, he counseled and worked with

---

[27] Mr. Benomar denies all wrongdoing alleged by Plaintiffs and assumes the allegations in the Complaint are true only for the purpose of this motion to dismiss.

Qatar at Morocco's request.  Benomar Decl. at ¶ 34.  Morocco recognized that its interest, like that of Qatar (and that of the U.S.), has been to resolve the regional dispute that so nearly resulted in an outbreak of war.  *Id.*  In light of his career as a diplomat and his experience in mediating regional conflicts, Mr. Benomar was a natural pick for this diplomatic assignment.  At all times, Morocco was aware of the counsel and services Mr. Benomar provided Qatar and consented to Mr. Benomar's actions.  Thus, Mr. Benomar's actions have been consistent with and in furtherance of his duties as an agent for Morocco.  Given that Qatar has been found immune from Plaintiffs' suit (as would Morocco) and Mr. Benomar is sued as some agent of that country, Mr. Benomar has derivative sovereign immunity.

## CONCLUSION

For all the foregoing reasons, Plaintiffs Complaint should be dismissed in its entirety with prejudice.

Dated: October 31, 2018                                  Respectfully submitted,

                                                                        /s/ Abbe David Lowell

                                                                        Abbe David Lowell (NY Bar No. 2981744)
                                                                        ADLowell@winston.com
                                                                        Eric W. Bloom *(pro hac vice)*
                                                                        EBloom@winston.com
                                                                        WINSTON & STRAWN LLP
                                                                        1700 K Street, NW
                                                                        Washington, DC 20006
                                                                        T: 1-202-282-5000
                                                                        F: 1-202-282-5100

                                                                        *Counsel for Jamal Benomar*