UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>       Plaintiffs,<br><br>    v.<br><br>JAMAL BENOMAR,<br><br>       Defendant. | Case No. 18-CV-6615-CS |

**P**LAINTIFFS' **O**PPOSITION TO **D**EFENDANT'S **M**OTION TO **D**ISMISS

**Table of Contents**

Preliminary Statement ........................................................................................................... 1

Argument ............................................................................................................................... 2

   I.     Legal Standard ......................................................................................................... 2

   II.    The State Department's Determination That Benomar Only Has Immunity for Official Acts Is Conclusive .........................................................**Error! Bookmark not defined.**

   III.   Benomar's Purported "Notice" of "Full Status Immunity" Does Not Undermine the State Department's Determination that He Only has "Official Acts Immunity" ............ 7

   IV.   Benomar's Exhibits Fail to Substantiate His Claims of Immunity ................................ 9

   V.    Even if the Court Ignored the State Department's Immunity Determination, Benomar's Claim for "Full Status Immunity" Fails on the Merits .................................................. 11

      A.   Benomar Fails to Comply with VCDR Requirement for Notice ............................. 11

      B.   Benomar is "Permanently Resident in" the United States ........................................ 11

      C.   Benomar is Engaged in Commercial Activity in the United States and is Not Engaged Full-Time in Diplomatic Work .................................................................. 13

      D.   The Moroccan Letters do Not Comply with State Department Procedures for Notification Pursuant to the VCDR ......................................................................... 14

      E.   Benomar's Moroccan Passports and Diplomatic Visa Fail to Establish Diplomatic Immunity ................................................................................................................. 15

   VI.   The Commercial Activity Exception To "Full Status Immunity" is Applicable .......... 16

   VII.  Benomar is Not Entitled to Derivative Sovereign Immunity ....................................... 18

   VIII. Plaintiffs Are Entitled to Jurisdictional Discovery ...................................................... 23

Conclusion ............................................................................................................................ 23

**Table of Authorities**

### Cases

*Ahmed v. Magan,*
  Case No:2-10-cv-342 (S.D.Ohio, 2011) ................................................ 18, 22

*Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigration Servs.,*
  No. 17-12709, 2018 WL 3660253 (11th Cir. Aug. 2, 2018) ...................... 9

*Arcaya v. Paez,*
  145 F. Supp. 464 (S.D.N.Y. 1956) .......................................................... 5

*Aurecchione v. Schoolman Transp. Sys., Inc.,*
  426 F.3d 635 (2d Cir.2005) .................................................................... 2

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................ 18

*Brown v. Fort Benning Family Communities LLC,*
  108 F. Supp. 3d 1367 (M.D. Ga. 2015) ................................................ 21

*Butters v. Vance Int'l, Inc.,*
  225 F.3d 462 (4th Cir. 2000) ............................................................... 21

*Cabalce v. Thomas E. Blanchard & Associates,*
  797 F.3d 720 (9th Cir. 2015) ............................................................... 22

*Campbell-Ewald Co. v. Gomez,*
  136 S. Ct. 663, 672 (2016), *as revised* (Feb. 9, 2016) ........................ 21

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
  991 F.2d 1012 (2d Cir. 1993) ................................................................. 3

*Funk v. Belneftekhim,*
  861 F.3d 354 (2d Cir. 2017) ................................................................ 24

*Gonzalez Paredes v. Vila,*
  479 F. Supp. 2d 187 (D.D.C. 2007) ................................................. 18, 19

*Gualandi v. Adams,*
  385 F.3d 236
  (2d Cir. 2004) ..................................................................................... 24

*In re KBR, Inc., Burn Pit Litig.,*
  744 F.3d 326 (4th Cir. 2014) ............................................................... 21

*In re Terrorist Attacks on Sept. 11, 2001,*
  392 F. Supp. 2d 539 (S.D.N.Y. 2005) ................................................ 3, 22

*In re World Trade Ctr. Disaster Site Litig.,*
  722 F.3d 483 (2d Cir. 2013) ................................................................ 10

*Lewis v. Mutond,*
  258 F. Supp. 3d 168 (D.D.C. 2017) ..................................................... 20

*Luckett v. Bure,*
  290 F.3d 493 (2d Cir. 2002) .................................................................. 3

*Montuya v. Chedid*,
  779 F. Supp. 2d 60 (D.D.C. 2011) ........................................................ 19
*Moriah v. Bank of China Ltd.*,
  107 F. Supp. 3d 272 (S.D.N.Y. 2015).............................................. 20, 24
*Republic of Philippines by Cent. Bank of Philippines v. Marcos*,
  665 F. Supp. 793 (N.D. Cal. 1987) ........................................................ 9
*Sabbithi v. Al Saleh*,
  605 F. Supp. 2d 122 (D.D.C. 2009) ...................................................... 19
*Salim v. Mitchell*,
  268 F. Supp. 3d 1132 (E.D. Wash. 2017) ............................................. 22
*Samantar v. Yousuf*,
  560 U.S. 305 (2010) .......................................................... 19, 21, 22
*Schrader v. Hercules, Inc.*,
  489 F. Supp. 159 (W.D. Va. 1980) ........................................................ 23
*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982) ................................................................................ 9
*Tabion v. Mufti*,
  73 F.3d 535 (4th Cir. 1996)............................................................ 17, 19
*Tachiona v. Mugabe*,
  186 F. Supp. 2d 383 (S.D.N.Y. 2002).................................................... 9
U.S.C.A. § 1746 ...................................................................................... 10
*United States v. Al-Hamdi*,
  356 F.3d 564 (4th Cir. 2004)................................................................ 16
*United States v. Enger*,
  472 F. Supp. 490 (D.N.J. 1978) ............................................................. 7
*United States v. Kostadinov*,
  734 F.2d 905 (2d Cir. 1984) ................................................................... 6
*United States v. Melekh*,
  190 F. Supp. 67 (S.D.N.Y. 1960) ........................................................... 6
*United States v. Noriega*,
  746 F. Supp. 1506 (S.D. Fla. 1990) ................................................ 16, 17
*US v. Coplon*, 88 F. Supp.
  915, 920 (S.D.N.Y. 1950) ............................................................... 16, 17
*Vulcan Iron Works, Inc. v. Polish Am. Mach. Corp.*,
  479 F. Supp. 1060 (S.D.N.Y. 1979).......................................... 3, 10, 15
*Yearsley v. W.A. Ross Const. Co.*,
  309 U.S. 18 (1940) ................................................................................ 23
*Yousuf v. Samantar*,
  699 F.3d 763 (4th Cir. 2012)................................................................ 23

**Rules**

Foreign Relations Law § 464 .................................................................... 6
U.S.C. § 1331 ............................................................................................ 2

U.S.C. § 1332 ................................................................................................................. 3
U.S.C. § 1367 ................................................................................................................. 2
U.S.C. § 288d ................................................................................................................. 7
U.S.C.A. § 288e .............................................................................................................. 7

## PRELIMINARY STATEMENT

To succeed on his motion to dismiss under Rule 12(b)(1), Defendant Jamal Benomar must demonstrate that he is entitled to "full status immunity" — immunity for all claims because of an individual's status as a duly-recognized diplomatic agent. Anything else falls short. But the evidence submitted in support of his motion demonstrates that the United States Government has determined that Benomar has "official acts immunity," that is, immunity only for conduct that was undertaken as part of the individual's official duties. As a result, Benomar's motion to dismiss should be denied.

The official documentation sent to Benomar by the U.S. State Department (and submitted in support of his motion) specifies that Benomar "enjoy[s] immunity from jurisdiction only with respect to acts performed in the course of official duties." (ECF 40, Exh. 5). The State Department has also made it clear that "official acts immunity" does not divest a court of jurisdiction, since it is an "an affirmative defense" and that requires the court to examine "all the relevant facts [and] determine[] whether the action complained of was an official act." State Department, Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities, at 22 ("State Department Judicial Guidance").[1]

In any event, Benomar does not demonstrate that he is entitled to "full status immunity" because he cannot overcome two disqualifying factors: (1) his longstanding and permanent residency in the United States and (2) his professional and commercial activities. Jurisdictional discovery would be necessary to assess whether Benomar can overcome these obstacles, and even if Benomar could establish "full status immunity" as a general proposition, those exceptions would deprive him of immunity.

---

[1] *Available at* https://www.state.gov/documents/organization/150546.pdf.

<u>ARGUMENT</u>

## I.    Legal Standard

As a general matter, the plaintiff has the burden to prove that the Court has subject matter

jurisdiction over the Complaint. *See e.g., Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d

635, 638 (2d Cir.2005). In the Complaint, Plaintiffs state that the Court has jurisdiction because

(1) the "Court has federal question jurisdiction under 28 U.S.C. § 1331, and supplemental

jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367" and (2) the Court "has

diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because Plaintiffs are all

citizens of the state of California and Benomar is a resident of the state of New York. The

amount in controversy exceeds $75,000, exclusive of interest and costs." (ECF 1 at  ¶¶ 10-11).

These jurisdictional allegations satisfy Plaintiffs' burden. Benomar has not challenged Plaintiffs'

jurisdictional allegations but, instead, has introduced a claim that he is entitled to immunity as a

diplomatic agent and as a foreign official and therefore the Court lacks jurisdiction.

Where an individual claims entitlement to immunity as a diplomat or foreign official,

they bear the burden of proving that immunity by a preponderance of evidence. The facts

concerning such immunity are "within the exclusive knowledge of [defendant] and his employers

[and] they bear the burden of establishing" immunity. *Vulcan Iron Works, Inc. v. Polish Am.*

*Mach. Corp.*, 479 F. Supp. 1060, 1067–68 (S.D.N.Y. 1979).[2] While no court has considered

these burdens in the context of a claim for immunity as a diplomat under the Vienna Convention

on Diplomatic Relations, 23 U.S.T. 3227 ("VCDR"), the Foreign Sovereign Immunities Act

---

[2] *Luckett v. Bure*, the case cited by Benomar, does not apply because it did not involve a claim
for diplomatic immunity. It involved claims against U.S. government officials acting in their
official capacity, but even there the defendants entered an affidavit from the U.S. Attorney
establishing that "individual federal defendants were acting within the scope of their employment
at the time of the incidents alleged in the complaint[.]"*Luckett v. Bure*, 290 F.3d 493, 497 (2d
Cir. 2002).

("FSIA") jurisprudence is analogous. Where a corporation asserts that it is immune from suit because it is an instrumentality of a foreign state, the burden is on the defendant corporation to make "a prima facie case that it is a foreign sovereign" and only then does the burden shift to the plaintiff to prove an exception to immunity, while "the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). "Throughout the inquiry" into the claim of sovereign immunity, "[d]efendants retain the burden of persuasion, which they must meet by a preponderance of the evidence." *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 547 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008). Benomar cannot meet this burden unless he proves, through a preponderance of evidence, that he is entitled to immunity. As will be discussed *infra* Section VIII, Plaintiffs are entitled to jurisdictional discovery before the Court considers the Defendant's Motion to Dismiss.

## II.   Benomar's Moving Papers Only Establish That he Has Immunity for Official Acts

Benomar's moving papers concede that the State Department notified him that he is entitled to immunity for "official acts only," and not the broader "full status immunity" on which he bases the motion to dismiss. (ECF 38 at 7). The State Department letter states: "you enjoy immunity from jurisdiction only with respect to acts performed in the course of official duties." (ECF 40, Exh. 5). In accord with its determination, the State Department issued Benomar a green-bordered Official Identification Card stating that the bearer "is entitled to immunity for official acts only" (as opposed to the blue-bordered cards recognizing "full status immunity," *see* State Department Judicial Guidance at 17, 31).

Benomar failed to include in ECF 40, Exh. 5 the reverse of his Official Identification Card, which contains the "statement of immunity" quoted above, even though the front of the

3

card states: "see reverse for statement of immunity." Benomar contends that the card is just used for "getting in and out of buildings," and the issuance of a green (as opposed to blue) card is just a "bureaucratic issue" (MTD at 18). But the State Department's immunity determination, which "can be highly fact dependent and must be made as directed by the facts of the situation," controls what immunity status Benomar has. Department of State, "Immunities of Foreign Representatives and Officials of International Organizations in the United States," 2 Foreign Affairs Manual 230.

Benomar has not submitted any evidence suggesting that the Department of State meant anything other than what it said in its official communications conveying its immunity determination.[3] Indeed, the State Department has issued guidance to judicial authorities that underscores that the "only authoritative identity document is the identity card issued by the U.S. Department of State[.]" State Department Judicial Guidance at 17. Attached to this filing is the affidavit of Professor David Stewart of Georgetown Law, a leading scholar and practitioner of diplomatic law. *See* Declaration of Professor David Stewart ("Stewart Declaration"), at ¶¶ 1-6. He confirms that the identity card is the definitive document issued by the State Department after its review of an application for immunity. Stewart Declaration at ¶¶ 19-20.  Benomar attempts to

---

[3] Further, Benomar would not be entitled to have the case dismissed if he did, in fact, have the status immunity he purports. He claims that notice of his status as a Minister Plenipotentiary was sent in September and October 2018 and became effective at that time. (MTD at 25). That still would have been after he was served with the summons and he does not dispute that the service of the summons was proper. In that precise circumstance, this Court has held that the case should not be dismissed but should be stayed. "If the summons had been served on defendant after he had attained the rank of a diplomatic envoy he would have been the victim of an unlawful act upon which plaintiff could base no rights. Here, however, plaintiff has lawfully served a summons on him." *Arcaya v. Paez*, 145 F. Supp. 464, 472 (S.D.N.Y. 1956), *aff'd*, 244 F.2d 958 (2d Cir. 1957) (staying a case against a defendant who had been accredited as a Minister Plenipotentiary in the Venezuelan mission to the United Nations after he had been served with the summons). In this circumstance, the Court should "stay[] the action for such time and only for such time as defendant retains his" immunity. *Id.*

undermine the State Department's "authoritative" determination by asserting that unknown
Moroccan officials have had unspecified communications on unspecified dates with the
"Diplomatic Accreditations Officer" at the U.S. Mission to the United Nations requesting a blue-
bordered card. (MTD at 7).[4] None of this is competent evidence. Benomar's assertions merely
underscore that the Department of State has not recognized the "full status immunity" that
Benomar seeks, but does not possess.[5]

  "In the United States, a person's diplomatic status is established when it is recognized by
the Department of State." Restatement (Third) of Foreign Relations Law § 464 (1987); *see also*
Stewart Declaration at ¶ 21. The Second Circuit has held that a claim for diplomatic immunity
under the Vienna Convention on Diplomatic Relations ("Vienna Convention" or "VCDR") fails
where the defendant "never received a diplomatic identity card and his name never appeared on
the blue or white lists prepared by this government which indicate that a person has diplomatic
immunity." *United States v. Kostadinov*, 734 F.2d 905, 912 (2d Cir. 1984). The Second Circuit
found that there had been no "acceptance of Kostadinov as a member of the Bulgarian
diplomatic mission entitled to immunity." *Id.* Similarly, the claim of a Soviet citizen that he was

---

[4] As discussed *infra* in Section IV, Benomar fails to provide any sworn authentication of his
positions from any Moroccan, United Nations, or U.S. State Department officials, and even
where he submits documents, they are often unsigned and/or not sworn to by a competent affiant.
Benomar's failure to do so suggests that he does not possess supporting documentation
supporting his motion to dismiss, and at a minimum suggests the need for jurisdictional
discovery.

[5] Today, counsel for both parties received an e-mail from an attorney at the State Department
(attached hereto as part of Wolosky Decl., Exh. B) that states: "the U.S. Mission to the UN has
registered Mr. Benomar with diplomatic privileges and immunities as of November 13, 2018.
Representatives of UN missions, including ministers, receive diplomatic privileges and
immunities based on the application of the law, including the UN Headquarters
Agreement." However, that e-mail does not state what type of immunity (full status or official
acts) Benomar has, or whether there has been a change in his immunity status. Counsel for
Plaintiffs sent a reply e-mail that is attached to the Wolosky Declaration as part of Exh. B.

entitled to immunity as a member of the U.S.S.R. mission to the United Nations was denied due

to his lack of acceptance by the State Department. *United States v. Melekh*, 190 F. Supp. 67, 89

n.3 (S.D.N.Y. 1960) ("The normal requirement of accreditation and recognition as a preliminary

to binding diplomatic status is  . . . a centuries-old requirement dictated by the practical

necessities of political intercourse."). Professor Stewart notes that the VCDR "recognized the

right of the receiving state to consent to such designations and to refuse to accept such

representatives in its discretion." Stewart Declaration at ¶ 10.

Benomar also fails in his argument—made without citation—that under the Headquarters

Agreement Between the United Nations and the United States, June 26, 1947, 61 Stat. 3416, 11

U.N.T.S. 11 ("Headquarters Agreement"), the State Department somehow has less of a role

"with respect to diplomats working at the UN" (MTD at 6).  The law is clear that a foreign

representative posted to the United Nations can only obtain immunity based on the approval of

the State Department. Stewart Declaration at ¶ 22.

*First*, the International Organization Immunities Act ("IOIA") provides only for "official

acts immunity": "Representatives of foreign governments in or to international organizations and

officers and employees of such organizations shall be immune from suit and legal process

relating to acts performed by them in their official capacity and falling within their functions as

such representatives, officers, or employees except insofar as such immunity may be waived by

the foreign government or international organization concerned." 22 U.S.C. § 288d.

*Second*, the IOIA requires approval from the State Department for a representative to or

employee of an international organization to enjoy any immunity: "No person shall be entitled to

the benefits of this subchapter, unless he (1) shall have been duly notified to and accepted by the

Secretary of State as a representative, officer, or employee; or (2) shall have been designated by

the Secretary of State, prior to formal notification and acceptance, as a prospective

representative, officer, or employee[.]." 22 U.S.C.A. § 288e.

*Third*, under the Headquarters Agreement, a representative to the U.N. may obtain status

immunity only subject to the same "conditions and obligations, as [the United States] accords to

envoys accredited to it." Headquarters Agreement, Art. V. Sec. 15. Based the text of the

agreement, therefore, a foreign representative to the United Nations receives immunity on the

same conditions as a diplomat accredited to the United States requires such approval.

Together, the Headquarters Agreement and the IOIA mean that "only a limited number of

persons may receive full immunity and then only after prior [U.S.] government approval; all

others are cloaked with immunity only when acting within the scope of their employment."

*United States v. Enger*, 472 F. Supp. 490, 503 (D.N.J. 1978). That is precisely the same result

that is reached through application of the VCDR. *See* Stewart Declaration at ¶¶ 22-23.

Benomar has failed to meet his burden of proving that he has immunity from suit. To the

contrary, on the record currently before the Court, the State Department's determination is

conclusive that he only has "official acts immunity."

## III.   Benomar's Purported "Notice" of "Full Status Immunity" Does Not Undermine the State Department's Determination that He Only has "Official Acts Immunity"

Benomar argues that his immunity has been effective under Article 39(1) of the Vienna

convention "at the moment" that the United States "received notification of his appointment."

(MTD at 17.)  That is not what Article 39(1) says.

Article 39(1) of the VCDR provides that *if* an individual is "entitled to privileges and

immunities," those immunities take effect immediately upon notice for individuals already

within the United States. VCDR Art. 39(1). But article 39(1) does not address *whether* someone

is entitled to immunity, which is a determination made by the State Department. Stewart

Declaration at ¶ 8.  In other words, if the State Department were to determine that Benomar was entitled to "full status immunity," that immunity would be effective as of the date of notice, not the date of the determination. But Article 39(1) does not say that notice conveys immunity— indeed, it would be contrary to the VCDR and an affront to sovereignty if another nation could unilaterally confer immunity by simply giving notice even when the United States declines to acknowledge the claimed immunity. Stewart Declaration at ¶ 13.

Indeed, under the VCDR, the sending state's ability to "freely appoint the members of the staff of [the] mission," VCDR Art. 7, is expressly limited by the receiving state's rights to on a "non-discriminatory basis refuse to accept officials of a particular category." VCDR Art 11(2). *See* Stewart Declaration at ¶ 11. The Second Circuit has held that this right includes the right of the State Department to issue Circular Notes to foreign embassies and missions that impose criteria, such as residency requirements, determining who can be accredited as a diplomatic agent.  *Kostadinov*, 734 F.2d 905, at 913; *see also* Stewart Declaration at ¶ 17-18. For decades, State Department policy has been that "the accreditation of diplomatic personnel is solely within the discretion of the receiving state[.]" State Department Circular Note, "Status of Offices or Diplomatic Missions outside of WashDC Area," July 31, 1989, https://www.state.gov/documents/organization/28503.pdf. Because "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight," *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 184–85 (1982), this Court is not free to disregard the Department of State's position that it plays the determinative role in accepting—or rejecting—claims of immunity.

None of the cases relied upon by Benomar support the proposition that notice is itself sufficient to convey immunity. (MTD at 17). *Ali v. Dist. Dir., Miami Dist., U.S. Citizenship &*

*Immigration Servs.*, No. 17-12709, 2018 WL 3660253 (11th Cir. Aug. 2, 2018), addressed the

"State Department accreditation process" and supported Plaintiffs' position here in finding that

"[i]n the United States in particular, a person's diplomatic status is established when it is

recognized by the Department of State." *Id.* at 3. *Tachiona ex rel. Tachiona v. Mugabe*, 186 F.

Supp. 2d 383 (S.D.N.Y. 2002), addressed the immunity of the president and foreign minister of

Zimbabwe, and the issue of whether notice could itself establish immunity was not addressed.

Finally, *Republic of Philippines by Cent. Bank of Philippines v. Marcos*, 665 F. Supp. 793 (N.D.

Cal. 1987), addressed whether a foreign state could appoint someone as a diplomat when they

were already in the receiving state. *Id.* at 799. In that case, the court was not addressing whether

the immunity was effective absent State Department recognition; indeed, the court deferred to

the State Department's explicit recognition of immunity, stating, "Out of respect for the foreign

policy decisions of the Executive Branch, this Court finds that Ordonez is entitled to diplomatic

immunity." *Id.* at 799. This Court should similarly defer to the State Department's present

determination in this case.

## IV.    Benomar's Exhibits Fail to Substantiate His Claims of Immunity

The documentary evidence submitted by Benomar does not establish the necessary

factual predicate to support his motion to dismiss.

1. Deficiencies in the Declaration of Abbe David Lowell. Lowell does not state that the

declaration is "true under penalty of perjury" as required by 28 U.S.C.A. § 1746. *In re World

Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (the "inclusion of the language

'under penalty of perjury' is an integral requirement of the statute … [and] omission of the

phrase 'under penalty of perjury' would allow[ ] the affiant to circumvent

the penalties for perjury in signing onto intentional falsehoods."). Moreover, Lowell lacks a basis

for authenticating Exhibits 4, 6, 7, 8, and 9 to his declaration, since those purport to be letters from the Moroccan Mission to the United Nations to various United Nations and United States officials. Lowell is neither a Moroccan, U.N. nor U.S. official. *Vulcan Iron Works, Inc v. Polish Am. Mach. Corp.*, 479 F. Supp. 1060, 1067 (S.D.N.Y. 1979) (letters from the Polish embassy to the State Department were not admissible because "the documents are not accompanied by the sworn statement of anyone with personal knowledge of their preparation or use").

2. Other Deficiencies in the Moroccan Documents. The August 27, 2018, and September 21, 2018 letters, purportedly from the Moroccan government to the State Department, appear to be photographs obtained under unknown circumstances and do not contain the name of the author(s) or any signatures. (ECF 40, Exhs. 6-7). Similarly, the letters that Benomar claims establish that notice was provided to the State Department of his rank as a Minister Plenipotentiary (*Id.* Exhs. 7, 9; MTD at 25) are inconsistent with each other (compare Benomar is "in charge of the Political Section" (ECF 40, Exh. 7) with Benomar's "duties include advising the head of the Mission on political issues related to the United Nations, as well as on regional and international conflicts." (ECF 40, Exh. 9), thereby suggesting that one or both letters may simply be unsent drafts.

3. Incomplete Documents. Benomar cannot rely on a series of incomplete documents, including excerpts from passports issued by Morocco, and a visa issued by the United States. (ECF 40, Exhs. 1, 2, 3).  In order to rely on those documents, Benomar must produce the entire document, since other portions of those documents may reveal information that rebuts his claim to diplomatic immunity. For example, a Moroccan diplomatic passport that showed that Benomar has not been present in the U.S. for significant periods of time would undermine his claim that he was a "full-time" diplomat in New York. And as previously discussed *supra* Sec.

II, Benomar failed to produce the reverse side of his official identification card, even though it contained the statement of the immunity to which he is entitled. (ECF, Exh. 5).

**V.      Even if the Court Ignored the State Department's Immunity Determination, Benomar's Claim for "Full Status Immunity" Fails on the Merits**

### A.      Benomar Fails to Comply with VCDR Requirement for Notice

Benomar does not state in his declaration that he was in the United States on September 21, 2018 or October 5, 2018, when the letters that purportedly constituted notification were sent. Benomar ignores the clear requirement in VCDR 39(1) that: "Every person entitled to privileges and immunities shall enjoy them from the moment . . . *if already in its territory*, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." VCDR Art 39(1). He fails to state he was "in [U.S.] territory" on those dates, or that he has subsequently entered U.S. territory to take up his post. *See* Stewart Declaration at ¶ 14.

### B.      Benomar is "Permanently Resident in" the United States

Benomar is not entitled to "full status immunity" because he has lived in the United States with his family (all of whom are U.S. citizens) on a continuous basis since the early 1990s. The VCDR provides that a diplomatic agent who is "permanently resident in" the receiving state "shall enjoy only immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of his functions," *i.e.*, only "official acts immunity." VCDR Art. 38(1). Being "permanently resident in" the United States, for these purposes, is not the same as being a lawful permanent resident (a green card holder). *See* State Department Judicial Guidance at 9. The State Department explains that an individual employed at a foreign embassy or mission is considered permanently resident in the United States unless, among other considerations, "the employing foreign state provides appropriate documentation to indicate that the sending state: (1)

11

pays the cost of the employee's transportation to the U.S. from the employee's normal place of residence; and (2) undertakes to pay the cost of the employee's transportation from the United States to the employee's normal place of residence or to the country of the employee's next assignment at the end of the employee's tour of duty in the United States." State Department, "Privileges and Immunities."[6]

Benomar concedes in his declaration that he has lived in the United States since the early 1990s. (ECF 39 at 2). Benomar's wife and children are American citizens and he owns a home in this District.[7] In determining whether a Saudi diplomat was "permanently resident in" the United Kingdom, a British court stated that "[w]here a man chooses to live with his wife and children, and I emphasise the element of choice, says a great deal, to my mind, about where he intends his home to be." *Estrada Juffali v Juffali*, (High Court of Justice Family Division) 2016 WL 00386328. Indeed, after returning from the United Nations, Benomar chose to stay in the United States, the only home has known for a quarter of a century. As such, Benomar is "permanently resident in" the United States within the meaning of the VCDR, and accordingly cannot be entitled to status immunity.

---

[6] *Available at*, https://www.state.gov/ofm/accreditation/privilegesandimmunities/index.htm
[7] After the completion of his service as a United Nations official, Benomar would have been eligible for a Green Card based on his wife's status as a U.S. citizen. However, Benomar instead arranged for a relationship with the Moroccan Mission to the United Nations, which would provide benefits including not having to pay U.S. taxes. Despite his claim that he began his diplomatic activities on a full-time basis over a year ago on November 1, 2017, his declaration provides no details on what his day-to-day work and does not include the name of a single person that he met with in his role as a Moroccan diplomat. (ECF 39). Indeed, after this case was filed on July 23, 2018 and his attorney entered an appearance on Benomar's behalf on August 31, 2018, there was no objection raised to service of process raised on immunity grounds, and his attorney made filings that did not reference Benomar's claimed status (ECF 13). It was not until September 28, 2018 that Benomar raised issues of diplomatic immunity to this Court. (ECF 25). At that time, the Moroccan government was still in the midst of sending letters seeking immunity for Benomar, showing that the status that Benomar purports to have has, at best, been assembled haphazardly in an effort solely to undermine this Court's jurisdiction.

C. **Benomar is Engaged in Commercial Activity in the United States and is Not Engaged Full-Time in Diplomatic Work**

According to the VCDR, "A diplomatic agent shall not in the receiving State practise for personal profit *any* professional or commercial activity." VCDR Art. 42. (emphasis added). The U.S. Mission to the United Nations ("USUN") published a Circular Note in 2016 stating that "diplomatic privileges and immunity would apply only to" individuals who meet "criteria" including that they "perform on behalf of the Member State, diplomatic duties directly related to the work of the United Nations on a full-time basis, which the Department of State describes as at least thirty-five hours each week at the Mission, and shall not practice for profit any professional or commercial activity in the United States." *See* USUN Circular Note HC-01-06, January 13, 2016, https://usun.state.gov/sites/default/files/organization_pdf/hc-01-16.pdf.

Bernomar has provided no evidence that he works at least thirty-five hours each week at the Mission.  Benomar contends only that he works "in my position on a full-time basis in New York." (ECF 39 at 8). This statement is too vague to satisfy his evidentiary burden to meet the Department of State's work requirement.

Moreover, Benomar admittedly engages in for-profit professional and commercial activity. Although Benomar asserts that he does "not engage in any *systematic* trade or business activity within the United States" (ECF 39 at 8) (emphasis added), the qualifier "systematic" is transparently intended to minimize the trade and business activities in which Benomar has engaged, certain of which form the predicate of this lawsuit. In addition to Benomar's commercial work for Qatar, in September 2018, Lagardère SCA, a multinational media company with significant holdings in the United States, announced that the "Lagardère Supervisory Board unanimously decided to appoint Jamal Benomar" to the supervisory board. Business Wire,

13

"Lagardère SCA: Change in the composition of the Supervisory Board," September 15, 2018.[8]

Notably, the press release made no mention of Benomar's diplomatic status, even though Beomar

contends that his service in the Moroccan mission began almost a year before, on November 1,

2017. (ECF 39 at 8). Regardless, the test is not whether someone serves on corporate boards in a

"systematic" manner, it is whether a diplomat engages in "any professional or commercial

activity." If so, as is clearly the case here, that person is not entitled to absolute immunity as a

matter of both U.S. and international law.

      To the extent that Benomar disputes these conclusions, jurisdictional discovery would be

necessary.  Benomar must demonstrate that he is not engaged in any disqualifying professional and

commercial activities, when the sworn testimony of his business partner indicates that he clearly

was doing so. Declaration of Lee S. Wolosky "Wolosky Declaration", Exh. A at 380:21-22.

Before overturning the Department of State's immunity determination set forth in the record

currently before the Court, the Court would need to make factual findings on both of those points,

findings which are impossible on the current record.

      **D.**    **The Moroccan Letters do not Comply with State Department Procedures for Notification Pursuant to the VCDR**

      The letters that Morocco purportedly sent to the State Department are not notification for

purposes of the Vienna Convention. The State Department requires that a diplomatic

appointment be conveyed through a Notice of Appointment, submitted through EGov. *See* State

Department, "Arrivals/Notification of Appointment,"

https://www.state.gov/ofm/accreditation/noa/index.htm; Stewart Declaration at ¶¶ 15-16.  In

*Vulcan Iron Works, Inc v. Polish Am. Mach. Corp.*, 479 F. Supp. 1060 (S.D.N.Y. 1979), the

---

[8] *Available at*
https://www.businesswire.com/news/home/20180913005856/en/Lagard%C3%A8re-
SCA%C2%A0Change-composition-Supervisory-Board.

court considered whether letters to the State Department constituted notification under the Vienna Convention and found such an "informal" communication was not "actually sent to the State Department in accordance with State Department procedures." *Id.* at 1067. By failing to comply with the State Department's established means of notification of an appointment, the Moroccan government's letters fail to establish notification under the VCDR.

Further, the *Vulcan* Court noted that none of the letters (1) "even uses the word [notification], as might be expected where a term of art is involved" and (2) "the State Department has nowhere indicated that it was in fact notified of [defendant's] appointment." *Id.* at 1067. The letters sent by Morocco do not use the term "notification" and instead are addressed as requests for the "color blue State Department identification card be issued to Mr. Jamal Benomar," (ECF 40, Exh. 7). On the record currently before the Court, the State Department has not acknowledged receipt of these letters, much less accreditation.

### E.     Benomar's Moroccan Passports and Diplomatic Visa Fail to Establish Diplomatic Immunity

The incomplete copies of passports issued by the Kingdom of Morocco do not confer diplomatic immunity. (ECF 40, Exh. 1, 2). The "issuance of the [foreign] diplomatic passport is a matter solely of [foreign] law and has no effect on its holder's status in another state. Though diplomatic passports issued by [a foreign sovereign] to reflect the esteem which that nation assigned to Defendant may have obtained [Defendant] certain courtesies in international travel, they are without significance in international law and United States law and do not, by themselves, entitle [Defendant] to any internationally or domestically protected status." *United States v. Noriega*, 746 F. Supp. 1506, 1524 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *see also US v. Coplon*, 88 F. Supp. 915, 920 (S.D.N.Y. 1950) ("The possession of

a diplomatic passport and visa by an alien coming to the United States has never been recognized by this Government as according, of their own force, diplomatic status and immunities.").

Nor does Benomar's G-1 visa confer immunity on him. (ECF 40, Exh. 3). "[A] visa does not necessarily confer diplomatic immunity." *Kostadinov,* 734 F.2d at 905; *see also United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) ("possession of an A–1 visa, standing alone, cannot confer diplomatic immunity upon him.") "The issuance of United States visas is an administrative action in connection with United States immigration law and is quite independent of the process of diplomatic accreditation." *Noriega*, 746 F. Supp. at 1524, *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *see also* Stewart Declaration at ¶ 23. Diplomatic visas are sometimes "issued to individuals who definitely do not have diplomatic status and immunities in this country in order that they may receive special courtesies." *Coplon*, 88 F. Supp. 915 at 920. Moreover, even if these documents could be indicia that Benomar is entitled to some immunity, they would not establish that Benomar has "full status immunity" as opposed to "official acts immunity."

## VI.    The Commercial Activity Exception To "Full Status Immunity" is Applicable

Even if Benomar did have "full status immunity" as a general matter, he would not be immune from the claims at issue here because they fall within the commercial activity exception to diplomatic immunity. Immunity does not apply in "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions." VCDR Art 31(1)(c).[9] Benomar concedes that the purpose of the commercial exception is to ensure that "diplomats do not seek immunity from normal, money-making activities," precisely the kind of activities in which Plaintiffs allege Benomar was involved. (MTD at 20).

---

[9] This exception establishes that Benomar does not enjoy immunity from this suit even if the State Department were to recognize that he has "full status immunity".

Benomar erroneously argues that the exception is narrow in scope. It is not. The scope of the exception was considered in *Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996), where the court found that hiring domestic help did not fit within the exception because the exception relates to "trade or business activity engaged in for personal profit." *Id.* at 537. The State Department filed a Statement of Interest stating that the exception "focuses on the pursuit of trade or business activity; it does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and family in the receiving State." *Id.* at 538 (quoting the State Department's Statement of Interest). Similarly, *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007), concerned a diplomat hiring domestic help. *Id.* at 193. Benomar participated in (and was paid millions of dollars for for) participating in a scheme to illegally hack Plaintiffs' computers and distribute the stolen materials to the press.  Benomar may dispute what he personally did as part of this scheme, but he does not dispute the fact that he was personally paid millions of dollars in commercial fees, and that his business partner, Joseph Allaham, threatened to sue him for $5-10 million the partners earned from Qatar but that Allaham did not receive. Wolosky Declaration, Exh. 1 at 380:21-22. The cases Benomar cites are distinguishable since they did not involve the pursuit of a trade or business activity for personal profit.

The Complaint alleges that Benomar's involvement in the hacking conspiracy was part of a commercial enterprise, and that Benomar had extensive contact with Qatar's paid agents in the United States as well as with "Ahmed Al-Rumaihi, who as a former Qatari diplomat and executive with the Qatar Investment Authority has access to billions of dollars in capital." (ECF 1 at p 47-48). A co-conspirator has testified that Benomar owed him "from five to ten million" for the work they did for Qatar. (Wolosky Declaration, Exh. A at 380:21-22). Benomar cannot

establish that his activities do not fall within the commercial activity exception to immunity by simply asserting (MTD at 21) that he did not engage in any such activities. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 589, (2007). Nor has Benomar provided documentary support for his argument that the "advice Mr. Benomar provided Qatar was at the request of Morocco and part of his official functions." (MTD at 38).

Benomar's argument that he was not commercially "across the table" from the Plaintiffs (MTD at 38) also fails. None of these cases cited by Benomar impose any such limitation on the commercial activity exception. Indeed, all the cases cited by Benomar involved suits brought by domestic servants against their employers, who were foreign diplomats. *See Montuya v. Chedid*, 779 F. Supp. 2d 60, 61 (D.D.C. 2011); *Gonzalez Paredes*, 479 F. Supp. at 189; *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 124 (D.D.C. 2009); *Tabion*, 877 F. Supp. 285, *aff'd*, 73 F.3d 535.

Finally, as argued *infra* Sec. VIII, the Court should permit Plaintiffs to conduct limited jurisdictional discovery concerning Benomar's commercial and professional activity before concluding that the commercial activity exception has not been met.

## VII.    Benomar is Not Entitled to Derivative Sovereign Immunity

Benomar argues that because the Court in the Central District of California found that "Qatar is immune under the Foreign Sovereign Immunities Act," then Benomar has immunity as an "agent" of Qatar. (MTD 22). While the FSIA does establish immunity for foreign sovereigns (with specified exceptions), the Supreme Court in *Samantar* held that the FSIA does not apply to individuals acting on behalf of a foreign sovereign. *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010). A suit against a foreign official "in his personal capacity [that] seek[s] damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign

state as the Act defines that term." *Id.* Here, Plaintiffs have filed suit against Benomar in his personal capacity, and the FSIA does not apply.

While foreign sovereigns enjoy extensive immunities under the FSIA, that does not hold true for foreign officials under the common law. "[I]mmunity from jurisdiction is the exception, not the rule. . . . The limited jurisdictional immunities accorded to foreign officials derogate from this baseline." Chimène I. Keitner, "The Common Law of Foreign Official Immunity," 14 GREEN BAG 2d 61, 62 (2010).  "Not all acts performed under color of foreign law benefit from conduct-based immunity, even if those acts are also attributable to the foreign state." *Id.* In asserting derivative sovereign immunity, Benomar advances a conduct-based immunity defense that will require extensive examination of the scope of his relationship with the foreign state and whether the alleged activity should be protected under the common law. None of that factual record exists to support a finding by the Court.

*First*, Benomar has not established that the alleged activities were done "within the scope of his position for Morocco" (MTD 24) or that the "alleged actions were performed as part of the actor's official duty" as a Moroccan diplomat. *Lewis v. Mutond*, 258 F. Supp. 3d 168, 173 (D.D.C. 2017). Although the Court can also "look to statements of the foreign state that either authorize or ratify the acts at issue to determine whether the defendant committed the alleged acts in an official capacity," Morocco has not proffered any statement that Benomar participated in the alleged hacking conspiracy as part of his duties as a Moroccan diplomat. *Id.*

*Second*, Benomar argues that foreign official immunity exists because the Complaint said that he was an "agent" of the State of Qatar. (MTD at 24). Even if Benomar were an "agent" of Qatar, that does not establish immunity from suit. In *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272 (S.D.N.Y. 2015), the Court considered whether foreign official immunity would apply to

an Israeli national who was a "senior advisor to various high-ranking Israeli government officials." *Id.* at 275. That individual's immunity was only established after jurisdictional discovery, as directed by the Court, that required him to "[e]xplain the nature of your status as a 'senior advisor.'" *Id.* at 279.

"[S]imply being the government's common law agent does not entitle a contractor to derivative sovereign immunity. *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 n.8 (4th Cir. 2014) (discussing derivative sovereign immunity for a contractor to the U.S. government). There is "no authority for the notion that private persons performing Government work acquire the Government's embracive immunity." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), *as revised* (Feb. 9, 2016); *see also Brown v. Fort Benning Family Communities LLC*, 108 F. Supp. 3d 1367, 1373 (M.D. Ga. 2015) ("agency alone is not sufficient for the extension of derivative sovereign immunity. Instead, a private entity seeking derivative sovereign immunity must establish that it is an agent of the government *and* that the policies underlying the immunity support the extension of immunity to private contractor agents.") [10] The allegation that Benomar was an agent of Qatar is not, taken alone, sufficient to deprive this Court of jurisdiction.

---

[10] Although Benomar argues that all contractors for a foreign sovereign enjoy immunity, he only cites a single decision involving a contractor hired by a foreign sovereign. *Butters v. Vance Int'l, Inc.,* 225 F.3d 462, 466 (4th Cir. 2000). There, the court held that a company hired by the Saudis could not be sued for gender discrimination where it had failed to promote a female guard when that decision was made by the Saudi government. *Butters* is inapplicable for three reasons. *First*, and most importantly, *Butters* was decided before *Samantar* established that the FSIA does not apply to individuals. It therefore is no longer good law. *Second*, *Butters* concerned the provision of bodyguards to a Saudi prince visiting the United States, and the Court recognized that there was a strong sovereign "interest in protecting its leaders while they are in the United States." *Id.* at 466. *Third*, the case involved allegations of gender discrimination against hiring a female guard, and the Court noted that its decision was rooted in "tolerance" for Saudi Arabia's decision "to protect a member of its royal family in a manner consistent with Islamic law and custom." *Id.* at 467. Here, there is no cultural value that is upheld in allowing the agent of a foreign state—

Further, immunity does not extend to a contractor for a sovereign where the contractor had a significant role in planning and carrying out the tortious activity. Where the contractor was alleged to have "helped convince" the sovereign to undertake the tortious activity and to have had a "significant role in the design of the" tortious activity, dismissal on the basis of derivative sovereign immunity is not appropriate. *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1150 (E.D. Wash. 2017); *see also Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015) ("We have held that derivative sovereign immunity . . . is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'") Benomar is misrepresenting the Complaint in seeking to have it dismissed: the Complaint alleges that he was the "mastermind" behind Qatar's strategy for building influence in the United States (ECF 1 at ¶ 30) and that he was the "mastermind [of] the dissemination of stolen materials to the media and other third parties." (ECF 1 at ¶ 43). While Benomar may dispute these allegations, "[a]t the pretrial stage of litigation, we construe the record in a light favorable to the party seeking to avoid summary disposition[.]" *Campbell-Ewald Co*, 136 S. Ct. at 673. A "mastermind" of such a tortious strategy would not be able to claim derivative sovereign immunity.

In *Samantar*, the Supreme Court held that foreign official immunity could be determined through a Statement of Immunity from the State Department and, absent such a suggestion, the Court should analyze whether "the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Samantar*, 560 U.S. at 312. The State Department will recognize a request for immunity if "(1) the foreign state requests it, and (2) the defendant acted in his official capacity on behalf of a recognized foreign government." *In re Terrorist Attacks on*

---

whether of Qatar or Morocco—to participate in a hacking conspiracy against an American citizen.

*Sept. 11, 2001*, 122 F. Supp. 3d 181, 188 (S.D.N.Y. 2015). Benomar's immunity claim does not

satisfy that because no foreign state has requested immunity for him. *See* State Department

Statement of Interest, *Ahmed v. Magan*, Case No:2-10-cv-342 (S.D.Ohio, 2011),

https://www.state.gov/documents/organization/194069.pdf at 8 ("immunity protecting foreign

officials for their official acts ultimately belongs to the sovereign rather than the official.")

Benomar has not established that his alleged were done as part of his work as an official of a

foreign government.[11]

  Benomar has failed to establish that his immunity claim should be protected based on the

established policy of the State Department. Moreover, the many open factual questions suggest

that Benomar has not established an entitlement to dismissal on 12(b)(1) grounds. Derivative

sovereign immunity should not be considered as a "bar of suit. Rather, it is a defense which must

be established on summary judgment or at trial by demonstrating that plaintiff's injury occurred

solely by reason of carrying out the sovereign's will." *Schrader v. Hercules, Inc*., 489 F. Supp.

159, 161 (W.D. Va. 1980). That defense must be established based on facts that can only be

uncovered through discovery—including the scope of a defendant's relationship with a foreign

sovereign and whether the instructions complied with domestic (in this case Qatari) law.

*Yearsley v. W.A. Ross Const. Co.,* 309 U.S. 18, 21 (1940).[12]

---

[11] Further, the State Department has stated, and the Fourth Circuit held, that a foreign official,
like Benomar, who resides in the U.S. should not be granted foreign official immunity because
those "who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of
the courts, particularly when sued by U.S. residents." *Yousuf v. Samantar*, 699 F.3d 763, 777
(4th Cir. 2012) (citing State Department Statement of Interest); *see also* State Department
Statement of Interest, *Ahmed v. Magan*, Case No:2-10-cv-342 (S.D.Ohio, 2011),
https://www.state.gov/documents/organization/194069.pdf  at 9 (the United States has "a right to
exercise jurisdiction over its residents" and that it would allow "U.S. courts to adjudicate claims
by and against U.S. residents.")

[12] In any event, Benomar would not have derivative sovereign immunity because such immunity
only exists when the order complies with domestic law. *Yearsley* 309 U.S. at 414. Hacking is

## VIII.   Plaintiffs Are Entitled to Jurisdictional Discovery

Benomar has asserted two bases for immunity—"full status immunity" (a diplomatic immunity claim) and "foreign official immunity" (a conduct immunity claim). At this point, the record is not sufficiently developed to enable the Court to rule for Benomar on either ground. "[C]ourts generally require that plaintiffs be given an opportunity to conduct discovery on [] jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004). Here, the facts concerning Benomar's claimed immunity are unquestionably "peculiarly within [his] knowledge." Where a party has asserted a claim for immunity, courts will permit jurisdictional discovery on the "specific facts" that are "crucial to an immunity determination." *Funk v. Belneftekhim*, 861 F.3d 354, 367 (2d Cir. 2017) (holding that discovery against a company claiming immunity under the FSIA was appropriate). Indeed, in *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272 (S.D.N.Y. 2015), cited by Benomar, the court ordered jurisdictional discovery.

Plaintiffs are entitled to discovery concerning Benomar's position with the Moroccan Mission, his outside commercial activity for profit, his U.S. residency, and the scope of his relationship with Qatar

<u>CONCLUSION</u>

For the reasons stated above, the Court should deny Benomar's motion to dismiss.

 Dated: November 14, 2018

---

illegal under Qatari law and therefore no one carrying out such an order would benefit from derivative sovereign immunity. *See* Law No. 14 of 2014 Promulgating the Cybercrime Prevention Law, http://www.ilo.org/dyn/natlex/natlex4.detail?p_lang=en&p_isn=100242.

New York, New York

/s/ Lee S. Wolosky

Lee S. Wolosky
Robert J. Dwyer
Joshua J. Libling
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Phone: 212-446-2300
Fax: 212-446-2350
lwolosky@bsfllp.com
rdwyer@bsfllp.com
jlibling@bsfllp.com

Amy L. Neuhardt
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, D.C. 20005
Phone: 202-237-2727
Fax: 202-237-6131
aneuhardt@bsfllp.com