UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BROIDY CAPITAL MANAGEMENT LLC
and ELLIOTT BROIDY,

                Plaintiffs,

v.

JAMAL BENOMAR,

                Defendant.

Case No. 18-CV-6615-CS

## DECLARATION OF BRUCE C. RASHKOW

I, Bruce C. Rashkow, declare under penalty of perjury pursuant to 28 U.S.C. §1746 that to the best of my knowledge the following is true and correct:

1. I am a Lecturer at Columbia School of Law in New York, New York since 2012, having taught courses on United Nations Law and Practice, which have specifically included the subject of the immunity of the United Nations and its officials and staff.

2. I served some 40 years in the US Government and/or in the United Nations. From 2005 through 2011, I served in the United States Mission to the United Nations (New York) as the Senior Policy Adviser, the Acting Deputy, and later as the Acting Minister Counselor for Management and Reform. From 1995 through 2005, I served as the Director, General Legal Division, Office of Legal Affairs, United Nations. From 1987 through 1995, I served as the Assistant Legal Adviser for the United Nations Affairs Office. From 1984 through 1987, I served as the Assistant Legal Adviser for the Diplomatic Law and Practice Office. From 1982 through 1984, I served as the Director, Office of Canadian Maritime Boundary Adjudication.

From 1981 through 1982, I served as a Senior Litigator of the Land and Natural Resources Division, US Department of Justice. From 1972 through 1982, I served as Attorney (and later Chief) of the Marine Resources Section, Land and Natural Resources Division, US Department of Justice. A copy of my Curricula Vitae is attached to this Declaration.

    3. Throughout much of my career with the US Government and the UN, I was responsible for addressing issues relating to diplomatic privileges and immunities. For example, as Assistant Legal Adviser for Diplomatic Law and Practice, I was responsible for issues relating to the implementation of international and domestic law relating to privileges and immunities afforded foreign missions and their personnel in the United States and US missions and their personnel located abroad. I also was responsible for the coordination and support of litigation in US and foreign courts and international tribunals, including cases involving diplomatic and sovereign immunity. As Assistant Legal Adviser for United Nations Affairs, I advised the Department of State and US Mission to the United Nations and other international organizations on issues relating to participation in the United Nations, its specialized agencies, and other international organizations. This included participation in civil cases before the US courts raising issues of liability and immunity of the UN and other organizations and their officials. As Director of the General Legal Division in the UN Office of Legal Affairs, I provided a full range of in-house legal counsel advice to the Secretary General and other officials throughout the organization.

    4. Since my retirement from the UN and the Department of State, I have continued to give presentations and write articles on a wide variety of subjects of international law, including in regard to privileges and immunities in relation to the United Nations. *See* my Curricula Vitae (attached) for list of recent Awards, Articles and Presentations.

5. I attended the University of Wisconsin as an undergraduate, going directly from there to the De Paul College of Law where I received a LL.B (1967); and then on to Oxford University where I received a Diploma in International Law (1969). I have been admitted to a number of Bars, including the Illinois State bar, the U S Court of Appeals for the District of Columbia and the US Supreme Court.

6. I have been asked to provide an expert opinion regarding diplomatic immunity under the governing international law in relation to Jamal Benomar, assigned to the Permanent Mission of Morocco to the United Nations in connection to the case of *Broidy Capital Management LLC et al v Benomar*. In this regard, I have been asked to consider or opine on, among other things, (1) whether a diplomat must be physically present in the United States under VCDR Art. 39(1) at the time of notification to the host state so that immunity attaches upon such notification; (2) the meaning of the term "permanently resident in" under VCDR Article 39(1) and whether this restriction to diplomatic immunity applies to Mr. Benomar; and (3) the meaning of the term "commercial activity" under the VCDR and whether Mr. Benomar—in the context of the facts presented in Plaintiffs' Opposition to Defendant's Motion to Dismiss (at pages 13-14, 16-18)—engaged in "commercial activity" such that his diplomatic immunity is restricted under the VCDR.

7. On the basis of the analysis below, I am of the opinion that Mr. Benomar has been accorded diplomatic immunity by the Department of State fully in accordance with the provisions of the VCDR and UNHQA, and that there does not appear to be a basis for applying any restrictions regarding "permanent residency" or "commercial activities" under the VCDR to Mr. Benomar.

8. Diplomats assigned by their Governments to their Permanent Missions to the United Nations in New York are accorded diplomatic immunity in accordance with the United Nations Charter, the United Nations Headquarters Agreement with the United States (UNHQA, 61 Stat. 756, 11 U.N.T.S., 11 T.I.A.S. No 1676), the Vienna Convention on Diplomatic Relations (VCDR, 23 U.S.T. 3227), as applied pursuant to the UNHQA, Article V(15); and the General Convention on the Privileges and Immunities of the United Nations, 21 UST 1418 General Convention, Article IV).  The International Organizations Immunities Act (IOIA), codified as 28 U.S.C. 288-289, provides for functional immunity for foreign representatives to international organizations and employees of such organizations (Section 7, 22 USC 288d), and, at least regarding issues of diplomatic immunity of UN officials and UN Mission personnel, has been superseded by the UNHQA and the General Convention.

9. In regard to diplomats assigned to Permanent Missions to the United Nations, it is the UN (rather than the Member States) that formally asks the United States to acknowledge the privileges and immunities attendant to diplomats assigned to Permanent Missions.  The individual Member States provide the names, titles and functions of its proposed diplomats to the UN which, in turn, incorporates the information in a formal request to the US Mission to the UN.

10. A Circular Note issued by the US Mission sets out for the UN and Member States of the UN specific criteria relevant to reviewing requests from the UN to accord diplomatic status to individual proposed by the UN.  Circular Note HC-01-16, "Criteria for Diplomatic Privileges and Immunities" (Jan. 13, 2016).  These criteria reflect and elaborate objective criteria provided in the VCDR, for example in regard to the titles and functions recognized as diplomatic in

nature, the scope of employment as essentially full time, and a general prohibition against outside professional or commercial activity for profit in the United States.

11. The United States expeditiously reviews the UN request for according diplomatic status, generally relying upon and confirming the information contained in the request from the UN for diplomatic immunity, and then confirms agreement to the request and provides, in due course, an official Identification Card issued by the Department of State. In so doing, the United States finds that the person to whom it grants the official Identification Card satisfies the criteria set forth in Circular Note HC-01-16.

12. The Moroccan Mission and the UN requested that Mr. Benomar be accorded diplomatic status commensurate with his functions at the Moroccan Mission, and that request has been granted. *See* Attachment B to Letter of Mr. Lowell to U.S. District Court Judge Seibel, Notice to Court of Material Development, November 14, 2018. As provided in Attachment B, the United States Mission to the UN granted that request.

13. As a preliminary matter, under Article 39 of the VCDR and consistent with the practice of the UN, "[e]very person entitled to privileges and immunities shall enjoy them. . . *if already in its territory*, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." The term "already in the territory" has never been construed by the State Department to mean that the subject must physically be in the United States on the day of notification. It is instead sufficient under this Article that the diplomat has already been posted to his or her post and has already been working in that capacity.

14. Questions have nonetheless been raised in this case regarding two specific restrictions on when diplomats are entitled to immunities from the jurisdiction of the receiving state. The first restriction provides that a diplomat who is "permanently resident in" the receiving state is not entitled to full immunity, but instead shall enjoy immunity only in regard to official acts performed in the exercise of his functions. VCDR Art. 38(1). The second restriction provides that a diplomat engaged in any professional or commercial activity outside his official functions in the receiving state is not entitled to immunity in regard to such activity. VCDR 31(1)(c).

15. In my opinion, the facts plaintiffs have put forward for considering these restrictions on the immunity accorded to Mr. Benomar, Plaintiff's Opposition to Defendant's Motion to Dismiss, pp. 11-14, 16-18, fail to establish a basis under the VCDR for applying these restrictions to Mr. Benomar.

16. The criteria of "permanently resident" sets a very high bar for diplomatic agents. The State Department "Guidance" to which Plaintiff refers, pages 11-12, simply reiterates the restriction contained in Article 38 of the VCDR, without providing any guidance as to the application of that provision. The Department of State website addressing "Privileges and Immunities" to which Plaintiff refers does not on its face address the circumstances of Mr. Benomar's many years of diplomatic service to the UN in the United States. It generally addresses A-2 visa holders for diplomatic and consular posts in the United States. A-2 visa holders include administrative and technical and service staff of such missions. Mr. Benomar holds a G-1 visa.

17. Notably, the Department of State issued a Circular Note in 1991 that provides a definition of "permanently resident" but only in regard to these administrative and technical and

service staff. The Circular Note, Circular Note, Washington, D.C. April 10, 1991. hhps://www.state.gov/documents/organization/58891.pdf. provides: "This note addresses the definition of the term 'permanently resident in' for purposes of Article 38(2) of the Vienna Convention and Article 71(2) of the Vienna Consular Convention. Until the present time, the United States has, for the sake of its own convenience, equated this term with the status of 'permanent resident alien' as the latter expression is employed in United States immigration law. … Upon careful review of the definition of 'permanently resident in' including the drafting of the Vienna Conventions, the practice of other States, and the fundamental purposes of the Vienna Conventions, the Department has determined that members of the administrative and technical and service staffs of diplomatic missions and consular employees and members of the service staff of consular posts in the United States will be considered permanently resident in the United States for the purposes of the Vienna Conventions unless the employing foreign state provides appropriate documentation" along the lines indicated in the Circular Note and on the Department of State website. The "Guidance" and the website material were intended to focus on lower level staff, not on diplomatic agents such as Mr. Benomar in terms of addressing the relevance of the length of time that such diplomatic agents may have resided in the United States in the service of their missions.

18. Thus, the standards set out in Department of State website and the 1991 Circular Note regarding permanent residency generally do not relate to the residency in the United States of a diplomatic agent of a foreign government accredited to the United States or, as in the case of Mr. Benomar, an official of the United Nations - no matter how long they have resided in the United States - unless they have taken steps formally to change their foreign nationality. It is irrelevant to this issue that Mr. Benomar has lived in the United States since the early 1990s, or

that his wife and children are American citizens, and that he owns a home in the District. As I understand, Mr. Benomar has worked for the United Nations for some 25 years, in a variety of positions, as a Moroccan national; he has never taken any steps to change his nationality. As the State Department Guidance seems to acknowledge, in this day and age, it is not unusual for foreign diplomats serving in the United States to marry US nationals — and have children with such spouses — without ever changing their own nationality. Mr. Benomar's work for the UN and resulting presence in the U.S. has no impact on his then becoming a full diplomat for Morocco when his service at the UN ended.

19. The commercial activities restriction to immunity is likewise inapplicable based on the facts as presented in the Plaintiffs' papers. [Plaintiffs' Opposition at 13-14, 16-18] The VCDR provision relating to the restriction against engaging in any professional or commercial activity outside of his official functions in the receiving state provided in Article 31(1)(c) should be read along with Article 42 of the VCDR, which specifically provides that the diplomat "shall not in the receiving state practice for personal profit any professional or commercial activity." VCDR, Art. 42. The Executive Branch has narrowly interpreted the commercial activity restriction in the Vienna Convention. *See* Statement of Interest of the United States, *Corazon Taion v. Faris Mufti and Lana Mufti*, Civil Action No. 94-1481-A (E.D.Va. Jan. 27, 1995). The term "commercial activity" as used in Article 31(1)(c) focuses on the pursuit of trade or business activity. Statement, p. 4. As the State Department representative testified to Congress regarding the commercial activities restriction: "The ideas of remuneration and of continuous activity are central to the purpose of Article 31(1)(c)." Statement, p. 15 (quoting Denza, Diplomatic Law 166-67 (1976)).

20. Articles 31(1)(c) and 42 are echoed in regard to the UN in the Circular Note issued by the US Mission to the UN, "Criteria for Diplomatic Privileges and Immunities," Circular Note HC-01-16 (January 13, 2016). That Note provides that diplomatic privileges and immunities will apply only to persons who meet certain criteria, including that "they will be conferred only with respect to categories of individuals who will represent their countries before the United Nations as their primary function in the United States" and that the individual should "perform on behalf of the Member State, diplomatic duties directly related to the work of the United Nations on a full time basis, which the Department of State describes as at least thirty five hours each week at the Mission, and *shall not practice for profit any professional or commercial activity in the United States*."

21. Activity by a diplomat that involves the exchange of money is not generally deemed, by itself, "commercial activity" under this restriction unless done so by the diplomat in "pursuit" of a "trade or business" *and* "for profit." *See* Paragraph 19 above. In other words, the restriction generally is not focused on one-off activities, or in connection with an event or undertaking that is not a "trade or business." The restriction is instead intended to address a diplomat's "side business," that is, a continuing business pursued for profit that is inconsistent with the diplomat's duties, so as to protect those persons (and only those persons) with whom the diplomat commercially engages in the United States. As the history of the VCDR provisions relating to commercial activities suggests, the restriction is focused on offering redress to those who do business with the diplomat:

> [T]he *client* should be able to obtain a settlement of disputes arising out of the professional of commercial activities conducted in the country. It would be quite improper if a diplomatic agent, ignoring the restraints which his status ought to have imposed upon him,

could, by claiming immunity, force the *client* to go abroad in order to have the case settled by a foreign court.[1]

And if [commercial activities] do occur the *persons with whom the diplomatic agent has had commercial of professional relations* cannot be deprived of their ordinary remedies.[2]

Subparagraph c) of paragraph 1 would enable persons in the receiving State *who have professional and business dealings of a non-diplomatic character with a diplomatic agent* to have the same recourse against him in the courts as they would have against a non-diplomatic person engaging in similar activities.[3]

22. The facts as presented by Plaintiffs, even if true, fail to demonstrate that Mr. Benomar is engaged in any professional or commercial activity outside of his official function in the United States. The allegation that Mr. Benomar serves as an unpaid Director on the Lagardère SCA Supervisory Board, again even if true, presents no impediment to him serving the Moroccan Mission full time as a diplomatic agent. It is activity outside the country; it appears to be *de minimus*; and there is no evidence that he is even being paid. Further, even where a diplomat in fact engages in a commercial activity for profit and in a continuous, systematic manner, the scope of the waiver relates only to the party or parties with whom he has engaged in the commercial activity. A stranger to the commercial transaction cannot restrict the scope of a diplomat's immunity based on a commercial transaction of which the stranger has had no part.

---

[1] *See* Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur, U.N. Doc.A/CN.4/116 (emphasis added).

[2] Report of the Commission to the General Assembly, U.N. Doc. A/3859, reprinted in [1958] 2 Y.B. Int'l L. Comm'n 98, U.N. Doc. A/CN.4/SER.A/1958/Add.1 (emphasis added).

[3] 7 Digest of Int'l Law 406 (Whiteman 1970) (emphasis added).

In my opinion, nothing adduced by the Plaintiff in its Opposition [pages 13-14, 16-18] raises a significant concern under Articles 31 and 42 of the VCDR.

23. Separately, Plaintiffs assert that Mr. Benomar owes a third party money because of some claimed wrong. Assuming the truth of the facts alleged, this too would be well outside the commercial activities restriction. Apparently, neither Plaintiff claims any personal commercial relationship with Mr. Benomar. Their reliance is instead on an allegation that he might (or might not) owe someone else money. Nor do they cite to any evidence that he has entered into a contract for money even with respect to this third person or that Mr. Benomar is engaged in an ongoing "trade" or a "business" separate from his diplomatic duties. Under these circumstances, Mr. Benomar would not be deemed under the VCDR to have conducted "commercial activity" that would restrict his immunity in any way.

Executed in New York, New York, this 21st day of November 2018.

By: _____
Bruce C. Rashkow

**BRUCE C. RASHKOW**

Married
Address: 505 West End Avenue
New York, New York 10024
Telephone: Cell - (212) 602-1223
Home -1(212) 874-4385

**2012 - present: Columbia University Law School: Lecturer in International law, Law and Practice of the United Nations.**

**2006 - 2011 - United States Mission to the United Nations (New York)**

**September 2007 – 2011:** Acting Minister Counselor for Management Reform Section
**September 2006 to August 2007:** Acting Deputy Minister Counselor for Management Reform Section

Major responsibilities included providing leadership in developing, coordinating, and implementing US policy on UN budgetary, financial, personnel, management and administrative matters and representing the United States before the Administrative and Budgetary (Fifth) Committee of the UN General Assembly and other intergovernmental bodies.

**August 2005 – August 2006:** Senior Policy Adviser to U.S. Permanent Representative to the UN on Management Reform in the UN

Provided advice and assistance to the Permanent Representative and others in the US Mission to the UN and the US Department of State on the review of all then existing UN mandates as well as management reforms to enhance transparency, accountability and effectiveness of the UN.

**United Nations Organization (New York)**

**1995 – 2005:** Director, General Legal Division, Office of Legal Affairs, United Nations

Provided the full range of in-house legal counsel advice to the Secretary General and other officials throughout the Organization in respect to the financial, personnel, procurement, and other management and administrative issues. The office provided advice and assistance concerning the staffing of and support arrangements for UN headquarters and in relation to peacekeeping, humanitarian. and other missions of the Organization worldwide, as well as the provision of developmental and other assistance to Member States. The office was responsible for providing guidance on all substantial procurement issues and included direct management or supervision of the resolution of numerous substantial or sensitive procurement disputes as well as substantial or sensitive disputes by third party claimants against the Organization. This included resolution through negotiation of settlements as well as arbitration of disputes, under the immediate direction or supervision of the Director, in accordance with specific rules and procedures developed and elaborated by the Office during this period.

**US Department of State**

**1987 – 1995:** Assistant Legal Adviser for United Nations Affairs, Office of the Legal Adviser

Advised the Department of State and the US Missions to the UN and other international organizations on issues relating to the participation in the United Nations, its specialized agencies, and other international organizations. This included the full range of policy, management, and administrative issues, This included participation in civil cases before the US courts raising issues of the liability and of the immunity of the UN and other organizations and their officials, as well as litigation before the International Court of Justice raising issues of the jurisdiction and authority of those organizations, including the United Nations. These included both contentious cases before the ICJ, e.g., Lockerbie (Libya v USA) Provisional Measures, Order of 14 April 1992; as well as Advisory cases in which the US participated, e.g., Liability by Use of States of Nuclear Weapons in Armed Conflict, ICJ Reports 1996 and Difference Relating

to Immunities from Legal Process of a Special Rapporteur of the Commission on Human Rights, ICJ Reports 1995.

**1984 – 1987:**  Assistant Legal Adviser for Diplomatic Law and Practice and Litigation Management

Responsible for: (1) issues relating to the implementation of international and domestic law relating to privileges, immunities, benefits and facilities afforded foreign missions and their personnel located in the United States and U.S. missions and their personnel located abroad; and (2) the coordination and support of litigation in US, and foreign Courts and international tribunals, including cases involving diplomatic and sovereign immunity. These responsibilities included addressing claims of immunity for foreign diplomats or international civil servants in the US accused of committing crimes or otherwise violating the laws of the United States or other states.

**1982 – 1984:**  Director, Office of Canadian Maritime Boundary Adjudication

Responsible for team of professionals established to assist the Department in developing and arguing the U.S. case with Canada before the International Court of Justice relating to the boundary delimiting the continental shelf and exclusive fishery rights of the two countries in the Gulf of Maine.  A Delimitation of the Maritime Boundary in the Gulf of Maine Area (Canada/USA); Judgment, ICJ Reports 1984.

**US Department of Justice**

**1981 – 1982:**  Senior Litigator.  One of a select group of litigators designated to handle the most complex and important cases, within the Land and Natural Resources Division of the Department of Justice, including representing the interests of the US Government at all levels of the Federal judiciary.

**1972 – 1981:**  Chief, Marine Resources Section, Land and Natural Resources Division. Headed Office of 6 to 8 professional staff responsible for matters relating to exploitation and protection of the marine and the coastal environments, including responsibility for cases at all levels of the state and Federal judiciary, including the US Supreme Court.

1970 - 1972:  Attorney"Immunity of the United Nations: Practice and Challenges", 10 Int"l Org. L. Rev. 332 (2014)

**Recipient of the ABA Section on International Law Louis B. Sohn Award for contributions to the**

**field of public international law (2016).**

**Recent publications, panels:**

**"Immunity of the United Nations: Practice and Challenges", 10 Int"l Org. L. Rev. 332 (2014)**

**"Remedies for Harms Caused by UN Peacekeepers, Am. J. Int'l Law Unbound, http://**

**www.asil.org/blogs/remedies-harm caused-un-peacekeepers (April 2, 2014).**

**2014 Global Seminar on Military Justice Reform, Yale Law School (November, 2014) -**

**presentation on "Discipline in UN Peacekeeping Troop Contingents".**

**ABA Section of International Law Spring Meeting (April 28-May2, 2015), Leading the Way or Dragging Behind? The UN's Obligations in a Changing Legal Order.**

**ILA International Law Weekend (November, 2015), Sustainable Development as a Grundnorm of International Environmental Law and Policy**

**ILA International Law Weekend (November, 2016), Above the Law?  Innovating Legal Responses to Build A More Accountable UN: Where Is the UN Now?**