

BOIES
SCHILLER
FLEXNER

November 30, 2018

**By ECF**

Hon. Cathy Seibel, U.S.D.J.
United States District Court
300 Quarropas Street
White Plains, NY 10601

      Re:    *Broidy Capital Management LLC et al. v Benomar*, 7:18-cv-06615-CS

Dear Judge Seibel:

Pursuant to Your Honor's Individual Rules of Practice, Plaintiffs request that the Court schedule a pre-motion conference concerning Plaintiffs' motion seeking leave to file the attached Amended Complaint under Fed. R. Civ P. 15(a)(2). Plaintiffs seek to "make a formal motion for leave to amend" the Complaint that could be ruled on "at the same time as Defendants' pending Motion to Dismiss." *Novie v. Vill. of Montebello*, No. 10-CV-9436 CS, 2012 WL 3542222, at *6 (S.D.N.Y. Aug. 16, 2012) (Seibel, J.).[1]

Plaintiffs seek leave to amend specifically to address the new events regarding Defendant's diplomatic immunity that occurred after both the filing of the Complaint, after Plaintiffs submitted their Opposition Brief and that are raised for the first time in Defendant's Reply Brief on the Motion to Dismiss.[2] Where facts occurred after the complaint "was filed, and [are] relevant to the current proceedings, and because adding these facts would not prejudice Defendants, the addition of these facts is appropriate" and leave should be granted to amend. *Novie*, No. 10-CV-9436 CS, 2012 WL 3542222, at *7. Where relevant developments "postdate[]" the filing of the Complaint there is clear reason "as to why these allegations could not have been included in the [Complaint]" and leave should be granted to allow Plaintiffs to amend. *Id.*

*Novie* implements the principle recognized by the Second Circuit that it is proper "to allow a party to amend its complaint unless the nonmovant demonstrates prejudice or bad faith." *City of New York v. Group Health Inc.*, 649 F.3d 151, 157 (2d Cir.2011); *see also Fitzgerald v. Chase Home*

---

[1] Plaintiffs are not seeking to "turn the December 21 court date into an opportunity for oral argument[.]" (ECF 52). Plaintiffs are requesting leave to file a motion and, per the Court's instruction, will be present on December 21 unless the Court determines that postponing that appearance is appropriate. Oct 10, 2016 Tr. at 26:25. Our objective is to promote judicial efficiency by allowing the Court to consider these issues simultaneously.

[2] Contrary to Defendant's assertion that these issues have "already been considered and denied by the Court," (ECF 52), the Court could not have considered these new facts at the October 10, 2018 conference because they did not occur until weeks later. Defendant's counsel stated at the hearing that, "There's not one thing that they can allege at any point that will do anything to obviate the 12(b)(1) grounds that we're going to seek to dismiss on." (Oct 10, 2016 Tr. at 39:11-13). However, Plaintiffs' Amended Complaint does make allegations that directly address the new 12(b)(1) circumstances  and leave should accordingly be granted to file it.



*Fin., LLC*, No. 10-CV-4148 CS, 2011 WL 9195046, at *3 (S.D.N.Y. Feb. 28, 2011) (Seibel, J.) ("Granting leave to amend a complaint is appropriate if the amended complaint could state plausible facts upon which relief could be granted.")

The Complaint in this matter was filed on July 23, 2018. (ECF 1). On November 21, 2018, nearly four months after the Complaint was filed and one week after Plaintiff's filed their opposition to the 12(b)(1) motion, the Defendant presented a blue-bordered State Department diplomatic identification card. (ECF 49, Exh. 8). That card established, unlike any ambiguous email from the State Department or a "notif[ication] by a reporter" (ECF 52), that Mr. Benomar had been accredited as a diplomatic agent and is entitled to status immunity.[3]

Although Defendant argues that as a result, he is entitled to "full" immunity from this litigation (ECF 52), in fact he is limited to the immunity conferred by the Vienna Convention on Diplomatic Relations. *Tachiona v. United States*, 386 F.3d 205, 219 (2d Cir. 2004) (representatives to U.N. "afforded by Article 31 of the Vienna Convention"). Defendant has cited *Tachiona* for the principle that U.N. representatives have immunity under the Vienna Convention. (ECF 48 at 3). Article 31(1) of the Vienna Convention clarifies that the scope of a diplomatic agent's immunity in civil litigation is not unlimited: "He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of … [a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Indeed, Defendant concedes that diplomats do not have immunity for "money-making activities." (ECF 38 at 20). The proposed Amended Complaint (a copy of which is attached as Attachment 1) alleges that Defendant undertook tortious activity for personal profit that targeted Plaintiffs in the United States and that Defendant's activities did not involve any diplomatic functions. Those allegations —which would not have been made in the Complaint because the pertinent events had not yet occurred—are within the exception defined in Article 31(1)(c) and are not included in the official functions identified in the documentation that is now a part of the record. (ECF 39).[4] Similarly, Defendant is not entitled to "full" immunity because he is permanently resident in the United States.

Because Defendant's assertion of diplomatic immunity is based on events that occurred after the complaint was filed, Plaintiffs are entitled to file the attached Amended Complaint.

Respectfully submitted,
*/S/ Lee. S. Wolosky*
Lee S. Wolosky

Encl.
cc (w/encl.): Abbe David Lowell, Esq.

---

[3] Moreover, there is no dispute that all of these events relating to the State Department's accreditation of diplomatic status took place after the Complaint was filed—which was the standard used in *Novie* for considering when to grant the Plaintiffs leave to amend. *Novie*, No. 10-CV-9436 CS, 2012 WL 3542222, at *7.

[4] Plaintiffs noted in our opposition to the motion to dismiss that Benomar failed to provide any documentary evidence to support his novel claim that he provided advice to Qatar as part of his official functions as a Moroccan diplomat. (ECF 47 at 16-17). No such documentary support was included in the Defendant's reply and Benomar has failed to provide any support for this assertion. Instead, all of the documents he has provided from the Moroccan government show that his only official function was to work within the mission to advise the Head of the Mission. (ECF 49, Exh. 5).

# ATTACHMENT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>                               Plaintiffs,<br><br>              v.<br><br>JAMAL BENOMAR,<br><br>                               Defendant. | Case No. 18-CV-6615 (CS)<br><br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiffs Broidy Capital Management LLC ("BCM") and Elliott Broidy ("Mr. Broidy"), by and through their attorneys Boies Schiller Flexner LLP, bring this action seeking monetary damages and injunctive relief against Defendant Jamal Benomar ("Benomar"), as set forth below.

1.      This action concerns a controversial former U.N. official, Jamal Benomar, who resigned from his position at the United Nations on July 1, 2017 and shortly thereafter entered into a lucrative commercial opportunity working as a paid consultant for the State of Qatar from his home in the United States. In June 2017, Qatar had been subjected to international sanctions because of its support for terrorism. The Defendant and his U.S.-based business associates were paid millions of dollars by the State of Qatar and/or its affiliated entities to improve Qatar's image in the United States and to target its enemies in the United States, including U.S. citizens. Defendant and his business partners specifically targeted Plaintiffs and participated in a conspiracy to hack their computer systems and disseminate their stolen, confidential emails to the media as part of an effort to punish and eliminate the speech of critics of Qatar through a sustained cyber, information, and influence operation.

2.      After media reports of a federal criminal investigation of the illegal hack, after the

filing of the Complaint, and after a falling out with his U.S. business partners, Defendant scrambled in an effort to obtain full diplomatic immunity recognition in an effort to avoid liability.  Although the U.S. State Department has now recognized Defendant's diplomatic status and immunity, such immunity does not apply to "[a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions." Defendant's conduct falls squarely within this exception to full immunity; he is thus not entitled to immunity from the civil jurisdiction of the U.S. courts for his unlawful conduct directed against U.S. citizens. Similarly, because he is permanently resident in the United States, Benomar is only entitled to immunity under the Vienna Convention on Diplomatic Relations for acts conducted as part of his official functions—and since these acts were carried out for commercial gain, and not as part of any official function as a Moroccan diplomat, Benomar lacks immunity as to these claims.

3.     Plaintiffs' computer systems were hacked and the documents and information gained from that hack were organized and disseminated to United States journalists with the intention of causing financial, reputational and emotional harm to Plaintiffs.  The hacking and distribution conspiracy aimed to silence Mr. Broidy specifically, punish and eliminate his political expression, alienate him in U.S. foreign policy circles, and reduce his influence on United States foreign policy, particularly as it relates to the State of Qatar.

4.     Benomar facilitated, enabled, and participated in the conspiracy to target and unlawfully harm Mr. Broidy. Benomar participated in the organization and distribution of the stolen material to journalists, and took credit for the success of the scheme to use stolen documents to harm Plaintiffs. Benomar also handled payment to at least one other individual for their participation in the conspiracy.

2

5.      Benomar participated in the hacking and dissemination conspiracy for his own pecuniary and commercial benefit as part of his trade or business. He was among several individuals paid millions of dollars to influence and manipulate United States public policy, and interfere with and harm the reputation and business of Plaintiffs. This conduct falls squarely into the exception of immunity set forth below.

6.      Benomar is not entitled to diplomatic immunity in this case because Benomar's for-pay commercial activity was for his own financial benefit.

7.      As a result, Plaintiffs are entitled to relief from Benomar's unlawful conduct.

## THE PARTIES

8.      Plaintiff Broidy Capital Management LLC is an investment firm run by Plaintiff Elliott Broidy. BCM is a corporation duly organized under the laws of the State of California with its principal place of business in Los Angeles, California.

9.      Plaintiff Elliott Broidy is a citizen of the United States and the State of California who resides in Los Angeles, California. He is the Chief Executive Officer and Chairman of BCM. Until earlier this year, he was Deputy Finance Chair of the Republican National Committee.

10.     Defendant Jamal Benomar is a dual citizen of the United Kingdom and the Kingdom of Morocco who has permanently resided in the United States since 1992 and presently resides in this district.

## JURISDICTION

11.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

12.     Additionally, this Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because Plaintiffs are all citizens of the state of California and Defendant is a citizen of a foreign state who is not domiciled in the state of California. The amount in

controversy exceeds $75,000, exclusive of interest and costs.

**VENUE**

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the

Defendant resides in this district.

**STATEMENT OF FACTS**

**I.      RELEVANT BACKGROUND ON THE PARTIES AND THE STATE OF QATAR**

14.     Benomar moved to the United States in 1992 when he became the Director of the

Carter Center at Emory University in Atlanta, Georgia. He began working for the United Nations

in 1993.  Since 1992, he has been a resident of the United States on an uninterrupted basis, first

in Atlanta and then Westchester County , and he is an owner or co-owner of a home in this

district.

15.     During Benomar's controversial career at the United Nations he exhibited a bias

in favor of the interests of the State of Qatar, making Benomar an attractive asset for the State of

Qatar in the United States that the State of Qatar could directly or indirectly use.

16.     The State of Qatar has allowed and continues to allow itself to be a sanctuary for

terrorist leaders and organizations, including but not limited to Al Qaeda (and its affiliates

including Al-Shabab and Al Qaeda in Syria, also known as Al-Nusra Front or Jabhat Al-Nusra),

Hamas, the Taliban, and the Muslim Brotherhood.

17.     Numerous individuals residing in Qatar have been sanctioned by the United States

Department of Treasury for raising funds for Al Qaeda.

18.     The State of Qatar also has permitted Hamas leaders to operate freely within the

country. Indeed, the State of Qatar has provided substantial funding to Hamas, despite being

subjected to international political and economic sanctions for such support.

4

19.     The State of Qatar has further allowed the Taliban to operate and maintain an office in Doha.

20.     The State of Qatar has given safe haven to many leaders of the Muslim Brotherhood after their expulsion from Egypt by the Egyptian government.

21.     On June 5, 2017, several neighboring Middle Eastern states severed diplomatic relations with the State of Qatar and imposed an economic embargo against the State of Qatar because of its support for terrorism and its close ties to Iran. Several other governments soon did the same. The sanctioning states issued a set of demands to the State of Qatar including that it curb ties with Iran and stop funding terrorist organizations. Those demands were rejected.

22.     On July 1, 2017, Benomar resigned from the United Nations after a twenty-four year career. Almost immediately thereafter Benomar became a paid consultant by the State of Qatar and/or affiliated entities and he engaged in commercial activities that had the effect of advancing the interests of the State of Qatar and/or affiliated entities.

23.     Although Qatar is a nation rich in natural gas resources, it relies heavily on imports to sustain its economy. Consequently, the international sanctions threatened to devastate the State of Qatar's economy. For example, the economic quarantine led to a massive drop-off in foreign investment in the Qatar. According to the International Monetary Fund, "following the rift, foreign financing (non-resident deposits and inter-bank placements) and resident private-sector deposits fell by about US $40 billion."

24.     In 2017, Mr. Broidy became a vocal critic of Qatar's support for terrorists and Qatar's friendly relationship with Iran. Mr. Broidy, who views Qatar as a major threat to the security of the United States and its allies, began to provide financial support for public

initiatives—such as conferences—to educate Americans about Qatar's support for terrorist organizations.

25.     During 2017 and continuing into 2018, Mr. Broidy regularly conveyed his criticism of Qatar in meetings with United States Government officials, including President Trump.

26.     President Trump made statements critical of the State of Qatar's role as "a funder of terrorism at a very high level" and generally in support of the embargo. During a June 2017 meeting of the Republican National Committee, for example, President Trump criticized the State of Qatar for funding terrorism and also praised Mr. Broidy, who was present.

27.     As a result of Mr. Broidy's public statements and the fact that Mr. Broidy was known to be influential in American Jewish and Republican circles on the issues of terrorism and the embargo, as well as due to President Trump's statements and public identification of Mr. Broidy, Benomar and his associates, Nicolas Muzin ("Muzin") (the CEO of Stonington Strategies) and Joseph Allaham ("Allaham") (the CEO of Lexington Strategies)., identified Mr. Broidy as a significant impediment to the State of Qatar's foreign policy objectives with the U.S. government (most significantly, to end the embargo).

28.     After the embargo began, the State of Qatar began a multi-million dollar influence operation in the United States that specifically targeted Mr. Broidy and aimed to recruit American Jewish leaders to its cause. Benomar orchestrated portions of that influence operation in a commercial capacity, and entered into commercial contracts with Muzin and Allaham, among others.

29.     Later in 2017, after resigning from the |United Nations, Benomar was in need of a legal means to remain in the United States. The Kingdom of Morocco had not joined the

embargo of the State of Qatar. Benomar continued his permanent residency in the United States by using forms of foreign mission credentials.

30.     On November 1, 2017, the United States issued Benomar a G-1 visa, purportedly for a short-term and part-time assignment as a member of the staff of the Moroccan Mission to the United Nations. Benomar entered the United States using that visa on November 16, 2017. On information and belief, the Moroccan Ambassador to the United Nations did not follow the standard protocol of sending a letter to the United Nations to notify them of the appointment of a diplomat, which would have been standard and compulsory protocol. On information and belief, Benomar did not engage in full-time diplomatic work as required for a G-1 visa permitting service in a foreign mission in the United States. On information and belief, Benomar has not engaged in any diplomatic work since obtaining his G-1 visa.

31.     On or just before November 14, 2018, there were news reports and communications from the U.S. Department of State stating that Benomar had been "registered … with diplomatic privileges and immunities as of November 13, 2018." However, those communications did not indicate that his immunity was status immunity, as opposed to functional immunity.

32.     Neither the United States nor the United Nations recognized Benomar as a diplomat entitled to any form of immunity—and the United Nations had no record of Benomar serving in any mission to the United Nations—until October 2018, well after Plaintiff filed its complaint, and after a lengthy span of time with several opportunities for Defendant or counsel for Defendant to inform the court, or opposing party prior to effective service of process, of the claim that Benomar was a diplomat for the Kingdom of Morocco.

## II.     BENOMAR PARTICIPATED IN FOR-PAY COMMERCIAL CONSPIRACY TO TARGET MR. BROIDY

33.     Individuals hired to work to advance the interests of the State of Qatar in the Fall of 2017 included U.S. lobbyists and Benomar business partners Muzin and Allaham. Benomar arranged for Muzin and Allaham to be hired and subsequently entered into for-pay commercial activity with them.

34.     Agents of foreign nations working in the United States are required to disclose certain information to the Department of Justice pursuant to the Foreign Agents Registration Act ("FARA").

35.     In September 2017, Muzin disclosed pursuant to FARA that his firm received monthly payments of $50,000 from the State of Qatar. In December 2017, Muzin disclosed that starting in November 2017, the monthly payments had increased to $300,000 per month. It was not until October 2018, however, that Muzin disclosed that his firm had received a total of $3.9 million between September 18, 2017, and October 10, 2017, from Blue Fort Public Relations LLC, a corporation with an office in Doha, working to promote Qatari interests in the United States.

36.     Allaham did not register under FARA until he was publicly outed.  On June 6, 2018, Judge Katherine Forrest of the Southern District of New York granted Plaintiffs' motion to compel the production of documents from Allaham in a subpoena-enforcement action. That same day, Muzin announced via Twitter that his company (Stonington Strategies LLC) would no longer represent the State of Qatar. Also on June 6, Allaham issued a statement to the media, published early the next morning, stating that he was "no longer affiliated" with the State of Qatar, and that he would belatedly register under FARA as a foreign agent of the State of Qatar.

8

37.     In the June 15, 2018 FARA filing made as a result of the subpoena enforcement action, Allaham disclosed that in his work he reported to the Emir of Qatar and Mohammed bin Hamad Al Thani, receiving $1.45 million from Qatar or the Supreme Committee for Delivery and Legacy, an organization that helped to manage Qatar's 2022 World Cup bid.

38.     According to Muzin's October 26, 2018 FARA disclosure, Muzin disbursed $2.3 million of the $3.9 million Muzin received to advance the interests of the State of Qatar to Allaham's Lexington Strategies. Allaham has not reported the receipt of these funds to the Department of Justice under FARA for the work Muzin reported in his disclosure. According to available FARA filings, Muzin and Allaham have received approximately $7 million for their work on behalf of Qatar.

39.     Benomar has received millions of dollars in compensation for commercial services to advance the interests of the State of Qatar and has not publicly disclosed this compensation.

40.     While claiming to be a full-time diplomat of the Kingdom of Morocco, Benomar engaged in personal financial transactions in the United States that were inconsistent with his claimed status as a full-time diplomat.

41.     Benomar was in close contact with Muzin and Allaham and worked with them to target Mr. Broidy. They began working together in the summer of 2017.  Allaham and Benomar spoke by telephone at least eighty times between June and November 2017 and, on August 6, 2017, Muzin established a group chat for the three of them on WhatsApp, which they used to communicate regarding their business.

42.      In the Summer and Fall of 2017, Benomar, Allaham, and Muzin worked together to craft a strategy for improving the State of Qatar's position in the United States.  They

9

identified Mr. Broidy as a target of their paid commercial activity that had the effect of advancing Qatari interests.

43.     For example, Muzin identified and described Mr. Broidy to the Qatari government as an impediment to Qatar's foreign policy interests in the U.S.

44.     On November 16, 2017, Benomar re-entered the United States.

45.     Starting on November 20, 2017 and continuing through the end of that month, Benomar engaged in extensive communications with Ali al-Thawadi, former or current Chief of Staff to Mohammed bin Hamad Al-Thani.,Mohammed bin Hamad Al-Thani is the brother of the Emir of Qatar. Allaham reports to Mohammed bin Hamad Al Thani according to his FARA filing. On information and belief, Al-Thawadi worked with Benomar to advance the conspiracy against Mr. Broidy. Al-Thawadi has been tied in news accounts to "black ops" that were perpetuated by the Supreme Committee on behalf of Qatar's 2022 World Cup bid. *See* "Qatar Sabotaged 2022 World Cup Rivals with Black Ops," The Sunday Times, July 29, 2018; https://www.thetimes.co.uk/article/exclusive-qatar-sabotaged-2022-world-cup-rivals-with-black-ops-glwl3kxkk. Allaham disclosed in his belated FARA filings that he worked for the Supreme Committee.

46.     Benomar and Al-Thawadi also engaged in substantial communications starting on June 6, 2018. As discussed above, that was the date when Judge Forrest in the Southern District of New York denied Qatar's motion to stop discovery of Allaham's communications regarding his work for Qatar.

47.     From November 20, 2017 to the end of the month, Benomar remained in regular communications with Allaham.

48.     Sometime prior to December 27, 2017, as part of the overall operations against Mr. Broidy, cyber mercenaries acting on behalf of the State of Qatar began to coordinate an offensive cyber and information operation against Plaintiffs, including by infiltrating Plaintiffs' computer networks in Los Angeles, California and obtaining unauthorized access to Google email accounts of United States persons associated with Plaintiffs.

49.     The hacking campaign was highly sophisticated and involved spear phishing e-mails and text messages to multiple individuals associated with Plaintiffs as well as the use of obfuscation techniques, such as Virtual Private Network ("VPN") servers that mask the location of the attackers.  Indeed, the web addresses used in the attack against Plaintiffs were linked to cyber threat actors who had launched phishing attacks against over 1,000 individuals in the time period from May 2017 to June 2018. Data obtained by Plaintiffs appear to show that the attacks date back to at least 2014. Some of the other recipients of the phishing attacks were, like Mr. Broidy, outspoken critics of the State of Qatar, and the cyber attackers used IP addresses in Doha, Qatar to launch some of the attacks against these other individuals.

50.     Efforts to gain access to BCM's network appear to have commenced as early as January 7, 2018. The first successful access was gained on January 16, 2018, just two days after a successful spear phishing campaign on Mr. Broidy's Executive Assistant. The attackers maintained unauthorized and unlawful access to the BCM email server until at least February 25, 2018. During this period, there were thousands of instances of unlawful and unauthorized access—many from points wholly within the United States—to corporate email accounts at BCM, including but not limited to unlawful and unauthorized connections to Mr. Broidy's and his Executive Assistant's email accounts at BCM. The unauthorized access was used to steal e-mails, business plans, intellectual property, trade secrets, and other documents sensitive for both

11

personal and professional reasons.

51.     During the period of the attack on Plaintiffs' computer systems, and while in the United States, Benomar served as the paymaster for Muzin and Allaham.

52.     On December 14, 2017, Benomar spoke with Muzin, and the next day Muzin received a payment of $500,000 from the State of Qatar. Benomar was in frequent contact between October 2017 and June 2018 with members of the conspiracy, including senior Qatari officials, identified in the Amended Complaint during times critical to the attack against Plaintiffs.

53.     Allaham testified that Benomar had not paid him the full amount he was due for Allaham's work advancing Qatari interests and that Allaham was owed  an additional "five to ten million" dollars, establishing Benomar's paymaster role for this conspiracy. Allaham expressed an interest in having that payment handled "offshore."

54.     After Plaintiffs' private communications, emails, documents and intellectual property were unlawfully obtained, members of the hacking conspiracy reviewed and organized them for dissemination to journalists. Benomar reviewed the Plaintiffs' stolen documents for this purpose, including by travelling to Qatar in early 2018. After his return to the United States, Benomar continued advancing the conspiracy's goals of organizing and distributing Plaintiffs' stolen documents.

55.     Allaham and Muzin discussed how Benomar helped review Plaintiffs' stolen materials in WhatsApp chats they exchanged  on March 13, 2018. Allaham states: "Try to get the emails, That [*sic*] what he was doing there. Reviewing them." Allaham, who by that time had stopped being paid through Benomar, also stated: "I'm sure he took the credit[.]" Muzin agreed: "Yes for sure."

12

56.     At the time he reviewed and organized Plaintiffs' stolen materials, and at the time he took credit for the campaign against Mr. Broidy, Benomar was aware that the materials had been stolen from Plaintiffs.

57.     Benomar's telephone records in February and March 2018—the crucial period for reviewing and disseminating Plaintiffs' stolen documents—reveal at least dozens of communications with Ahmed Al-Rumaihi, a former high-level Qatari diplomat who participated in the conspiracy to hack and disseminate Plaintiffs' materials.

58.     On February 24, 2018, members of the conspiracy registered the email address "LA.Confidential@mail.com." This e-mail address was then used to disseminate the packets of stolen documents and other information that Benomar had helped prepare to journalists so as to cause the publication of articles based on those stolen documents and other information the co-conspirators produced.  The first such article in which the contents of documents stolen from Plaintiffs' computers and servers appeared was published in the March 1, 2018 *Wall Street Journal*.

59.     Stories based on the stolen materials (and in some cases based on fabricated information) were published or reported on in media outlets, including the *Huffington Post* on March 2, 2018, the *New York Times* on March 3, 2018 and the BBC on March 5, 2018.

60.     From March 4 to 6, 2018 Allaham sent multiple updates to Benomar about articles that had been posted online based on Plaintiffs' stolen materials and Benomar's efforts.

61.     These activities were engaged in by Benomar for commercial and pecuniary gain as part of a trade or business. Benomar received millions of dollars from the State of Qatar and/or affiliated entities for his efforts to punish and silence a perceived antagonist of Qatar, Mr. Broidy. Plaintiffs were not strangers to Benomar's continuing business interests but, to the

13

contrary, were explicitly identified targets of attack. Benomar was also compensated for this activity through various means including appointment to corporate boards at companies in which affiliates of the State of Qatar were heavily invested. Until after the Complaint in this action was filed, Benomar had never claimed publicly to be a diplomat for the State of Qatar or the Kingdom of Morocco after his retirement from the United Nations.

62.     Benomar did not have instructions from the Kingdom of Morocco to take part in the review and dissemination of Plaintiffs' stolen materials. Benomar had not been given any authorization from a Moroccan official to undertake such work as part of any official functions he may have had in connection with any responsibilities he may have had for the Permanent Mission of the Kingdom of Morocco to the United Nations.

63.     During the November 1, 2017 to August 1, 2018 period, within which Benomar claims to have been a Moroccan diplomat, there is no contemporaneous reporting in the public domain supporting the diplomatic status Benomar now claims to have had. Extensive searching of news media items turned up no news article identifying Benomar as a diplomat or government official working on behalf of his native country.  There is not a single instance in which Benomar is referred to by a title or description suggesting that he was employed by or otherwise associated with the Moroccan Mission to the United Nations, or otherwise formally associated with the Moroccan government.  There are no results for Benomar and "Minister Plenipotentiary" or "Permanent Mission," or even "Benomar" and "Morocco" and "Mission," in English, French, and Arabic.

64.     There is contemporaneous evidence during this period of time that Benomar was *not* a Moroccan diplomat.  U.N. records notably do not list Benomar as a Moroccan diplomat during this period of time. The U.N. Blue Book contains a list of senior accredited diplomats

including Ministers Plenipotentiary at each country's U.N. mission. The U.N. Blue Book valid as of November 17, 2017 does not list Benomar at the Permanent Mission of the Kingdom of Morocco. The U.N. Blue Book valid as of August 18, 2018 does not list Benomar at the Permanent Mission of the Kingdom of Morocco.

65.     Benomar's trade or business activity in the United States to advance Qatari interests was not limited to attacking Plaintiffs.  Rather, the attack on Plaintiffs was part of Benomar's continuing business pursued for profit. For example, Benomar engaged in extensive conversations with individuals who had been identified by Allaham and Muzin as "influencers" in both Republican and Jewish circles who should be targeted to support the State of Qatar. *See* Julie Bycowicz, "The New Lobbying: Qatar Targeted 250 Trump 'Influencers' to Change U.S. Policy," Wall Street Journal, August 29, 2018, https://www.wsj.com/articles/the-new-lobbying-qatar-targeted-250-trump-influencers-to-change-u-s-policy-1535554647. Benomar's telephone records show over 100 calls in late 2017 and early 2018 with American "influencers" on Muzin's and Allaham's list.

66.     Benomar's trade or business activity in the United States to advance Qatari interests also continues through the present.  In September 2018, Benomar was appointed to the Supervisory Board of Lagardère SCA (a multinational conglomerate). Benomar was appointed to this position at the behest of the Qatar Investment Authority, which has a large stake in Lagardère SCA, and which compensates Benomar for his service on that board. Lagardère SCA has a considerable presence in the United States. For example, in August 2018, it agreed to purchase a United States-based travel retail company for $330 million. Consequently, Benomar's service on the Supervisory Board of the company of necessity involves his engagement in trade

or business activity in the United States since part of that position involves oversight of the company's operations, including those in the United States.

### III.   AFTER THE COMPLAINT IN THIS ACTION WAS FILED, BENOMAR SCRAMBLED TO COBBLE TOGETHER A DEFENSE OF DIPLOMATIC IMMUNITY

67.   Prior to filing the instant action, Plaintiff obtained Benomar's phone records from a subpoena to T-Mobile. Neither Benomar nor T-Mobile ever suggested that those records were protected by diplomatic immunity.

68.   On July 23, 2018, Plaintiffs filed the Complaint in this action in the Southern District of New York.

69.   On August 20, 2018, a process server delivered the summons and Complaint to Benomar's wife at the residence she shares with Benomar in Scarsdale, New York.

70.   On August 21, 2018, counsel for Benomar wrote to the Court stating that Benomar had agreed not to contest service. That letter made no mention of any affiliation the Defendant had with the Moroccan Mission to the United Nations and did not assert that Benomar had diplomatic status that would bar effective service of process.

71.   In numerous communications between counsel for Benomar and counsel for Plaintiffs during the summer of 2018, counsel for Benomar never mentioned any purported diplomatic status.

72.   On September 4, 2018, counsel for Benomar again wrote to the Court, but made no reference to any position that Benomar had with the Moroccan Mission to the United Nations and made no reference to any claim for diplomatic immunity.

73.   On September 28, 2018—more than a month after Benomar had been served and counsel had appeared for him—counsel for Benomar wrote a letter to the Court conceding that Benomar had "counseled Qatar" but asserting that it was on behalf of another nation—the

16

Kingdom of Morocco.

74.     On August 1, 2018, after the Complaint was filed, the Moroccan Ambassador to the United Nations wrote to the United Nations Director of Protocol seeking to appoint Benomar as a "conseiller special" (special advisor) to the Moroccan Mission.

75.     On August 27, 2018, the U.S. State Department issued Benomar an Official Identification Card that stated that he was "Support Staff" at Moroccan Mission and, as stated in the accompanying letter, would have "immunity from jurisdiction only with respect to acts performed in the course of official duties."

76.     That same day, the Moroccan Mission wrote to the State Department requesting that Benomar's identification card be replaced with "a new ID card mentioning his title of 'Special Adviser' and the same as the cards delivered to the other diplomats accredited to this Mission".

77.      The Moroccan Mission notified the State Department of a change in Benomar's diplomatic rank in a September 21, 2018 letter to the U.S. Mission to the United Nations. That letter noted that Benomar had now been appointed "as a Minister Plenipotentiary at this Permanent Mission, in charge of the Political Section." In an October 5, 2018 letter, the Minister of Foreign Affairs and International Cooperation of the Kingdom of Morocco wrote a letter to the U.S. Embassy in Rabat stating that Benomar had the title of Minister Plenipotentiary. However, the description of Benomar's duties made no mention of his running the Political Section and instead said that Benomar's "full time diplomatic duties include advising the head of the Mission on political issues related to the United Nations, as well as on regional and international conflicts."

78.     Benomar's pursuit of continuing for-profit commercial activities that had the effect of advancing the interests of the State of Qatar, including through targeting Plaintiffs, contravened his duties as a diplomat. During the period of the conspiracy and Benomar's broader work on behalf of Qatari interests, Benomar's primary function in the United States was not diplomacy at the United Nations on behalf of Morocco, and Benomar did not spend the 35-hours-per-week required by the State Department on working for the Moroccan Mission to the United Nations.

79.     No letter sent by the Kingdom of Morocco made any reference to Benomar advising Qatar or any other foreign sovereign as part of his duties. No letter sent by the Kingdom of Morocco made any reference to Benomar working with commercial agents (including Allaham and Muzin) in the United States as part of his official duties. No letter sent by the Kingdom of Morocco made any reference to Benomar taking part in a cyber-attack against Americans or the distribution of materials stolen from American citizens as part of his official duties. The only official duties described in letters sent by the Kingdom of Morocco were: (a) the management of the Political Section in the Moroccan Mission; and (b) advising the head of the Moroccan Mission.

80.     On October 10, 2018, the Moroccan Ambassador to the U.N. wrote to the U.N. Chief of Protocol requesting that Benomar's diplomatic title be changed from "Special Advisor" to "Minister Plenipotentiary" and that he be issued updated diplomatic documents.

81.     On November 13, 2018, the U.S. State Department issued a blue-bordered Diplomatic Identification Card to Benomar.

82.     A blue-bordered Diplomatic Identification Card generally signifies that the bearer is entitled to complete immunity, but immunity does not attach to actions relating to the bearer's

professional or commercial activity in the United States.  *See* Article 31(1) of the Vienna

Convention on Diplomatic Relations ("A diplomatic agent shall enjoy immunity from the

criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and

administrative jurisdiction, except in the case of: . . . An action relating to any professional or

commercial activity exercised by the diplomatic agent in the receiving State outside his official

functions."). Nor does it establish that the individual is not permanently resident in the United

States and therefore only entitled to functional immunity as a matter of international law. *See*

Article 38(1) of the Vienna Convention on Diplomatic Relations (Except insofar as additional

privileges and immunities may be granted by the receiving state, a diplomatic agent who is a

national of permanently resident in that State shall enjoy only immunity from jurisdiction, and

inviolability, in respect of official acts performed in the exercise of his functions.")

83.     Benomar was paid millions of dollars to participate in a scheme that resulted in

hacking Plaintiffs' confidential information and disseminating it to journalists in order to

suppress Plaintiffs' Constitutional rights to free speech and participation in the political process.

### IV.     BENOMAR IS NOT ENTITLED TO DIPLOMATIC IMMUNITY IN THIS CASE

84.     Benomar's conduct set forth in the Complaint was not in his capacity as a

diplomat. Benomar's conduct was for personal financial gain in a commercial capacity.

85.     The Kingdom of Morocco did not direct Benomar to participate in this conspiracy

targeting Mr. Broidy, as established by as the Moroccan government's letters and documentation

describing Benomar's functions that Benomar submitted to this Court.

86.     Even if the Kingdom of Morocco did direct Benomar to participate in this

conspiracy to target and harm Mr. Broidy, Benomar's claim that he gave "advice" to the State of

Qatar in his capacity "as a Moroccan diplomat" could not extend to the tortious activity alleged

in the Complaint because it falls squarely within the commercial activity exception to diplomatic immunity.

87.     Benomar is, in any event, a permanent resident of the United States for purposes of the Vienna Convention on Diplomatic Relations and accordingly would only be entitled to immunity for acts performed as part of his official functions as a Moroccan diplomat. Since his official functions did not include participating in a conspiracy directed against the Plaintiffs, he does not have immunity from this suit.

88.     Mr. Broidy is therefore entitled to relief from Benomar's unlawful conduct.

**FOR A FIRST CAUSE OF ACTION:**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION**
**OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ. 51.**

89.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

90.     The materials that the attackers stole from Plaintiffs' computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

91.     The BCM server stored trade secrets including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships. These trade secrets are of immense value to Plaintiffs.

92.     Plaintiffs take and have taken reasonable measures to keep this information secret. For example, Plaintiffs have always maintained their information on secured servers that are protected by passwords, firewalls, and antivirus software.

20

93.     Plaintiffs' trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

94.     Benomar participated in the conspiracy to disseminate Plaintiffs' trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Benomar disclosed, or aided in the disclosure of, the trade secrets by sharing those trade secrets with media organizations, as discussed herein, while knowing or having reason to know that the trade secrets were acquired by improper means.

95.     As a direct consequence of Benomar's misappropriation, Plaintiffs have suffered damages, which include, but are not limited to, damage resulting from harm to Plaintiffs' computers and servers, loss in the value of Plaintiffs' trade secrets and business information, and harm to Plaintiffs' business, in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

96.     Furthermore, on information and belief, as a direct consequence of Benomar's unlawful misappropriation, he has unjustly benefited from possession of Plaintiffs' trade secrets.

97.     In misappropriating Plaintiffs' trade secrets, Benomar acted willfully and maliciously. Plaintiffs are thus entitled to exemplary damages and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

## FOR A SECOND CAUSE OF ACTION: CONVERSION OF STOLEN PROPERTY

98.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

99.     Plaintiffs had a possessory right and interest in the documents and information stolen during the hack on Plaintiffs' computer systems.

100.     Among the rights Plaintiffs had over the stolen documents was the right of exclusion, preventing others from having access to those documents.

101.     Benomar participated in the conspiracy that received and converted the stolen documents knowing that they had been stolen from Plaintiffs.

102.     Benomar and/or his co-conspirators exercised dominion over the stolen documents, and derogated Plaintiffs' right to exclusion both through his own possession and through dissemination to various media outlets.

103.     Plaintiffs were harmed thereby in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

**FOR A THIRD CAUSE OF ACTION:**
**UNJUST ENRICHMENT**

104.     Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

105.     Benomar received compensation for his services rendered to Qatar.

106.     The purpose of the illegal hack and dissemination to the media of information stolen from Plaintiffs' computer servers were to cause Plaintiffs embarrassment, as well as financial and emotional harm.

107.     The illegal hack and dissemination did in fact cause Plaintiffs embarrassment, as well as financial and emotional harm, including damaged business prospects and having to resign from certain positions of value to Plaintiff Broidy.

108.     Equity and good conscience require restitution of the monies earned by Benomar from Qatar to Plaintiffs.

**FOR A FOURTH CAUSE OF ACTION:**
**CIVIL CONSPIRACY**

109.     Plaintiffs incorporate and adopt by reference the allegations contained in each and

22

every preceding paragraph of this Complaint.

110.    On information and belief, Benomar willfully, intentionally, and knowingly agreed and conspired with others known and unknown to engage in the unlawful conduct alleged herein, including but not limited to possessing, analyzing, editing, compiling, and distributing to third-parties documents, information, and trade secrets stolen from Plaintiffs' computer systems.

111.    Benomar knew that the documents, information, and trade secrets that the conspirators were involved in possessing, analyzing, editing, compiling, and distributing had been stolen from Plaintiffs' computer systems.

112.    Plaintiffs were harmed thereby in an amount to be proven at trial, but in any event, in excess of $75,000, exclusive of interest and costs.

## **REQUEST FOR RELIEF**

113.    Plaintiffs repeat and re-allege the allegations contained in each and every preceding paragraph of this Complaint.

114.    Plaintiffs request that this Court order the following relief:

   a.  Grant judgment in favor of Plaintiffs and against Defendant;

   b.  Enjoin Defendant against dissemination of the documents and information stolen from Plaintiffs;

   c.  Award Plaintiffs an appropriate amount in monetary damages as determined at trial, including interest;

   d.  Award Plaintiffs punitive damages under 18 U.S.C. § 1836(b)(3);

   e.  Award Plaintiffs attorneys' fees and the costs of bringing this action; and

   f.  Grant Plaintiffs such other relief as is just and appropriate.

Dated: November 30, 2018
        New York, New York

/S/ Lee S. Wolosky

_____

Lee S. Wolosky
Robert J. Dwyer
Joshua J. Libling
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Phone: 212-446-2300
Fax: 212-446-2350
lwolosky@bsfllp.com
rdwyer@bsfllp.com
jlibling@bsfllp.com