181221broidyD                    Decision

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------x

3   BROIDY CAPITAL MANAGEMENT,
    LLC, et al.,
4
                    Plaintiffs,
5
                 v.                           18 Civ. 6615 CS
6
    JAMAL BENOMAR,
7
                    Defendant.
8
    ----------------------------x
9                                        United States Courthouse
                                         White Plains, N.Y.
10                                       December 21, 2018
                                         10:00 a.m.
11
    Before:
12
                      THE HONORABLE CATHY SEIBEL,
13
                                                   District Judge
14
                            APPEARANCES
15
    BOIES SCHILLER & FLEXNER, LLP
16       Attorneys for Plaintiff Broidy Capital Mgmt., et al.
    SAM KLEINER,
17  ROBERT JEFFREY DWYER
       -and-
18  LEE SCOTT WOLOSKY

19  WINSTON & STRAWN, LLP
         Attorneys for Defendant Jamal Benomar
20  ABBE DAVID LOWELL
       -and-
21  ERIC WESTON BLOOM

22

23

24

25

              SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
                            (914)390-4053

181221broidyD              Decision

1              (In open court)

2              THE DEPUTY CLERK:  In the matter of Broidy v. Benomar.

3              THE COURT:  Have a seat.  Let me make sure I know who

4    is who.

5              Mr. Wolosky.

6              MR. WOLOSKY:  Good morning, your Honor.

7              THE COURT:  Mr. Kleiner --

8              MR. KLEINER:  Good morning, your Honor.

9              THE COURT:  And Mr. Dwyer.

10             MR. DWYER:  Good morning, your Honor.

11             THE COURT:  Good morning.

12             And Mr. Lowell.

13             MR. LOWELL:  Yes, ma'am.

14             THE COURT:  And Mr. Bloom.

15             MR. BLOOM:  Good morning, your Honor.

16             THE COURT:  Ordinarily, I invite the lawyers to tell

17   me if there's anything they want to add that's not covered by

18   the papers.  I'm a little nervous about doing that because, in

19   this case, sometimes I think the lawyers tell me things because

20   they would like to see them quoted back later in the paper or

21   because they want to make me think the other side or the other

22   side's lawyer is a good guy or bad guy.  I'm really not

23   interested in that.

24             I don't care if Mr. Benomar did great things when he

25   was with the UN or if he did terrible things since, and I don't

181221broidyD              Decision

1    care if Mr. Broidy is doing great things for the government or

2    is under investigation by the government.  I don't want to hear

3    any of that.

4         But if there's something related to the motion that

5    you didn't have the opportunity to cover in the papers, I'll

6    give you the opportunity to say a few words, but don't feel

7    obligated.  It's your motion, Mr. Lowell.

8         Is there anything not covered by the papers that you

9    think is important?

10        MR. LOWELL:  I don't think so, your Honor.  I think

11   you gave us the chance to fully brief the legal issues that

12   apply, and I feel like we have given you all that we need to

13   ask for the relief that we ask.

14        THE COURT:  Mr. Wolosky, any last words?

15        MR. WOLOSKY:  No, your Honor.  Obviously, we had

16   sought leave to amend our complaint to account for the

17   case-changing development that occurred in the middle -- two

18   months after we filed our complaint, as evidenced by the

19   submission made to the Court of a blue card on November 21st.

20   Obviously, our amended complaint would seek to add the

21   jurisdictional allegations that are now relevant to the status

22   that's been confirmed relating to the defendant by the State

23   Department.

24        THE COURT:  Well, I'll get to that.

25        MR. WOLOSKY:  Thank you, your Honor.

181221broidyD          Decision

1          THE COURT:  Let me tell you where I come out.

2          First of all, it's the defendant's motion to dismiss

3     under Rule 12(b)(1) on grounds of diplomatic immunity and

4     derivative sovereign immunity.  I take the factual background

5     from the complaint and the various exhibits, declarations and

6     affidavits provided in connection with the motion.

7          And by the way, to the extent the plaintiffs objected

8     to Mr. Lowell's declarations' failure to properly authenticate

9     the exhibits attached to it, and that declaration was Document

10    40, an objection that, in large part, was well taken, that

11    objection has largely been mooted by the defendant's

12    supplemental declaration, which is Document 49, which I think

13    does properly authenticate the exhibits attached to it.

14         The plaintiff, Broidy Capital Management, LLC, is an

15    investment firm.  The plaintiff, Elliott Broidy, is the C.E.O.

16    and Chairman of Broidy Capital Management.  He is the former

17    Deputy Finance Chair of the Republican National Committee.

18         The defendant, Jamal Benomar, was born in Morocco, is

19    a citizen of the United Kingdom and resides in this district.

20    In 1993, he joined the United Nations.  During his career at

21    the UN, he held various positions in New York, Geneva, and

22    other locations.  Over the course of his career, he's resided

23    in the U.S. for significant periods.

24         On July 1, 2017, he left the UN after 24 years.  At an

25    unstated time thereafter, he was asked to advise the Kingdom of

181221broidyD            Decision

1   Morocco by becoming an official in the Kingdom's Permanent

2   Mission to the UN.  And this is coming largely from his

3   declaration.  He asserts that since November 1 of last year, he

4   has served as a diplomat with the highest diplomatic rank of

5   Minister Plenipotentiary at the Permanent Mission as accredited

6   by the Ministry of Foreign Affairs and International

7   Cooperation of the Kingdom of Morocco.

8        In recognition of his diplomatic status, on November 1

9   of last year, the U.S. granted him a G-1 diplomatic visa, which

10  is attached to his supplemental declaration as Exhibit 1.  That

11  visa remains operative and doesn't expire until October 2022.

12       For the last 12 months, the defendant has acted as a

13  Moroccan diplomat for Morocco's Permanent Mission to the UN,

14  traveling on his diplomatic passport, and returning to the U.S.

15  on his diplomatic visa; although, he states in his declaration

16  that he has not left the country since September 15, 2018, or

17  at least that was so as of the date of his declaration.

18       The plaintiffs in this action were also plaintiffs in

19  an action commenced on March 26, 2018, in the U.S. District

20  Court for the Central District of California, captioned Broidy

21  Capital Management, LLC, et al. v. State of Qatar.  And that

22  was Case No. 18 CV 2421.  I'm going to call that the California

23  action.

24       The defendants in the California action were the State

25  of Qatar – I'm probably mispronouncing that – Stonington

181221broidyD          Decision

1   Strategies, LLC, Nicolas D. Muzin, Global Risk Advisors, LLC,

2   Kevin Chalker, David Mark Powell, Mohammed Bin Hamad Bin

3   Khalifa Al Thani, Ahmed Al-Ruhmaihi, and certain Doe

4   defendants.

5          The California action alleges a conspiracy by which

6   Qatar, acting through various agents, directed and orchestrated

7   a sophisticated criminal hack of computer systems belonging to

8   plaintiffs.

9          The conspiracy further extended to the review,

10   analysis, categorization, and distribution of hundreds of

11   thousands of stolen documents to various media outlets for the

12   purpose of harming plaintiff Broidy.

13          Plaintiff's full description of that conspiracy is

14   contained in the May 24, 2018 first amended complaint filed in

15   the California action, which is attached to the complaint in

16   this case.

17          Benomar is referred to in Paragraph 7 of the first

18   amended complaint in the California action as a, quote,

19   "retired Moroccan diplomat," unquote, who, upon information and

20   belief, was used by Qatar to attack the plaintiffs.

21          After plaintiffs filed the lawsuit in the California

22   action, Benomar says he and his family became the subject of

23   harassment, which harassment intensified after the filing of

24   this action.  Following these incidents, Benomar consulted with

25   colleagues in, quote, "the government," unquote, although he

181221broidyD            Decision

1   doesn't specify which government he is talking about.  That's

2   in Paragraph 39 of his declaration.

3        He sought U.S. identification credentials to see if

4   that could help avoid, stop, or respond to these acts of

5   harassment.  To that end, on August 1, 2018, the Permanent

6   Mission of the Kingdom of Morocco to the United Nations

7   provided the UN Director of Protocol a formal written

8   notification of Benomar's appointment as a Special Advisor.

9        On August 27, the Permanent Mission sent a letter to

10  the Diplomatic Accreditation Officer of Host Country Affairs

11  for the United States Permanent Mission to the UN, explaining

12  that Benomar's, quote, "high rank of Special Advisor," unquote,

13  was intended to place him at the full diplomat level and

14  requesting that he be given the same identification as other

15  diplomats, such as Ministers Plenipotentiary.

16       Morocco had already issued a full diplomatic passport

17  on September 16, 2016 with an expiration date of

18  September 16, 2019.  That passport was replaced this past

19  October with another diplomatic passport that will expire in

20  October 2022.

21       On September 21, 2018, Morocco's Permanent Mission

22  advised the U.S. Mission that Benomar enjoys the title of

23  Minister Plenipotentiary at the Permanent Mission of Morocco,

24  with full diplomatic privileges and immunities.

25       On October 5, the Moroccan Ministry for Foreign

181221broidyD          Decision

1    Affairs and International Cooperation affirmed Benomar's status

2    as a full-time Minister Plenipotentiary in the letter to the

3    U.S. Embassy in Rabat and the Minister Counselor of Host

4    Country Affairs at the U.S. Mission.  The letter states that

5    Benomar serves as Minister Plenipotentiary conducting full-time

6    diplomatic duties and has served in that capacity since

7    November 1, 2017.  That's Exhibit 5 to Benomar's supplemental

8    declaration.  And that supplemental declaration, by the way, is

9    Document 49.

10        On October 10, the Moroccan Mission forwarded the

11   October 5, 2018 letter to the UN Office of Protocol.  That's

12   Exhibit 6.  The UN Blue Book, Protocol and Liaison Service, as

13   of October 31, 2018, lists Benomar as "Minister

14   Plenipotentiary."  That's Exhibit 10 to Mr. Lowell's

15   declaration.

16        On November 13 of this year, the United States Mission

17   to the UN informed the Moroccan Mission to the UN that, quote,

18   "Mr. Benomar has been accredited, and if you wish, I can have

19   his passport available for retrieval in tomorrow's routine

20   pick-up.  The Department of State Diplomatic ID card should be

21   in from Washington within the three to five business days,"

22   unquote.  That's Exhibit 7 to Benomar's supplemental

23   declaration.

24        The following day, November 14, Mary Catherine Malin,

25   the Assistant Legal Advisor for Diplomatic Law and Litigation

181221broidyD              Decision

1    at the U.S. State Department, advised counsel for both

2    plaintiffs and defendant that the U.S. mission to the UN

3    acknowledges Benomar as a diplomat with full privileges and

4    immunities.

5            Her note is attached as Exhibit B to Mr. Wolosky's

6    affidavit, which is Document 45-1; and as Exhibit B to document

7    46.  At pages 2 to 3, it reads as follows:  Quote, "The

8    Permanent Mission of Morocco to the United Nations accredited

9    Mr. Benomar with the United Nations as a Minister

10   Plenipotentiary.  Based on his assignment, the Moroccan Mission

11   requested from the United Nations privileges and immunities

12   that would normally be extended to a representative of a UN

13   mission in a similar capacity.  The United Nations subsequently

14   notified the U.S. Mission regarding the Moroccan Mission's

15   request for privileges and immunities for Mr. Benomar.  This

16   notification was processed pursuant to our normal course of

17   business and was reviewed by U.S. Mission personnel to ensure

18   it met the requirements set forth by U.S. law and the UN

19   Headquarters Agreement.  Based on this information, the U.S.

20   Mission to the UN has registered Mr. Benomar with diplomatic

21   privileges and immunities as of November 13, 2018.

22   Representatives of the UN missions, including ministers,

23   receive diplomatic privileges and immunities based on the

24   application of the law, including the UN Headquarters

25   Agreement," unquote.

181221broidyD               Decision

1          Then the U.S. State Department sent, and Benomar

2     received, his blue diplomatic ID card, which is Exhibit 8 to

3     his supplemental declaration.  The accompanying letter provides

4     as follows in part:  Quote, "As MINISTER PLENIPOTENTIARY at the

5     Permanent Mission of MOROCCO to the United Nations, you are

6     entitled in the territory of the United States to the

7     privileges and immunities of a diplomatic envoy under the terms

8     of Section 15 of the Headquarters Agreement between the United

9     States and the United Nations," unquote.

10          It further provides, quote, "YOUR NAME WILL BE

11     INCLUDED on the next list of *Permanent Missions to the United*

12     *Nations - Officers Entitled to Diplomatic Privileges and*

13     *Immunities*," unquote.

14          In this case, plaintiffs allege that Benomar has, for

15     a long time, served the interests of the State of Qatar.

16     During his tenure at the UN, he allegedly used his official

17     position to advance the Qatari agenda, and while serving as the

18     UN envoy for Yemen, he allegedly reflected a bias towards the

19     interests of Qatar.  That's in Paragraphs 6 and 7 of the

20     complaint.

21          Telephone records of Benomar show that he had frequent

22     phone contact between October 2017 and June 2018 with senior

23     Qatari officials and alleged members of the conspiracy as

24     described in the California action.  That's Paragraph 8.

25          Plaintiffs allege that Benomar was a, quote, "key

181221broidyD              Decision

1   player," unquote, in the review, analysis, categorization, and

2   distribution of the stolen documents.  That's in Paragraph 17.

3          Plaintiffs further allege that the State of Qatar

4   sponsors and supports terrorism; that President Trump has

5   denounced it; and that several Middle Eastern countries have

6   imposed an economic embargo on it and demanded that it stop

7   funding terrorists.  That's Paragraph 25 to 28.

8          Plaintiffs further allege that the international

9   sanctions and President Trump's support for them, quote,

10  "threaten to devastate Qatar's economy and plunge Qatar into

11  crisis," unquote.  That's from Paragraph 29.  Qatar allegedly

12  responded to the sanctions by trying to build influence within

13  the United States, and Benomar, on information and belief,

14  quote, "helped to mastermind Qatar's strategy," unquote.

15  That's from Paragraph 30.

16         Part of the strategy was to try to curtail the

17  influence of prominent Americans, like plaintiff Broidy, who

18  were opposed to Qatar.  Broidy was a vocal critic of Qatar's

19  support for terrorists and Qatar's friendly relationship with

20  Iran.  He provided financial support for public initiatives,

21  such as conferences, to educate Americans about Qatar's support

22  for terrorist organizations.

23         During 2017 and '18, according to the complaint, he

24  conveyed his criticism of Qatar in meetings with U.S.

25  government officials, including President Trump.  Qatar was

181221broidyD              Decision

1    aware of Broidy's criticism of Qatar's policy and efforts to

2    influence American opinion leaders and allegedly specifically

3    focused its efforts on him.  For example, Qatari officials

4    allegedly believed Broidy had prompted President Trump's public

5    criticism of Qatar in June 2017.  This is in Paragraphs 34

6    through 38.

7         In late 2017 and early 2018, Qatar, acting through

8    agents both in the U.S. and abroad, allegedly conducted a

9    sophisticated computer hack on plaintiffs' California-based

10   computer systems.  The attack, which plaintiffs allege appears

11   to have been executed from locations in at least Qatar and the

12   United States, resulted in the theft of many gigabytes of data

13   from plaintiffs, including trade secrets and personal

14   information.

15        After the documents and information were taken from

16   plaintiffs' computer systems, they were organized thematically

17   for distribution to the media.  That's Paragraphs 39 through

18   41.

19        Plaintiffs allege on information and belief that

20   Benomar, aware that the documents been stolen from plaintiffs,

21   was a, quote, "key participant in this process," unquote, and

22   that's from Paragraph 42; and, quote, "helped to mastermind the

23   dissemination of stolen materials to the media and other third

24   parties," unquote, that's Paragraph 43.  As part of his

25   involvement with the conspiracy, Benomar allegedly spoke

181221broidyD                Decision

1    regularly with senior Qatari officials about elements of the

2    conspiracy.  That's also in Paragraph 43.

3          Starting in late February 2018 and continuing

4    thereafter, members of the conspiracy allegedly distributed the

5    stolen materials to media outlets in the U.S. and abroad, which

6    subsequently published articles based on those materials.

7          The procedural background is as follows:  Plaintiff

8    filed this lawsuit on July 23 of this year.  The complaint

9    raises four claims: misappropriation of trade secrets in

10   violation of the Defend Trade Secrets Act, 18 U.S. Code,

11   Section 1836 *et seq.*; conversion of stolen property; unjust

12   enrichment; and civil conspiracy.

13         The case was reassigned to me on September 6.  On

14   October 31, defendant filed the motion.  Plaintiffs filed

15   their opposition on November 14.  On the same day, November 14,

16   defendant submitted a letter notifying the Court that the

17   United States had approved Benomar's status as a Minister

18   Plenipotentiary, entitled to full diplomatic immunity.  And on

19   November 21, defendant filed his reply papers.

20         On November 26, plaintiffs filed a letter explaining

21   their intention to seek leave to file an amended complaint

22   considering the defendant's introduction of new facts and

23   arguments related to the defendant's diplomatic status.  That

24   letter is Document 51.  And defendant responded the next day by

25   letter, which is Document 52.

181221broidyD                    Decision

1          On November 30, plaintiff then filed a letter formally

2     seeking leave to amend, to which the defendant replied on

3     December 2.  Those are 53 and 54.  And I told the parties I

4     would let them know how I plan to proceed.  So let me turn to

5     the motion.

6          A couple of preliminary issues:  First, on a motion to

7     dismiss under Rule 12(b)(1), the court may look to affidavits

8     and other evidence outside the pleadings to resolve disputed

9     jurisdictional fact issues.  *Eastern Paralyzed Veterans v.*

10    *Lazarus-Burman*, 133 F. Supp. 2d 203, 208 (E.D.N.Y. 2001).

11    Where jurisdictional facts are disputed, the court has the

12    power and the obligation to consider matters outside the

13    pleadings, such as affidavits, documents, and testimony, to

14    determine whether jurisdiction exists.  *Sokolowski v. MTA*, 849

15    F. Supp. 2d 412, 414 (S.D.N.Y. 2012), *affirmed* 723 F.3d 187 and

16    529 F. App'x 48.  But a district court may not rely on

17    conclusory or hearsay statements contained in the materials

18    outside the pleadings.  *J.S. ex rel. N.S. v. Attica Central*

19    *Schools*, 386 F.3d 107, 110.

20         Both parties attached documents to their submissions.

21    Defendant submitted an affidavit from the defendant, which is

22    39, and another from Mr. Lowell, which is 40 on the docket.

23    Defendant provided Mr. Wolosky's affidavit with exhibits, and

24    the defendant provided more documents, including a supplemental

25    declaration from Mr. Benomar with exhibits, which is 49.  I'll

181221broidyD                    Decision

1  consider the affidavits and any properly authenticated exhibits

2  as I am to do under Rule 12(b)(1).

3              As part of their submissions, both parties also

4  included expert reports.  Federal Rule of Evidence 702 requires

5  me to determine whether an expert's testimony is based on

6  scientific, technical, or other specialized knowledge that will

7  help the trier of fact.  By definition, expert testimony that

8  tells the trier of fact what result to reach does not help the

9  trier of fact.  *See Nationwide Transport v. Case Information*

10 *Systems*, 523 F.3d 1051, 1058-59 (9th Cir. 2008); and *U.S. v.*

11 *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

12             Accordingly, as a general rule, an expert's testimony

13 on issues of law is inadmissible.  *U.S. v. Bilzerian*, 926 F.2d

14 1285, 1294.  Although an expert may opine on an issue of fact

15 within the province of a trier of fact, he may not

16 give testimony stating ultimate legal conclusions based on

17 those facts.  That's *Bilzerian* at 1294.

18             Additionally, an expert may not nearly narrate facts

19 as doing so does not constitute offering opinions on the basis

20 of specialized knowledge or expertise and may also invade the

21 province of the trier of fact.  *Travelers Indemnity v. Northrup*

22 *Grumman*, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014).

23             Here, the plaintiffs filed an expert opinion of

24 David P. Stewart, who is a Professor from Practice at

25 Georgetown University Law Center, that's Document 45-4; and the

181221broidyD          Decision

1   defendant filed the declaration of Bruce Rashkow, a lecturer at

2   Columbia Law School, that's Document 50.  Both expert reports

3   contain discussions about acquiring diplomatic immunity under

4   the controlling statutes and international agreements.

5          Under Rule 702 and the pertinent law, the experts

6   are precluded from opining on which side's version of the facts

7   is correct, marshaling arguments from the evidence, and

8   offering legal conclusions concerning whether or not Benomar

9   has diplomatic immunity or whether or not an exception to the

10  Vienna Convention applies.  Making arguments from facts in

11  evidence is the lawyer's job, and is not an exercise of the

12  witness' specialized knowledge.

13         The experts can, however, provide testimony based on

14  their specialized knowledge that falls short of a legal

15  conclusion, but will help the trier of fact: for example, they

16  can explain how a diplomat acquires diplomatic immunity or

17  point the Court to relevant provisions of the Vienna Convention

18  and other controlling international agreements and statutes.

19  But whether Benomar is entitled to immunity is not a subject of

20  proper expert opinion.

21         Therefore, I've considered the testimony from the

22  experts only to the extent the opinions provided specialized

23  knowledge regarding procedures and provisions related to

24  diplomatic immunity, but I've disregarded opinions on what the

25  law is or what conclusions I should reach on the facts or the

181221broidyD                Decision

1    law.

2             Turning now to the legal standards:  Because federal

3    courts are courts of limited jurisdiction, a claim must be

4    dismissed if a court lacks subject matter jurisdiction over it.

5    *See Frontera Resources v. State Oil Company of Azerbaijan*, 582

6    F.3d 393, 397.  A case is properly dismissed for lack of

7    subject matter jurisdiction under Rule 12(b)(1) when the

8    district court lacks the statutory or constitutional power to

9    adjudicate it.  *Makarova v. United States*, 201 F.3d 110, 113.

10   A plaintiff asserting subject matter jurisdiction has the

11   burden of proving by a preponderance of the evidence that it

12   exists.  That's *Makarova* at 113.

13            Diplomatic immunity is a matter of subject matter

14   jurisdiction.  *Swarna v. Al-Awadi*, 607 F. Supp. 2d 509, 515

15   (S.D.N.Y. 2009), *affirmed in part, vacated in part, and*

16   *remanded on other grounds*, 622 F.3d 123; *see, e.g., Hilt*

17   *Construction v. Permanent Mission of Chad*, 2017 WL 4480760, at

18   *1 (S.D.N.Y. Oct. 6, 2017).

19            Plaintiffs argue that because no court has considered

20   who has the burden of proving or disproving immunity in the

21   context of a diplomat making such a claim under the Vienna

22   Convention, I should adopt the procedure applied in cases where

23   courts make immunity determinations under the Foreign Sovereign

24   Immunities Act, or FSIA, 28 U.S. Code Section 1602 *et seq.,* and

25   require the defendant to make out a *prima facie* case that he is

181221broidyD                Decision

immune, which then shifts the burden back to plaintiffs to

prove an exception to the immunity, with the ultimate burden of

persuasion remaining with the defendant.  Plaintiffs make that

argument in its opposition at pages 2 to 3.

        I decline the suggestion that I use the FSIA as an

interpretative guide for the Vienna Convention.  As the

Fourth Circuit has observed, when also declining to do so,

quote, "The FSIA is a statute which establishes the framework

for determining when federal or state courts in the United

States may exercise jurisdiction over foreign states; it is not

a treaty dealing with many countries.  In addition, the FSIA

was enacted after the Vienna Convention on Diplomatic Relations

came into existence, and thus, could not have been a textual

source for Convention delegates.  Furthermore, Congress did not

intend for the FSIA to affect diplomatic immunity under the

Vienna Convention.  Section 1609 specifically states that

Congress enacted the FSIA subject to existing international

agreements to which the United States is a party at the time of

the enactment of this act," unquote.  *Tabion v. Mufti,* 73 F.3d

535, 538 n.7 (4th Cir. 1996).  And I've omitted the citation to

the legislative history – House Report 1487.

        So I will not follow the FSIA and, instead, will apply

the usual rule that where a defendant challenges the court's

subject matter jurisdiction under Rule 12(b)(1), that puts the

burden on the plaintiffs, but I think here the result would be

181221broidyD              Decision

1   the same, even if defendant had the initial *prima facie* burden

2   and plaintiff then had to show an exception.

3         Motions under Rule 12(b)(1) may attack either the

4   sufficiency or the truth of the allegations supporting subject

5   matter jurisdiction.  *Wells Fargo v. Ullah,* 2014 WL 470883, at

6   *2 (S.D.N.Y. Feb. 6, 2014).  Quote, "In a facial challenge, the

7   court accepts as true the uncontroverted factual allegations in

8   the complaint.  By contrast, in connection with a factual

9   challenge, the court's review is not confined to the pleadings,

10  but may examine extraneous evidence submitted with the motion

11  and make any findings of fact necessary to determine the

12  existence of subject matter jurisdiction.  In that event, the

13  court is not obligated to accord presumptive truthfulness to

14  the allegations of the complaint.  Rather, it may weigh the

15  evidence on the record accompanying the Rule 12(b)(1) motion or

16  hold an evidentiary hearing and decide for itself the merits of

17  the jurisdictional dispute.  Finally, the burden of proving

18  jurisdiction is on the party asserting it," unquote.  *Dow Jones*

19  *v. Harrods*, 237 F. Supp. 2d 394, 404 (S.D.N.Y 2002), *affirmed*

20  346 F.3d 357.

21        The present case involves a factual attack and not a

22  facial attack.  It's undisputed that absent immunity, the Court

23  would have subject matter jurisdiction under federal question

24  jurisdiction, 28 U.S. Code Section 1331, or diversity

25  jurisdiction, 28 U.S. Code 1332, and plaintiffs do not dispute

181221broidyD                Decision

1   that defendant's attack is limited to a factual attack.  In

2   their opposition at page 2, they state, quote, "Benomar has not

3   challenged plaintiffs' jurisdictional allegations but, instead,

4   has introduced a claim that he is entitled to immunity as a

5   diplomatic agent and a foreign official, and therefore, the

6   Court lacks jurisdiction."

7           Accordingly, (1) the burden is on the plaintiffs to

8   prove jurisdiction by a preponderance of the evidence; (2) I am

9   not required to presume the truthfulness of plaintiffs'

10  complaint; and (3) I may examine evidence submitted by the

11  parties.

12          With these principles in mind, I now turn to the

13  merits:  Benomar contends that dismissal is mandated by federal

14  statute and the Vienna Convention on Diplomatic Relations –

15  which I'm going to call either the VCDR or the Vienna

16  Convention – because he is a currently-serving accredited

17  diplomat entitled to immunity from civil jurisdiction in the

18  United States.  He argues that he's absolutely immune from suit

19  in this country as a diplomat of the Kingdom of Morocco and

20  that his status immunity protects him from legal actions of any

21  kind, including civil lawsuits and discovery from the moment

22  the U.S. was notified of his diplomatic status.  See

23  defendant's memorandum at pages 2 to 3 and 14 to 21.

24          Under Article 31(1) of the Vienna Convention, a

25  current diplomatic agent enjoys near absolute immunity from

181221broidyD              Decision

1   civil jurisdiction.  This immunity is given full effect under

2   U.S. law pursuant to the Diplomatic Relations Act, 22 U.S.

3   Code, Section 254d, which states, quote, "Any action or

4   proceeding brought against an individual who is entitled to

5   immunity with respect to such action or proceeding under the

6   Vienna Convention," unquote, shall be dismissed.

7          As the preamble to the Vienna Convention recognizes,

8   the purpose of such immunity is not to benefit individuals, but

9   to ensure the efficient performance of the functions of

10  diplomatic missions as representing states.

11         The Second Circuit has recognized that under the

12  Vienna Convention, current diplomatic envoys enjoy absolute

13  immunity from civil and criminal process.  *Brzak v. United*

14  *Nations*, 597 F.3d 107, 113; *see Tachiona v. United States*, 386

15  F.3d 205, 215, where the court said, quote, "With limited

16  exceptions, the Convention broadly immunizes diplomatic

17  representatives from the civil jurisdiction of the U.S.

18  Courts," unquote; and *Swarna v. Al-Awadi,* 622 F.3d 123, 137,

19  where the Circuit said sitting diplomats get near absolute

20  immunity in the receiving state to avoid interference with the

21  diplomat's service for his or her government.

22         Article 31 of the Convention provides narrow

23  exceptions to this diplomatic immunity, one of which –

24  commercial activity – is raised by plaintiffs here.

25         So, Article 31(1) and subsection (c) read as follows:

181221broidyD               Decision

1   A diplomatic agent shall enjoy immunity from the criminal

2   jurisdiction of the receiving state.  He shall also enjoy

3   immunity from its civil and administrative jurisdiction, except

4   in the case of an action relating to any professional or

5   commercial activity exercised by the diplomatic agent in the

6   receiving state outside his official functions.

7           It seems the parties agree that defendant has shown in

8   the first instance that he is a diplomatic agent with the

9   position of Minister Plenipotentiary at Morocco's Permanent

10  Mission to the UN as accredited by the Ministry of Foreign

11  Affairs and International Cooperation of the Kingdom of

12  Morocco, as acknowledged by the UN, and as notified to the U.S.

13  through its Permanent Mission to the UN, see Benomar's

14  supplemental declaration, Exhibits 4 through 8, and thus, that

15  he is entitled to diplomatic immunity unless an exception

16  applies.

17          Indeed, before defendant had the blue-bordered

18  diplomatic identification card, plaintiffs had argued in their

19  opposition at page 4 that the State Department's immunity

20  determination controls what immunity status Benomar has and, at

21  page 9, that the Court should defer to the State Department's

22  determination.  Even the plaintiff's expert Professor Stewart

23  said that the identity card is the definitive document issued

24  by the State Department after its review of an application for

25  immunity.  That's in Paragraph 20 of his declaration.  And the

181221broidyD              Decision

1    Restatement (Third) of Foreign Relations Section 464, which

2    plaintiffs cite at page 5, provides:  "In the United States, a

3    person's diplomatic status is established when it is recognized

4    by the Department of State."

5         The United States UN mission has now confirmed that

6    the U.S. has registered defendant with diplomatic privileges

7    and immunities in recognition of the fact that the Permanent

8    Mission of Morocco to the UN accredited Mr. Benomar with the UN

9    as a Minister Plenipotentiary.  See Exhibit B to Mr. Wolosky's

10   affidavit.  This recognition was followed by the United States

11   providing defendant with the blue ID card that plaintiffs

12   argued was necessary for him to have immunity.  The

13   accompanying letter says that he is entitled to the privileges

14   and immunities of a diplomatic envoy.  And plaintiffs

15   acknowledge in Document 53 at page 2, that the defendant's

16   presentation of the blue-bordered State Department diplomatic

17   ID card establishes that Benomar has been accredited as a

18   diplomatic agent and is entitled to status immunity.

19        And, quote, "In proceedings where a person's

20   diplomatic status is contested, courts generally consider the

21   State Department's determination to be conclusive," unquote.

22   *U.S. v. Khobragade*, 15 F. Supp. 3d 383, 385 n.16 (S.D.N.Y.

23   2014) (collecting cases*); see Gonzalez Paredes v. Vila,* 479

24   F. Supp. 2d 187, 194 (D.D.C. 2007) where the court said, quote,

25   "The Department of State certified the defendants' diplomatic

181221broidyD            Decision

1    status, and it is not for this Court to revoke or question it,

2    but, rather, only to determine if an exception to diplomatic

3    immunity set forth in the Convention applies," unquote.

4            So, the questions remaining are whether the plaintiffs

5    have a meritorious argument that undermines Benomar's immunity.

6            They first raise the notice requirement.  Benomar

7    argues his immunity has been effective from the moment the

8    United States received notification of his appointment.  That's

9    in his brief at page 17.  Under Article 39 subsection (1) of

10   the VCDR, quote, "[e]very person entitled to privileges and

11   immunity shall enjoy them...if already in its territory, from

12   the moment when his appointment is notified to the Ministry of

13   Foreign Affairs," unquote.

14           Under Article 39, agents are entitled to immunity at

15   the moment of notification to the appropriate authorities of

16   the receiving state, even if they have already entered the

17   territory.  *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 297 n.171

18   (S.D.N.Y. 2001*), affirmed in part, reversed in part on other*

19   *grounds, and remanded*, 386 F.3d 205.

20           As plaintiffs' expert Professor Stewart explains in

21   paragraph 14 of his declaration, quote, "When the appropriate

22   authorities of the receiving state do accredit an individual as

23   a member of the sending state's diplomatic mission...that

24   individual's entitlement to immunity will be considered to have

25   commenced either upon the moment the individual enters the

181221broidyD            Decision

1   country to take up the post, or if the individual is already in

2   the receiving state, when notice was made to the Ministry for

3   Foreign Affairs," unquote.

4          The defendant provided exhibits that reflect that no

5   later than September 21 or October 5, 2018, Morocco expressly

6   notified the U.S. of Benomar's appointment as a Minister

7   Plenipotentiary.  See Exhibits 4 and 5 to the defendant's

8   supplemental declaration.

9          Plaintiffs point to the language in Article 39, quote,

10  "if already in its territory," unquote, and note that Benomar

11  never stated in his declaration that he was in the United

12  States on either date.

13         In his supplemental declaration, Benomar avers that he

14  was in the U.S. on both dates and that he had returned from

15  international travel back into the U.S. on September 15 and has

16  remained in the U.S. continuously from that date through at

17  least the date of his declaration.  He provided a copy of the

18  U.S. Customs stamp he received on September 15 reflecting his

19  entry into the country that day.  That's Exhibit 1 to the

20  supplemental declaration.  I, therefore, find his immunity was

21  effective upon Morocco's notice of his appointment.

22         Further, even if he were not in the United States on

23  those dates, it seems clear, based on plaintiffs' expert report

24  and the language of the treaty, that the immunity is to be

25  effective from the time of notification if the person is

181221broidyD          Decision

1   already living here when appointed, or from the time of arrival

2   in the United States if the person is residing abroad when

3   appointed.  So, Benomar would be covered from the time of

4   notification, as long as he was living here – which he was –

5   even if he happened to be on a trip out of the United States at

6   that moment.

7          Turning now to the requirement of permanent residency.

8   Plaintiffs argue that a diplomat who is, quote, "permanently

9   resident in," unquote, the receiving state is not entitled to

10  full immunity.  That's in their brief at pages 11 to 12, citing

11  Article 38(1) of the VCDR, which provides that a diplomatic

12  agent who is, quote, "permanently resident in," unquote, the

13  receiving state, quote, "shall enjoy only immunity from

14  jurisdiction and inviolability in respect of official acts

15  performed in the exercise of its functions," unquote.

16         Plaintiffs argue that because Benomar has lived in the

17  United States with his family, all of whom are U.S. citizens,

18  on a continuous basis since the early 1990s, he is not entitled

19  to "full status immunity" but only "official acts" immunity.

20         There is not a lot of precedent with respect to

21  Article 38(1).  Both sides point to State Department documents.

22  While not binding, quote, "the meaning attributable to treaty

23  provisions by the government agencies charged with their

24  negotiation and enforcement is entitled to great weight."

25  *Sumitomo Shoji America v. Avagliano,* 457 U.S. 176, 184–85

181221broidyD              Decision

1   (1982).

2          Plaintiffs point the Court to the State Department

3   Judicial Guidance and assert at page 11 of their brief that

4   being permanently resident in the United States for these

5   purposes is not the same as being a lawful permanent resident,

6   commonly known as a green card holder.  And they cite to a

7   Department of State publication from 2015 called "Diplomatic

8   and Consular Immunity: Guidance for Law Enforcement and

9   Judicial Activities."  And that you can find at the following

10  url:  Https://www.state.gov -- actually, I don't know if these

11  are slashes or back-slashes --

12  .gov/documents/organizations/150546.pdf.  And they quote to

13  page 9 of that document.

14         It may be so that being permanently resident in the

15  U.S. is not the same as being a green card holder, but that

16  does not really help plaintiffs with respect to this defendant.

17  That Guidance at page 9 says that the United States -- now I'm

18  quoting -- "the United States as a matter of policy does not

19  normally accept as diplomatic agents its own nationals, legal

20  permanent residents of the United States, or others who are

21  permanently resident in the United States," unquote.  That

22  suggests that because the United States has accepted the

23  defendant as a diplomatic agent, he is not considered to be,

24  quote, "permanently resident" in the United States.

25         Indeed, the Guidance goes on to say that police

181221broidyD              Decision

officers, quote, "should not have to deal with this distinction
since the U.S. Department of State issues cards...with the
nationality principle in mind," unquote.

Because the Department of State has issued the
defendant a blue-bordered identity card which is for diplomatic
agents, it must not regard defendant as permanently resident in
the United States.

Plaintiffs also point to a page on the State
Department's website that discusses privileges and immunities
and says that they do not apply unless the employing foreign
state documents that it pays for the employee's travel to and
from the United States, which Morocco has not documented.
But as defendant correctly notes, the provision cited by
plaintiffs only applies to A-2 visa holders, but does not apply
to Benomar who holds the higher G-1 visa.  And that web page is
at
https://www.state.gov/ofm/accreditation/privilegesandimmunities
/index.htm.

The defendant's expert points to a Circular Note that the
State Department issued in 1991 that provides a definition of,
quote, "permanently resident," unquote, but only in regard to
administrative and technical and service staff.

The Circular Note, dated April 10, 1991, can be found
at https://www.state.gov/documents/organization/58891.pdf.  The
Circular Note states that, quote, "The United States has, for

181221broidyD                Decision

the sake of its own convenience, equated [the term 'permanently resident in'] with the status of 'permanent resident alien' as...employed in U.S. Immigration Law."  So it's saying that, as of the date of that Circular Note, the U.S, for its own convenience, equated permanent residency with being a green card holder.

    It then goes on to explain a change.  It says that "the State Department has determined that members of the administrative and technical and service staffs of diplomatic missions...will be considered permanently resident in the United States for purposes of the Vienna Convention, unless the employing foreign state provides appropriate documentation," unquote, showing that it pays for travel and undertakes to transfer the employee out of the U.S. within a specific time frame consistent with the sending state's transfer policy."

    So for administrative, technical, and service staffs, there's a change in how the U.S. regards permanent residence, but the absence of any such change with respect to diplomatic agents like defendant suggests that no such documentation is required for them to avoid being considered permanently resident in the United States, and that with respect to diplomatic agents, quote, "permanently resident in" the United States continues to be equated with being a permanent resident alien, a/k/a green card holder, which defendant is not.

    Finding these sources to be suggestive of immunity but

181221broidyD          Decision

1  not determinative, I am left with the facts and the burden of

2  persuasion.  From what I know from the record, Benomar was born

3  in Morocco, is a citizen of the UK, has no U.S. immigration

4  status, and has been in this country on visas at all relevant

5  times, albeit in jobs requiring frequent travel abroad.

6          The State Department has issued him a blue-bordered

7  identity card that reflects his entitlement to the privileges

8  and immunities of a diplomatic envoy.  The State Department was

9  no doubt aware of the amount of time Benomar has spent in the

10  United States.

11          Plaintiffs have provided no authority - and I know of

12  none - for the proposition that a career diplomat whose jobs

13  have led him to live in the U.S. for an extended period, is to

14  be considered the equivalent of a national or a lawful

15  permanent resident under the VCDR.

16          The State Department obviously does not interpret the

17  term, quote, "permanently resident in the United State,"

18  unquote, that way, and nobody else seems to, either.  So I find

19  that plaintiffs' argument in this regard unavailing.

20          Next, plaintiffs make two related arguments related to

21  Benomar's commercial activities.

22          First, they argue that under Article 42 of the Vienna

23  Convention, when a diplomat engages in, quote, "any

24  professional or commercial activity," unquote, the person is

25  not entitled to absolute immunity as a matter of both U.S. and

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

181221broidyD                Decision

1    international law.

2            Under Article 42, quote, "[a] diplomatic agent shall

3    not, in the receiving state, practice for personal profit any

4    professional or commercial activity," unquote.  To supplement

5    this claim, plaintiffs cite to a Circular Note published by the

6    U.S. Mission to the UN in 2016, which can be found at

7    https://www.state.gov/documents/organization/58891.pdf.  That

8    Circular Note says that diplomatic privileges and immunities

9    would apply only to individuals who meet criteria, including

10   that they perform on behalf of the member state diplomatic

11   duties directly related to the work of the UN on a full-time

12   basis, which the Department of State describes as at least 35

13   hours each week at the Mission, and shall not practice for

14   profit any professional or commercial activity in the United

15   States.  And that is called U.S./UN Circular Note HC-01-06,

16   dated January 13, 2016.

17           Plaintiffs argue that defendant has failed to satisfy

18   these criteria and, therefore, is not entitled to diplomatic

19   immunity.  They argue he's provided no evidence that he works

20   at least 35 hours a week at the Mission, and because he engages

21   in for-profit professional and commercial activity, he is not

22   entitled to diplomatic immunity under Article 42.

23           The related argument is that the commercial activities

24   exception to full status immunity is applicable under VCDR

25   Article 31(1)(c), which, as I noted earlier, excepts from

181221broidyD          Decision

immunity, quote, "an action relating to any professional or
commercial activity exercised by the diplomatic agent in the
receiving state outside his official function," unquote.

As a preliminary matter, defendant has provided
evidence that his duties for Morocco are full time.  He has
provided his own declaration, see paragraph 31; and the
October 5, 2018 Moroccan Ministry of Foreign Affairs note,
which is Exhibit 5 to his supplemental declaration, both of
which say he works full time.

With respect to the commercial exception, quote,
"[T]here are few published decisions of U.S. courts
interpreting the 'commercial activity' exception found within
Article 31(1)(c) of the Vienna Convention," unquote.  *Gonzalez
Paredes*, 479 F. Supp. 2d at 192.

The most expansive decision on Article 31(1)(c) of
which I'm aware is from 1995, a case from the Eastern District
of Virginia, *Tabion v. Mufti*, 877 F. Supp. 285, 292 (E.D. Va.
1995), *affirmed*, 73 F.3d 535 (4th Cir. 1996).  In granting the
defendant's motion to quash a subpoena on the grounds of
immunity, Judge Ellis of the Eastern District of Virginia
assessed the meaning of the Vienna Convention's use of the
phrase, quote, "commercial activity," unquote, by analyzing the
negotiating and drafting history of the treaty which suggested
that the insertion of "commercial" after "professional" was
something of a redundant afterthought.  See 877 F. Supp. at 290

181221broidyD            Decision

1  & n.10.

2              After his analysis, Judge Ellis made the following

3  observations about the Vienna Convention.  Now I'm quoting:

4              "At all stages, the treaties drafting and negotiating

5  history points persuasively to the conclusion that Article

6  31(1)(c) was not intended to carve out a broad exception to

7  diplomatic immunity for a diplomat's daily contractual

8  transactions for personal goods and services.  Activities such

9  as purchasing a car, sending clothing to a tailor, and hiring a

10 domestic servant certainly are not, quote, 'wholly

11 inconsistent,' unquote, with a diplomat's functions.  Nor are

12 such activities particularly 'unusual' or prohibited by Article

13 42.  Yet those involved in the drafting process consistently

14 questioned the need to provide an immunity exemption for

15 commercial activities when diplomats were already barred from

16 those activities.  Thus, it is evident that the phrase

17 'commercial activity' in the Vienna Convention means a business

18 or trade activity for profit and that Article 31(1)(c) was

19 intended to reach those rare instances where a diplomatic agent

20 ignores the restraints of his office and, contrary to Article

21 42, engages in such activity in the receiving state.

22 Accordingly, a diplomat who strays from his diplomatic

23 functions and runs a car business or becomes a tailor in the

24 receiving State cannot then shelter himself behind diplomatic

25 immunity when disputes arise out of that activity.  Not only is

181221broidyD          Decision

1   this broader construction of immunity clearly consistent with

2   the drafters' intent, but it also follows the fundamental

3   principle that treaties should be liberally construed so as to

4   enlarge, rather than restrict, rights that signatory nations

5   may claim under them."

6          That's *Tabion*, 877 F. Supp. at 291.

7          Judge Ellis also state cited to the State Department's

8   written response to a question pertaining to the scope of

9   Article 31(1)(c) submitted to Congress during hearings on

10  diplomatic privileges and immunities in 1988.

11         The State Department wrote, quote, "The ideas of

12  remuneration and of a continuous activity are central to the

13  purpose of Article 31(1)(c)," unquote.  That's *Tabion* at 292

14  n.12, which contains the cite to that State Department

15  document.

16         Plaintiffs allege that Benomar was personally paid

17  millions of dollars in commercial fees and that his business

18  partner, Joseph Allaham, threatened to sue him for $5- to

19  $10 million for money Allaham earned from Qatar but did not

20  receive.  That's in plaintiffs' opposition at page 17 and

21  Mr. Wolosky's declaration, Exhibit A.

22         Plaintiff argues that Benomar was involved in the

23  hacking conspiracy as part of a commercial enterprise.  That's

24  at page 17.  And they further allege at pages 13 to 14 that his

25  position on the board of a multinational media company, called

181221broidyD            Decision

1    Lagardère SCA, constitutes commercial activity.

2              Defendant's arguments in response -- well, in his

3    first memorandum and in his response, in his reply memorandum,

4    can be boiled down to three assertions that address both of

5    plaintiffs' commercial activity arguments.

6              The defendant says he didn't engage in any systematic

7    trade or business activity within the U.S. for personal profit;

8    that the advice he provided to Qatar was at the request of

9    Morocco and part of his official functions; and that the

10   commercial activity exception has been used only where the

11   counter-party is commercially, quote, "across the table,"

12   unquote, from the defendant-diplomat.  That's at page 21 of the

13   defendant's brief.

14             I reject the third argument.  None of the cases cited

15   by defendant imposed an, quote, "across the table," unquote,

16   arrangement as a legal requirement to the commercial activity

17   exception, and I don't find such an arrangement necessary to

18   satisfy the exception.

19             In turning to the defendant's other two arguments, I

20   again find not a lot of helpful law.  Many of the cases deal

21   with extremes.  They contrast a diplomat's day-to-day, everyday

22   purchases at the retail level to a diplomat running a business

23   or practicing a profession at the other extreme.

24             I don't know if I said that right.

25             They compare a diplomat's everyday retail purchases to

181221broidyD              Decision

1   a diplomat running a business or practicing a profession.

2         So, again, I look to the evidence in the record and

3   the burden of persuasion.  It was plaintiffs' responsibility to

4   bring to the table evidence to help me decide this

5   jurisdictional question.  This jurisdictional question,

6   plaintiffs' commercial activity arguments – under Article 31

7   and 42 – fall short because I do not find plaintiffs have

8   sufficiently provided evidence that Benomar has engaged in

9   commercial activities.

10        First, his position with the supervisory board of

11  Lagardère SCA is not commercial activity under the VCDR.

12  Plaintiffs have made no showing that this position involves any

13  activity within the United States as the VCDR requires.  The

14  only evidence I have on it is from Mr. Benomar's supplemental

15  declaration where he says the only requirements of the job are

16  attending a meeting every three months, which is hardly enough

17  to render him less than a full-time diplomat, which he asserts

18  he is.  He further says that he has not received any

19  remuneration for this position.  So, despite whatever ambiguity

20  there may be about what a commercial activity is under the

21  VCDR, at a minimum, the activity must take place, quote, "in

22  the receiving state," unquote.  That's from 31(1)(c).  And it's

23  unlikely the definition of commercial activity would include

24  non-profit-making work.  So, the only evidence of record is

25  that the board position does not bring Benomar within the

181221broidyD              Decision

1   exception.

2          Second, plaintiffs' bald allegations that Benomar

3   participated in (and was paid millions of dollars for)

4   participating in the scheme to illegally hack plaintiffs'

5   computers and distribute the results to the press, also does

6   not satisfy the commercial activities exception for the

7   following reasons:

8          Whatever the precise definition of commercial activity

9   under the VCDR is, it is obvious that paying cyberhackers to

10  hack plaintiffs' computers or getting paid to distribute stolen

11  material is not, quote, "professional or commercial," unquote,

12  as those terms are commonly understood.

13         Judge Ellis offered the examples of a diplomat running

14  a car dealership or being a tailor in *Tabion* at 291.  And in

15  *Barbata v. Latamie*, 2012 WL 2422740, at *2 (S.D.N.Y. June 26,

16  2012), Judge Cote found commercial activity outside of any

17  official functions regarding a diplomat who had made an

18  agreement to purchase a portfolio of art prints.  These

19  ordinary clearly commercial activities are of a different ilk

20  from the world of cybercrime and distribution of stolen

21  property.

22         Simply put, the complex hacking conspiracy described

23  in plaintiffs' complaint does not describe an example of the

24  common understanding of commercial activity, especially

25  considering that plaintiffs allege that this conspiracy was at

181221broidyD                    Decision

1   the direction of a foreign government.

2            While many crimes could be regarded as commercial

3   because they are designed to make money, here, the goal of the

4   defendant and his alleged co-conspirators is alleged to be

5   political, not monetary.

6            The Fourth Circuit, affirming Judge Ellis' decision in

7   *Tabion*, said that commercial activity does not include, quote,

8   "occasional service contracts," unquote, but did include,

9   quote, "trade or business activity, engaged in for personal

10  profit," unquote.  73 F.3d at 537.

11           Defendant's alleged assistance to Qatar strikes the

12  Court as closer to the former.  It is not a business or job

13  defendant is alleged to have set up alongside or in place of

14  his day job as a diplomat, but, rather, is alleged to be a

15  several-month international espionage project.  The State

16  Department, as indicated earlier, indicated that remuneration

17  and continuous activity are central to the purpose of 31(1)(c).

18  The activity alleged here is akin to a consulting gig doable in

19  one's spare time while working full-time as a diplomat.

20           In so construing the commercial activity exception, I

21  am mindful that, quote, "treaties are to be construed in a

22  broad and liberal spirit, and when two constructions are

23  possible, one restrictive of the rights that may be claimed

24  under it and the other favorable to them, the latter is to be

25  preferred," unquote.  That's *Asakura v. City of Seattle*, 265

181221broidyD          Decision

1    U.S. 332, 342 (1924).  Interpreting, quote, "professional or

2    commercial activity," unquote, to exclude the time-limited,

3    illicit, foreign-directed, politically-motivated conduct

4    alleged to have occurred here is the interpretation that

5    enlarges the rights that may be claimed under the VCDR.  *See*

6    *Jordan v. K. Tashiro,* 278 U.S. 123, 127.

7              More fundamentally, however, even if cybercrime were

8    considered to be commercial activity, plaintiffs have not

9    established by a preponderance of the evidence that Benomar was

10   involved in the activity or did it for money.  Their

11   allegations regarding his participation are almost entirely on

12   information and belief, with no basis for that information and

13   belief stated.

14             The only evidence they provided was a few lines of a

15   deposition transcript in which Joseph Allaham states he is owed

16   $5- to $10 million by Qatar and was thinking of suing Benomar

17   over it because he could not get a straight answer about it.

18   This is in Exhibit A to Mr. Wolosky's declaration around pages

19   380 to 381.

20             This inscrutable excerpt does not show that Benomar

21   was paid anything, let alone that he was paid for participating

22   in the hacking conspiracy, or even that Allaham was; nor does

23   it show that Benomar was paid or agreed to pay anyone.  Maybe

24   this excerpt is more meaningful to the plaintiffs than it is to

25   me, but I can only go on the evidence provided.  And what is

181221broidyD            Decision

1   provided shows no more than that Allaham believed, until

2   disabused by his lawyers, that he could somehow, through

3   Benomar, get money that Qatar owed to him.  That hardly amounts

4   to evidence of the applicability of the commercial activity

5   exception.

6           Further, in the same excerpts, Allaham says he had no

7   agreement with Benomar.  And defendant provided the Court with

8   another excerpt from the same deposition during which Allaham

9   testified that he never discussed the hacking with Benomar.

10  That's defendant's reply Exhibit A at page 47.  In sum, the

11  transcript lines plaintiffs provide are, at best, unconvincing

12  and, at worst, out of context and potentially misleading.

13          I understand that plaintiffs are asking for

14  jurisdictional discovery to establish the facts I now find to

15  be unsupported by evidence, but whether to allow such

16  discovery, and if so, to what extent, is committed to my broad

17  discretion.  *In re Terrorist Attacks on September 11*, 689 F.

18  Supp. 2d 552, 566 (S.D.N.Y. 2010).  Where a plaintiff fails to

19  establish a *prima facie* case that a court has jurisdiction over

20  a defendant, it is within a court's discretion whether to allow

21  jurisdictional discovery.  *Togut v. Forever 21*, 285 F. Supp. 3d

22  643, 648 (S.D.N.Y. 2018).  And discovery need not be granted to

23  allow plaintiff to engage in an unfounded fishing expedition

24  for jurisdictional facts.  *Vista Food v. Champion Food Service*,

25  124 F. Supp. 3d 301, 315 (S.D.N.Y. 2015).  It was plaintiffs'

181221broidyD          Decision

1    obligation to provide evidence to show the Court that it had

2    jurisdiction.  They seem to have taken their best shot, and

3    they have come up short.

4          Denying jurisdictional discovery is especially

5    appropriate here because plaintiffs have already taken

6    substantial discovery in the California action.

7          If the defendant is diplomatically immune, he is also

8    immune from discovery, and the concerns of international comity

9    that animated the VCDR would be undermined if diplomats had to

10   engage in discovery, even where plaintiffs made no showing of

11   subject matter jurisdiction.  So, I find that the defendant is

12   entitled to diplomatic immunity and decline to allow

13   jurisdictional discovery.

14         Although I need not address whether the defendant is

15   entitled to derivative sovereign immunity, I'll talk about it

16   for a couple of minutes because I tend to think that he does

17   have the better of the argument.

18         He claims he's entitled to derivative sovereign

19   immunity, also known as Foreign Official Immunity, because, to

20   the extent the plaintiffs' complaint is true, or must be taken

21   as true, he allegedly acted as an agent on behalf of both Qatar

22   and Morocco, both of which are immune under the Foreign

23   Sovereign Immunities Act.

24         Plaintiffs argue that derivative sovereign immunity

25   does not apply because Benomar is sued in his personal

181221broidyD               Decision

1    capacity, and therefore, the FSIA, which only applies to

2    foreign sovereigns, doesn't apply to him.

3            The FSIA, 28 U.S. Code Section 1604, provides that a

4    foreign state shall be immune from the jurisdiction of the

5    courts of the United States and other States, except as

6    provided in Sections 1605 to 1607 of this chapter.

7            *In Samantar v. Yousef,* 560 U.S. 305, 320, the Supreme

8    Court clarified that the FSIA governed determinations of

9    sovereign immunity for foreign states, but not for current or

10   former foreign officials.  It pointed out, however, at page

11   324, that even if a suit is not governed by the FSIA, it may

12   still be barred by foreign sovereign immunity under common law.

13   The official's immunity is derivative of state immunity but is

14   not coextensive with the law of state immunity.  In other

15   words, in some circumstances, the immunity of the foreign state

16   extends to the individual for acts taken in his official

17   capacity.  That's *Samantar* at 320, 322.

18           The relevant inquiry focuses on the official's

19   conduct, not his status, and whether the act was performed on

20   behalf of the foreign state and is, thus, attributable to the

21   state.  *Moriah v. Bank of China*, 107 F. Supp. 3d 272, 277

22   (S.D.N.Y. 2015).

23           As one court has explained, the common law of foreign

24   sovereign immunity is perhaps uncharacteristically facile and

25   straightforward.  If the State Department submits a suggestion

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

181221broidyD               Decision

1   of immunity, then the district court surrenders its

2   jurisdiction.  *Tawfik v. al-Sabah,* 2012 WL 3542209, at *2

3   (S.D.N.Y. Aug. 16, 2012).  If, however, the State Department

4   declines the request or does not provide a response, the

5   district court has authority to decide for itself whether all

6   the requisites for such immunity exist.  *Moriah*, 107 F. Supp.

7   3d at 276.  When deciding for itself, a district court inquires

8   whether the ground of immunity is one which it is the

9   established policy of the State Department to recognize.

10  *Samantar* at 312.

11         To my knowledge, the State Department has not filed a

12  suggestion of immunity, so I'm authorized to decide whether

13  such immunity exists by inquiring whether the ground of

14  immunity asserted is one which it is the established policy of

15  the State Department to recognize.

16         But I must first determine the appropriate pleading

17  standards.  Although derivative sovereign immunity is based on

18  a foreign sovereign's immunity, it does not make much sense to

19  apply the procedural framework from an FSIA case here because

20  the Supreme Court has made clear that the FSIA does not apply

21  to individual foreign officials.  The motion before me is still

22  a challenge to subject matter jurisdiction on Rule 12(b)(1).

23  So, as before, I apply the standard principles that the burden

24  is on plaintiff to prove jurisdiction by a preponderance.  I'm

25  not required to presume the truthfulness of the complaint, and

181221broidyD              Decision

1    I may examine evidence.

2          Once again, it does not appear to me that plaintiffs

3    have satisfied their burden by a preponderance.  No evidence of

4    defendant's status has been provided, but even if I accepted

5    plaintiffs' allegations, plaintiffs would not prevail.  They

6    allege that Benomar acted as a Qatari official or agent in

7    hacking and disseminating plaintiffs' e-mails and sensitive

8    information.

9          They allege, on information and belief, that he,

10   quote, "serves as a secret and unregistered agent of a foreign

11   power and has significant responsibility for coordinating

12   Qatari influence operations in the United States," unquote.

13   That's Paragraph 9 of the complaint.  They further allege that,

14   in that capacity, he helped mastermind Qatar's strategy to

15   build influence in the U.S., that's Paragraph 30, through the

16   dissemination of stolen materials to the media and other third

17   parties, that's Paragraph 43.

18         Although I'm not required to presume the truthfulness

19   of plaintiffs' complaint, it seems to me unfair to allow

20   plaintiffs to disavow their own allegations.  To allow

21   plaintiffs to sue Benomar would be to allow a suit for conduct

22   that plaintiffs' claim was actually committed by the sovereign

23   or that Benomar committed at the sovereign's direction and on

24   the sovereign's behalf.

25         Because plaintiffs' own allegations suggest that he

181221broidyD          Decision

1   acted on behalf of a foreign state and that his conduct is

2   attributable to it, if I had to reach the issue, I likely would

3   find that I lack subject matter jurisdiction on grounds of

4   derivative sovereign immunity.

5          Plaintiffs' arguments regarding government contractors

6   I find inapposite because plaintiffs allege not that the

7   defendant is a mere contractor, but that he is a secret and

8   unregistered agent of a foreign power.

9          Finally, I turn to leave to amend or stay.  Plaintiffs

10  have asked to amend in light of the issuance of a blue-bordered

11  ID card.  They did that in Document 53.  Under Rule 15(a)(2),

12  leave to amend should freely be given when justice so requires.

13  It's within the discretion of the district court to grant or

14  deny leave to amend.  *McCarthy v. Dun & Bradstreet*, 482 F.3d

15  184, 200.  Leave to amend, though liberally granted, may

16  properly be denied for undue delay, bad faith, or dilatory

17  motive on the part of the movant, repeated failure to cure

18  deficiencies by amendments previously allowed, undue prejudice

19  to the opposing party by virtue of allowance of the amendment,

20  futility of amendments, etc.  *Ruotolo v. City of New York*, 514

21  F.3d 184, 191.

22          The complaint in this case was filed on July 23, 2018.

23  Plaintiffs filed their opposition to the instant motion on

24  November 14, 2018.  Between those two dates, they had every

25  opportunity to gather evidence to show that Benomar was not

181221broidyD            Decision

entitled to diplomatic immunity.  They were aware that he would

claim such entitlement at least as of September 28 when his

counsel raised it in a pre-motion letter, Document 25; and they

likely were aware of that possibility before that.

They were aware that Benomar could obtain a

blue-bordered identification card; they were aware of the

Vienna Convention's exceptions to diplomatic immunity; they

intended, at least as of October 4, 2018, to raise the

commercial activity exception because they mentioned it in

their pre-motion letter, Document 27 at page 2.  They were

aware, because the Court pointed it out at the October 10, 2018

status conference, and, undoubtedly, apart from that, that

material outside the complaint would be considered on the

defendant's Rule 12(b)(1) motion.  And they were, or should

have been aware, that they would have to present concrete facts

and evidence to overcome diplomatic immunity, or to establish

an exception to it.

I think what I have before me is plaintiffs' best shot

at establishing that Benomar is not entitled to diplomatic

immunity.  Not only is the blue card not really a surprise to

plaintiffs, but plaintiffs stated in Document 47 that they

believe that their opposition brief already addressed the

issues raised by its issuance.

Further, plaintiffs have not suggested that they are

in possession of facts that would cure the deficiencies

181221broidyD                Decision

1    identified in this ruling.  They've presented a proposed

2    amended complaint, which is attached to Document 53, that

3    includes allegations.  If those allegations were proven, they

4    could possibly establish the commercial activity exception, but

5    they are just that, allegations.  They are not evidence.

6         Even if I allowed plaintiffs to file the amended

7    complaint, a renewed motion would come out the same way because

8    plaintiffs have not claimed to have any evidence not already

9    available to them.  So amendment would be futile because the

10   problem here is not a pleading deficiency that plaintiffs can

11   fix.  It's an absence of evidence.

12        *See Raj v. Société General*, 2016 WL 354033 – it might

13   be 354133 – at *2 (S.D.N.Y. Jan. 21, 2016), where the court

14   found amendment would be futile if the amended complaint would

15   be subject to dismissal for lack of subject matter

16   jurisdiction, so I decline to permit leave to amend.

17        Finally, plaintiffs invoke the 1956 decision at page 4

18   of their opposition, footnote 3, to argue that I should stay

19   the case while Benomar serves out his diplomatic assignment,

20   but defendant is correct that that case was decided more than a

21   decade before the ratification of the VCDR and the enactment of

22   the Diplomatic Relations Act, which requires courts to dismiss

23   cases brought against diplomats immune under the VCDR.  *See* 22

24   U.S. Code Section 254d.  Therefore, the request for the stay is

25   also denied.

1           Despite the gravity of the allegations made by the

2    plaintiffs in this case, the diplomatic immunity mandated by

3    Section 254d precludes me from considering the merits of

4    plaintiffs' claims, at least while Mr. Benomar is cloaked with

5    immunity as a diplomat.

6           I understand the frustration, particularly because the

7    diplomatic status was not documented until after the alleged

8    conduct, but the purpose of that immunity, quote, "is not to

9    cover up heinous deeds from coming to the light of day, or to

10   protect a nation's leaders from accountability for their acts,"

11   unquote, *Tachonia*, 169 F. Supp. 2d at 317, but, rather, to

12   protect the interests of comity and diplomacy among nations and

13   to ensure the protection of our own diplomats abroad, *see*

14   *Tabion*, 877 F. Supp. at 292-93.

15          Because Benomar is entitled to immunity under Section

16   254d, I lack subject matter jurisdiction over the claims

17   against him, and the motion to dismiss is granted.

18          If plaintiff wants to sue additional defendants, as he

19   indicated at one point, he should start a new case in whatever

20   court is appropriate.

21          The clerk of court should terminate Document 37.

22          I will do a written order incorporating my ruling so

23   that if anybody wants to appeal, they can do so.

24          I think that takes care of our business.

25          MR. WOLOSKY:  Your Honor, may I.  Just two points.

181221broidyD               Decision

1          First, to make the record clear, and to preserve our

2     rights for appeal, we would like to make an offer of proof that

3     we sought to file the amended complaint that is docketed as

4     ECF 53.

5          Second, we wish to make an offer of proof and provide

6     to the Court the request for production of documents that we

7     would have sought in the context of jurisdictional discovery.

8          May I approach the bench to provide to your Honor the

9     second document, the request for production?

10          MR. LOWELL:  I don't see a procedure vehicle for what

11     he wants to do.  He has taken his shot in the pleadings that

12     you have now ruled upon, and having been ruled upon, he wants

13     to put something else in the record.  It doesn't occur that way

14     when you just come to court saying, By the way, here's what I'd

15     like the record to be.

16          Given that he did not have those documents properly

17     filed at a time and in a vehicle, then what it does is put in

18     the record things that I cannot respond to, that the Court has

19     already ruled against, and basically it has no legal effect for

20     what he might want to do, which is, appeal your decision based

21     on what you have just spent a considerable amount of time

22     explaining.

23          THE COURT:  Sounds right to me.

24          Look, the Circuit could tell me I'm wrong, but I don't

25     think they should do it on the basis of information that was

181221broidyD               Decision

1    not in front of me.

2         The proposed amended complaint is already in the

3    record, but I'm not going to add anything after I've ruled.

4         MR. DWYER:  Your Honor, just one thing.

5         We were going to file these before, and you ordered

6    the parties not to submit any more filings.  We think --

7         THE COURT:  And I did that for a reason.

8         MR. DWYER:  Right.  We think it's unfair for us to be

9    denied both the opportunity to do it when Mr. Lowell would

10   concede it was timely, and now because it's now not timely

11   because you wouldn't let us file anything.

12        THE COURT:  But you had the opportunity to request --

13   the document we're talking about is the request for

14   jurisdictional discovery.  You talked about that in your motion

15   papers.

16        MR. WOLOSKY:  No, your Honor --

17        THE COURT:  There was nothing stopping you from

18   expanding on that.

19        What I didn't like was the nasty grams that you guys

20   were sending back and forth, and I'd heard enough on leave to

21   amend.  The issue of jurisdictional discovery was something

22   raised in the motion papers, and you certainly had the option

23   to say, If we were allowed jurisdictional discovery, here's

24   what we would have asked for.  So, when I said stop sending me

25   letters, that was about amending -- it didn't seem to have

181221broidyD                Decision

 1    anything to do with jurisdictional discovery.

 2          MR. DWYER:  With deference, you said, Stop sending me

 3    letters.  You didn't say, Stop sending me nasty grams.  Not

 4    sending you --

 5          THE COURT:  Nasty gram is my shorthand for letters

 6    where the lawyers are taking shots at each other, and I've

 7    heard enough on the subject.

 8          The subject was the amendment.  The issue of

 9    jurisdictional discovery, I don't even think was mentioned in

10    those letters, but as I said a moment ago, the opportunity to

11    elaborate on what jurisdictional discovery you wanted or might

12    be helpful, was when you opposed the motion.  So I'm not going

13    to accept anything else into the record after I've ruled.

14          If the Circuit says that I should have been

15    clairvoyant enough to know that you wanted to say something

16    about what jurisdictional discovery you would seek and that

17    when I said enough with the nasty grams, I shouldn't have done

18    that because I should have somehow known that you might have

19    had something else you wanted to put in on jurisdictional

20    discovery, they'll tell me.

21          MR. WOLOSKY:  Different subject, your Honor.  This

22    goes to the evidence that we do have.

23          THE COURT:  I don't want to hear it.  Whatever

24    evidence is in the record, I looked at.

25          You know, one can't --

181221broidyD            Decision

1          MR. WOLOSKY:  Your Honor --

2          THE COURT:  I've ruled.

3          MR. WOLOSKY:  I understand.  It goes to the evidence

4    that's not in the record and the reason why --

5          THE COURT:  That's all the more reason why it

6    shouldn't come into the record.  I've looked at what's in the

7    record, and whatever -- if there's more, it's not something I

8    can consider.  I've ruled.

9          MR. WOLOSKY:  I understand.

10         THE COURT:  And I'm not going to --

11         MR. WOLOSKY:  May I just offer two sentences or three

12   sentences on this, your Honor.

13         Your Honor, at the last hearing, there was an extended

14   colloquy with Mr. Dwyer about our efforts to submit materials

15   to you that had been taken in discovery in the California case,

16   including discovery of the individuals that we allege were

17   Mr. Benomar's business partners and co-conspirators.

18         We had an extended discussion about why we couldn't

19   submit those on the public record and why we needed to file

20   them, if at all, under seal, because they were protected.  They

21   were designated in the California case.  That discussion ended

22   with Mr. Lowell saying that he didn't want to receive any

23   documents.

24         What we would like to submit to you, your Honor, is

25   that just because Mr. Lowell does not want to receive the

181221broidyD          Decision

1    documents, which are dispositive -- the documents that we have,

2    which are accessible from Mr. Benomar's files, are dispositive

3    of the commercial relationship.  We would like the submit that

4    to your Honor for in-camera review in connection with our

5    forthcoming motion for reconsideration.  It is one document,

6    one document.

7          THE COURT:  Let me tell you something.  You know as

8    well as I do that you cannot submit new material on a motion

9    for reconsideration, so save your client's money if that's what

10   you're planning to do.  You know what a motion for

11   reconsideration is.  A motion for reconsideration is for

12   something that was before me that I overlooked.

13         I don't remember the ins and outs of the conversation

14   we had last time except that it sounded like I was being asked

15   to mess with the protective order issued by another judge, and

16   I was not inclined to do that.  And that was the last I heard

17   of it.  So, I cannot help you with that subject.  But really,

18   if your basis for a motion for reconsideration is going to be

19   that you had more evidence that you could have put in, that is

20   not a basis for reconsideration, and it, frankly, would be

21   frivolous.

22         If there's something that you would put in a motion

23   for reconsideration, I don't know why it wasn't put in your

24   opposition.

25         Thank you, all.  Have a nice break.  I hope you'll all

181221broidyD                    Decision

1    get one.

2              MR. LOWELL:  Thank you, Judge.

3              MR. WOLOSKY:  Thank you, your Honor.

4              (Adjourned)

5                             - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25