181221broidyD          Decision

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BROIDY CAPITAL MANAGEMENT,
   LLC, et al.,
4
                Plaintiffs,
5
            v.                          18 Civ. 6615 CS
6
   JAMAL BENOMAR,
7
                Defendant.
8
   ------------------------------x
9                                       United States Courthouse
                                        White Plains, N.Y.
10                                      December 21, 2018
                                        10:00 a.m.
11
   Before:
12
                   THE HONORABLE CATHY SEIBEL,
13
                                             District Judge
14
                        APPEARANCES
15
   BOIES SCHILLER & FLEXNER, LLP
16     Attorneys for Plaintiff Broidy Capital Mgmt., et al.
   SAM KLEINER,
17 ROBERT JEFFREY DWYER
      -and-
18 LEE SCOTT WOLOSKY

19 WINSTON & STRAWN, LLP
       Attorneys for Defendant Jamal Benomar
20 ABBE DAVID LOWELL
      -and-
21 ERIC WESTON BLOOM

22

23

24

25

          SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
                      (914)390-4053

181221broidyD          Decision

1          (In open court)

2          THE DEPUTY CLERK:  In the matter of Broidy v. Benomar.

3          THE COURT:  Have a seat.  Let me make sure I know who

4    is who.

5          Mr. Wolosky.

6          MR. WOLOSKY:  Good morning, your Honor.

7          THE COURT:  Mr. Kleiner --

8          MR. KLEINER:  Good morning, your Honor.

9          THE COURT:  And Mr. Dwyer.

10          MR. DWYER:  Good morning, your Honor.

11          THE COURT:  Good morning.

12          And Mr. Lowell.

13          MR. LOWELL:  Yes, ma'am.

14          THE COURT:  And Mr. Bloom.

15          MR. BLOOM:  Good morning, your Honor.

16          THE COURT:  Ordinarily, I invite the lawyers to tell

17    me if there's anything they want to add that's not covered by

18    the papers.  I'm a little nervous about doing that because, in

19    this case, sometimes I think the lawyers tell me things because

20    they would like to see them quoted back later in the paper or

21    because they want to make me think the other side or the other

22    side's lawyer is a good guy or bad guy.  I'm really not

23    interested in that.

24          I don't care if Mr. Benomar did great things when he

25    was with the UN or if he did terrible things since, and I don't

1    care if Mr. Broidy is doing great things for the government or

2    is under investigation by the government.  I don't want to hear

3    any of that.

4           But if there's something related to the motion that

5    you didn't have the opportunity to cover in the papers, I'll

6    give you the opportunity to say a few words, but don't feel

7    obligated.  It's your motion, Mr. Lowell.

8           Is there anything not covered by the papers that you

9    think is important?

10          MR. LOWELL:  I don't think so, your Honor.  I think

11   you gave us the chance to fully brief the legal issues that

12   apply, and I feel like we have given you all that we need to

13   ask for the relief that we ask.

14          THE COURT:  Mr. Wolosky, any last words?

15          MR. WOLOSKY:  No, your Honor.  Obviously, we had

16   sought leave to amend our complaint to account for the

17   case-changing development that occurred in the middle -- two

18   months after we filed our complaint, as evidenced by the

19   submission made to the Court of a blue card on November 21st.

20   Obviously, our amended complaint would seek to add the

21   jurisdictional allegations that are now relevant to the status

22   that's been confirmed relating to the defendant by the State

23   Department.

24          THE COURT:  Well, I'll get to that.

25          MR. WOLOSKY:  Thank you, your Honor.

181221broidyD          Decision

1          THE COURT:  Let me tell you where I come out.

2          First of all, it's the defendant's motion to dismiss

3    under Rule 12(b)(1) on grounds of diplomatic immunity and

4    derivative sovereign immunity.  I take the factual background

5    from the complaint and the various exhibits, declarations and

6    affidavits provided in connection with the motion.

7          And by the way, to the extent the plaintiffs objected

8    to Mr. Lowell's declarations' failure to properly authenticate

9    the exhibits attached to it, and that declaration was Document

10   40, an objection that, in large part, was well taken, that

11   objection has largely been mooted by the defendant's

12   supplemental declaration, which is Document 49, which I think

13   does properly authenticate the exhibits attached to it.

14         The plaintiff, Broidy Capital Management, LLC, is an

15   investment firm.  The plaintiff, Elliott Broidy, is the C.E.O.

16   and Chairman of Broidy Capital Management.  He is the former

17   Deputy Finance Chair of the Republican National Committee.

18         The defendant, Jamal Benomar, was born in Morocco, is

19   a citizen of the United Kingdom and resides in this district.

20   In 1993, he joined the United Nations.  During his career at

21   the UN, he held various positions in New York, Geneva, and

22   other locations.  Over the course of his career, he's resided

23   in the U.S. for significant periods.

24         On July 1, 2017, he left the UN after 24 years.  At an

25   unstated time thereafter, he was asked to advise the Kingdom of

181221broidyD          Decision

1    Morocco by becoming an official in the Kingdom's Permanent

2    Mission to the UN.  And this is coming largely from his

3    declaration.  He asserts that since November 1 of last year, he

4    has served as a diplomat with the highest diplomatic rank of

5    Minister Plenipotentiary at the Permanent Mission as accredited

6    by the Ministry of Foreign Affairs and International

7    Cooperation of the Kingdom of Morocco.

8          In recognition of his diplomatic status, on November 1

9    of last year, the U.S. granted him a G-1 diplomatic visa, which

10   is attached to his supplemental declaration as Exhibit 1.  That

11   visa remains operative and doesn't expire until October 2022.

12         For the last 12 months, the defendant has acted as a

13   Moroccan diplomat for Morocco's Permanent Mission to the UN,

14   traveling on his diplomatic passport, and returning to the U.S.

15   on his diplomatic visa; although, he states in his declaration

16   that he has not left the country since September 15, 2018, or

17   at least that was so as of the date of his declaration.

18         The plaintiffs in this action were also plaintiffs in

19   an action commenced on March 26, 2018, in the U.S. District

20   Court for the Central District of California, captioned Broidy

21   Capital Management, LLC, et al. v. State of Qatar.  And that

22   was Case No. 18 CV 2421.  I'm going to call that the California

23   action.

24         The defendants in the California action were the State

25   of Qatar – I'm probably mispronouncing that – Stonington

1  Strategies, LLC, Nicolas D. Muzin, Global Risk Advisors, LLC,

2  Kevin Chalker, David Mark Powell, Mohammed Bin Hamad Bin

3  Khalifa Al Thani, Ahmed Al-Ruhmaihi, and certain Doe

4  defendants.

5          The California action alleges a conspiracy by which

6  Qatar, acting through various agents, directed and orchestrated

7  a sophisticated criminal hack of computer systems belonging to

8  plaintiffs.

9          The conspiracy further extended to the review,

10  analysis, categorization, and distribution of hundreds of

11  thousands of stolen documents to various media outlets for the

12  purpose of harming plaintiff Broidy.

13          Plaintiff's full description of that conspiracy is

14  contained in the May 24, 2018 first amended complaint filed in

15  the California action, which is attached to the complaint in

16  this case.

17          Benomar is referred to in Paragraph 7 of the first

18  amended complaint in the California action as a, quote,

19  "retired Moroccan diplomat," unquote, who, upon information and

20  belief, was used by Qatar to attack the plaintiffs.

21          After plaintiffs filed the lawsuit in the California

22  action, Benomar says he and his family became the subject of

23  harassment, which harassment intensified after the filing of

24  this action.  Following these incidents, Benomar consulted with

25  colleagues in, quote, "the government," unquote, although he

181221broidyD          Decision

1    doesn't specify which government he is talking about.  That's

2    in Paragraph 39 of his declaration.

3          He sought U.S. identification credentials to see if

4    that could help avoid, stop, or respond to these acts of

5    harassment.  To that end, on August 1, 2018, the Permanent

6    Mission of the Kingdom of Morocco to the United Nations

7    provided the UN Director of Protocol a formal written

8    notification of Benomar's appointment as a Special Advisor.

9          On August 27, the Permanent Mission sent a letter to

10   the Diplomatic Accreditation Officer of Host Country Affairs

11   for the United States Permanent Mission to the UN, explaining

12   that Benomar's, quote, "high rank of Special Advisor," unquote,

13   was intended to place him at the full diplomat level and

14   requesting that he be given the same identification as other

15   diplomats, such as Ministers Plenipotentiary.

16         Morocco had already issued a full diplomatic passport

17   on September 16, 2016 with an expiration date of

18   September 16, 2019.  That passport was replaced this past

19   October with another diplomatic passport that will expire in

20   October 2022.

21         On September 21, 2018, Morocco's Permanent Mission

22   advised the U.S. Mission that Benomar enjoys the title of

23   Minister Plenipotentiary at the Permanent Mission of Morocco,

24   with full diplomatic privileges and immunities.

25         On October 5, the Moroccan Ministry for Foreign

181221broidyD          Decision

1   Affairs and International Cooperation affirmed Benomar's status

2   as a full-time Minister Plenipotentiary in the letter to the

3   U.S. Embassy in Rabat and the Minister Counselor of Host

4   Country Affairs at the U.S. Mission.  The letter states that

5   Benomar serves as Minister Plenipotentiary conducting full-time

6   diplomatic duties and has served in that capacity since

7   November 1, 2017.  That's Exhibit 5 to Benomar's supplemental

8   declaration.  And that supplemental declaration, by the way, is

9   Document 49.

10          On October 10, the Moroccan Mission forwarded the

11  October 5, 2018 letter to the UN Office of Protocol.  That's

12  Exhibit 6.  The UN Blue Book, Protocol and Liaison Service, as

13  of October 31, 2018, lists Benomar as "Minister

14  Plenipotentiary."  That's Exhibit 10 to Mr. Lowell's

15  declaration.

16          On November 13 of this year, the United States Mission

17  to the UN informed the Moroccan Mission to the UN that, quote,

18  "Mr. Benomar has been accredited, and if you wish, I can have

19  his passport available for retrieval in tomorrow's routine

20  pick-up.  The Department of State Diplomatic ID card should be

21  in from Washington within the three to five business days,"

22  unquote.  That's Exhibit 7 to Benomar's supplemental

23  declaration.

24          The following day, November 14, Mary Catherine Malin,

25  the Assistant Legal Advisor for Diplomatic Law and Litigation

181221broidyD          Decision

1   at the U.S. State Department, advised counsel for both

2   plaintiffs and defendant that the U.S. mission to the UN

3   acknowledges Benomar as a diplomat with full privileges and

4   immunities.

5          Her note is attached as Exhibit B to Mr. Wolosky's

6   affidavit, which is Document 45-1; and as Exhibit B to document

7   46.  At pages 2 to 3, it reads as follows:  Quote, "The

8   Permanent Mission of Morocco to the United Nations accredited

9   Mr. Benomar with the United Nations as a Minister

10  Plenipotentiary.  Based on his assignment, the Moroccan Mission

11  requested from the United Nations privileges and immunities

12  that would normally be extended to a representative of a UN

13  mission in a similar capacity.  The United Nations subsequently

14  notified the U.S. Mission regarding the Moroccan Mission's

15  request for privileges and immunities for Mr. Benomar.  This

16  notification was processed pursuant to our normal course of

17  business and was reviewed by U.S. Mission personnel to ensure

18  it met the requirements set forth by U.S. law and the UN

19  Headquarters Agreement.  Based on this information, the U.S.

20  Mission to the UN has registered Mr. Benomar with diplomatic

21  privileges and immunities as of November 13, 2018.

22  Representatives of the UN missions, including ministers,

23  receive diplomatic privileges and immunities based on the

24  application of the law, including the UN Headquarters

25  Agreement," unquote.

181221broidyD          Decision

1          Then the U.S. State Department sent, and Benomar

2    received, his blue diplomatic ID card, which is Exhibit 8 to

3    his supplemental declaration.  The accompanying letter provides

4    as follows in part:  Quote, "As MINISTER PLENIPOTENTIARY at the

5    Permanent Mission of MOROCCO to the United Nations, you are

6    entitled in the territory of the United States to the

7    privileges and immunities of a diplomatic envoy under the terms

8    of Section 15 of the Headquarters Agreement between the United

9    States and the United Nations," unquote.

10          It further provides, quote, "YOUR NAME WILL BE

11   INCLUDED on the next list of *Permanent Missions to the United*

12   *Nations – Officers Entitled to Diplomatic Privileges and*

13   *Immunities*," unquote.

14          In this case, plaintiffs allege that Benomar has, for

15   a long time, served the interests of the State of Qatar.

16   During his tenure at the UN, he allegedly used his official

17   position to advance the Qatari agenda, and while serving as the

18   UN envoy for Yemen, he allegedly reflected a bias towards the

19   interests of Qatar.  That's in Paragraphs 6 and 7 of the

20   complaint.

21          Telephone records of Benomar show that he had frequent

22   phone contact between October 2017 and June 2018 with senior

23   Qatari officials and alleged members of the conspiracy as

24   described in the California action.  That's Paragraph 8.

25          Plaintiffs allege that Benomar was a, quote, "key

181221broidyD          Decision

1  player," unquote, in the review, analysis, categorization, and

2  distribution of the stolen documents.  That's in Paragraph 17.

3          Plaintiffs further allege that the State of Qatar

4  sponsors and supports terrorism; that President Trump has

5  denounced it; and that several Middle Eastern countries have

6  imposed an economic embargo on it and demanded that it stop

7  funding terrorists.  That's Paragraph 25 to 28.

8          Plaintiffs further allege that the international

9  sanctions and President Trump's support for them, quote,

10  "threaten to devastate Qatar's economy and plunge Qatar into

11  crisis," unquote.  That's from Paragraph 29.  Qatar allegedly

12  responded to the sanctions by trying to build influence within

13  the United States, and Benomar, on information and belief,

14  quote, "helped to mastermind Qatar's strategy," unquote.

15  That's from Paragraph 30.

16          Part of the strategy was to try to curtail the

17  influence of prominent Americans, like plaintiff Broidy, who

18  were opposed to Qatar.  Broidy was a vocal critic of Qatar's

19  support for terrorists and Qatar's friendly relationship with

20  Iran.  He provided financial support for public initiatives,

21  such as conferences, to educate Americans about Qatar's support

22  for terrorist organizations.

23          During 2017 and '18, according to the complaint, he

24  conveyed his criticism of Qatar in meetings with U.S.

25  government officials, including President Trump.  Qatar was

1  aware of Broidy's criticism of Qatar's policy and efforts to

2  influence American opinion leaders and allegedly specifically

3  focused its efforts on him.  For example, Qatari officials

4  allegedly believed Broidy had prompted President Trump's public

5  criticism of Qatar in June 2017.  This is in Paragraphs 34

6  through 38.

7          In late 2017 and early 2018, Qatar, acting through

8  agents both in the U.S. and abroad, allegedly conducted a

9  sophisticated computer hack on plaintiffs' California-based

10  computer systems.  The attack, which plaintiffs allege appears

11  to have been executed from locations in at least Qatar and the

12  United States, resulted in the theft of many gigabytes of data

13  from plaintiffs, including trade secrets and personal

14  information.

15          After the documents and information were taken from

16  plaintiffs' computer systems, they were organized thematically

17  for distribution to the media.  That's Paragraphs 39 through

18  41.

19          Plaintiffs allege on information and belief that

20  Benomar, aware that the documents been stolen from plaintiffs,

21  was a, quote, "key participant in this process," unquote, and

22  that's from Paragraph 42; and, quote, "helped to mastermind the

23  dissemination of stolen materials to the media and other third

24  parties," unquote, that's Paragraph 43.  As part of his

25  involvement with the conspiracy, Benomar allegedly spoke

181221broidyD          Decision

1    regularly with senior Qatari officials about elements of the

2    conspiracy.  That's also in Paragraph 43.

3          Starting in late February 2018 and continuing

4    thereafter, members of the conspiracy allegedly distributed the

5    stolen materials to media outlets in the U.S. and abroad, which

6    subsequently published articles based on those materials.

7          The procedural background is as follows:  Plaintiff

8    filed this lawsuit on July 23 of this year.  The complaint

9    raises four claims: misappropriation of trade secrets in

10   violation of the Defend Trade Secrets Act, 18 U.S. Code,

11   Section 1836 *et seq.*; conversion of stolen property; unjust

12   enrichment; and civil conspiracy.

13         The case was reassigned to me on September 6.  On

14   October 31, defendant filed the motion.  Plaintiffs filed

15   their opposition on November 14.  On the same day, November 14,

16   defendant submitted a letter notifying the Court that the

17   United States had approved Benomar's status as a Minister

18   Plenipotentiary, entitled to full diplomatic immunity.  And on

19   November 21, defendant filed his reply papers.

20         On November 26, plaintiffs filed a letter explaining

21   their intention to seek leave to file an amended complaint

22   considering the defendant's introduction of new facts and

23   arguments related to the defendant's diplomatic status.  That

24   letter is Document 51.  And defendant responded the next day by

25   letter, which is Document 52.

1          On November 30, plaintiff then filed a letter formally

2     seeking leave to amend, to which the defendant replied on

3     December 2.  Those are 53 and 54.  And I told the parties I

4     would let them know how I plan to proceed.  So let me turn to

5     the motion.

6          A couple of preliminary issues:  First, on a motion to

7     dismiss under Rule 12(b)(1), the court may look to affidavits

8     and other evidence outside the pleadings to resolve disputed

9     jurisdictional fact issues.  *Eastern Paralyzed Veterans v.*

10    *Lazarus-Burman*, 133 F. Supp. 2d 203, 208 (E.D.N.Y. 2001).

11    Where jurisdictional facts are disputed, the court has the

12    power and the obligation to consider matters outside the

13    pleadings, such as affidavits, documents, and testimony, to

14    determine whether jurisdiction exists.  *Sokolowski v. MTA*, 849

15    F. Supp. 2d 412, 414 (S.D.N.Y. 2012), *affirmed* 723 F.3d 187 and

16    529 F. App'x 48.  But a district court may not rely on

17    conclusory or hearsay statements contained in the materials

18    outside the pleadings.  *J.S. ex rel. N.S. v. Attica Central*

19    *Schools*, 386 F.3d 107, 110.

20         Both parties attached documents to their submissions.

21    Defendant submitted an affidavit from the defendant, which is

22    39, and another from Mr. Lowell, which is 40 on the docket.

23    Defendant provided Mr. Wolosky's affidavit with exhibits, and

24    the defendant provided more documents, including a supplemental

25    declaration from Mr. Benomar with exhibits, which is 49.  I'll

1  consider the affidavits and any properly authenticated exhibits

2  as I am to do under Rule 12(b)(1).

3          As part of their submissions, both parties also

4  included expert reports.  Federal Rule of Evidence 702 requires

5  me to determine whether an expert's testimony is based on

6  scientific, technical, or other specialized knowledge that will

7  help the trier of fact.  By definition, expert testimony that

8  tells the trier of fact what result to reach does not help the

9  trier of fact.  *See Nationwide Transport v. Case Information*

10  *Systems*, 523 F.3d 1051, 1058-59 (9th Cir. 2008); and *U.S. v.*

11  *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

12          Accordingly, as a general rule, an expert's testimony

13  on issues of law is inadmissible.  *U.S. v. Bilzerian*, 926 F.2d

14  1285, 1294.  Although an expert may opine on an issue of fact

15  within the province of a trier of fact, he may not

16  give testimony stating ultimate legal conclusions based on

17  those facts.  That's *Bilzerian* at 1294.

18          Additionally, an expert may not nearly narrate facts

19  as doing so does not constitute offering opinions on the basis

20  of specialized knowledge or expertise and may also invade the

21  province of the trier of fact.  *Travelers Indemnity v. Northrup*

22  *Grumman*, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014).

23          Here, the plaintiffs filed an expert opinion of

24  David P. Stewart, who is a Professor from Practice at

25  Georgetown University Law Center, that's Document 45-4; and the

1  defendant filed the declaration of Bruce Rashkow, a lecturer at

2  Columbia Law School, that's Document 50.  Both expert reports

3  contain discussions about acquiring diplomatic immunity under

4  the controlling statutes and international agreements.

5        Under Rule 702 and the pertinent law, the experts

6  are precluded from opining on which side's version of the facts

7  is correct, marshaling arguments from the evidence, and

8  offering legal conclusions concerning whether or not Benomar

9  has diplomatic immunity or whether or not an exception to the

10 Vienna Convention applies.  Making arguments from facts in

11 evidence is the lawyer's job, and is not an exercise of the

12 witness' specialized knowledge.

13       The experts can, however, provide testimony based on

14 their specialized knowledge that falls short of a legal

15 conclusion, but will help the trier of fact: for example, they

16 can explain how a diplomat acquires diplomatic immunity or

17 point the Court to relevant provisions of the Vienna Convention

18 and other controlling international agreements and statutes.

19 But whether Benomar is entitled to immunity is not a subject of

20 proper expert opinion.

21       Therefore, I've considered the testimony from the

22 experts only to the extent the opinions provided specialized

23 knowledge regarding procedures and provisions related to

24 diplomatic immunity, but I've disregarded opinions on what the

25 law is or what conclusions I should reach on the facts or the

1  law.

2        Turning now to the legal standards:  Because federal

3  courts are courts of limited jurisdiction, a claim must be

4  dismissed if a court lacks subject matter jurisdiction over it.

5  *See Frontera Resources v. State Oil Company of Azerbaijan*, 582

6  F.3d 393, 397.  A case is properly dismissed for lack of

7  subject matter jurisdiction under Rule 12(b)(1) when the

8  district court lacks the statutory or constitutional power to

9  adjudicate it.  *Makarova v. United States*, 201 F.3d 110, 113.

10  A plaintiff asserting subject matter jurisdiction has the

11  burden of proving by a preponderance of the evidence that it

12  exists.  That's *Makarova* at 113.

13        Diplomatic immunity is a matter of subject matter

14  jurisdiction.  *Swarna v. Al-Awadi*, 607 F. Supp. 2d 509, 515

15  (S.D.N.Y. 2009), *affirmed in part, vacated in part, and*

16  *remanded on other grounds*, 622 F.3d 123; *see, e.g., Hilt*

17  *Construction v. Permanent Mission of Chad*, 2017 WL 4480760, at

18  *1 (S.D.N.Y. Oct. 6, 2017).

19        Plaintiffs argue that because no court has considered

20  who has the burden of proving or disproving immunity in the

21  context of a diplomat making such a claim under the Vienna

22  Convention, I should adopt the procedure applied in cases where

23  courts make immunity determinations under the Foreign Sovereign

24  Immunities Act, or FSIA, 28 U.S. Code Section 1602 *et seq.,* and

25  require the defendant to make out a *prima facie* case that he is

1    immune, which then shifts the burden back to plaintiffs to

2    prove an exception to the immunity, with the ultimate burden of

3    persuasion remaining with the defendant.  Plaintiffs make that

4    argument in its opposition at pages 2 to 3.

5          I decline the suggestion that I use the FSIA as an

6    interpretative guide for the Vienna Convention.  As the

7    Fourth Circuit has observed, when also declining to do so,

8    quote, "The FSIA is a statute which establishes the framework

9    for determining when federal or state courts in the United

10   States may exercise jurisdiction over foreign states; it is not

11   a treaty dealing with many countries.  In addition, the FSIA

12   was enacted after the Vienna Convention on Diplomatic Relations

13   came into existence, and thus, could not have been a textual

14   source for Convention delegates.  Furthermore, Congress did not

15   intend for the FSIA to affect diplomatic immunity under the

16   Vienna Convention.  Section 1609 specifically states that

17   Congress enacted the FSIA subject to existing international

18   agreements to which the United States is a party at the time of

19   the enactment of this act," unquote.  *Tabion v. Mufti,* 73 F.3d

20   535, 538 n.7 (4th Cir. 1996).  And I've omitted the citation to

21   the legislative history – House Report 1487.

22         So I will not follow the FSIA and, instead, will apply

23   the usual rule that where a defendant challenges the court's

24   subject matter jurisdiction under Rule 12(b)(1), that puts the

25   burden on the plaintiffs, but I think here the result would be

1  the same, even if defendant had the initial *prima facie* burden

2  and plaintiff then had to show an exception.

3          Motions under Rule 12(b)(1) may attack either the

4  sufficiency or the truth of the allegations supporting subject

5  matter jurisdiction. *Wells Fargo v. Ullah,* 2014 WL 470883, at

6  *2 (S.D.N.Y. Feb. 6, 2014). Quote, "In a facial challenge, the

7  court accepts as true the uncontroverted factual allegations in

8  the complaint. By contrast, in connection with a factual

9  challenge, the court's review is not confined to the pleadings,

10 but may examine extraneous evidence submitted with the motion

11 and make any findings of fact necessary to determine the

12 existence of subject matter jurisdiction. In that event, the

13 court is not obligated to accord presumptive truthfulness to

14 the allegations of the complaint. Rather, it may weigh the

15 evidence on the record accompanying the Rule 12(b)(1) motion or

16 hold an evidentiary hearing and decide for itself the merits of

17 the jurisdictional dispute. Finally, the burden of proving

18 jurisdiction is on the party asserting it," unquote. *Dow Jones*

19 *v. Harrods*, 237 F. Supp. 2d 394, 404 (S.D.N.Y 2002), *affirmed*

20 346 F.3d 357.

21         The present case involves a factual attack and not a

22 facial attack. It's undisputed that absent immunity, the Court

23 would have subject matter jurisdiction under federal question

24 jurisdiction, 28 U.S. Code Section 1331, or diversity

25 jurisdiction, 28 U.S. Code 1332, and plaintiffs do not dispute

1    that defendant's attack is limited to a factual attack.  In

2    their opposition at page 2, they state, quote, "Benomar has not

3    challenged plaintiffs' jurisdictional allegations but, instead,

4    has introduced a claim that he is entitled to immunity as a

5    diplomatic agent and a foreign official, and therefore, the

6    Court lacks jurisdiction."

7          Accordingly, (1) the burden is on the plaintiffs to

8    prove jurisdiction by a preponderance of the evidence; (2) I am

9    not required to presume the truthfulness of plaintiffs'

10   complaint; and (3) I may examine evidence submitted by the

11   parties.

12         With these principles in mind, I now turn to the

13   merits:  Benomar contends that dismissal is mandated by federal

14   statute and the Vienna Convention on Diplomatic Relations –

15   which I'm going to call either the VCDR or the Vienna

16   Convention – because he is a currently-serving accredited

17   diplomat entitled to immunity from civil jurisdiction in the

18   United States.  He argues that he's absolutely immune from suit

19   in this country as a diplomat of the Kingdom of Morocco and

20   that his status immunity protects him from legal actions of any

21   kind, including civil lawsuits and discovery from the moment

22   the U.S. was notified of his diplomatic status.  See

23   defendant's memorandum at pages 2 to 3 and 14 to 21.

24         Under Article 31(1) of the Vienna Convention, a

25   current diplomatic agent enjoys near absolute immunity from

1    civil jurisdiction.  This immunity is given full effect under

2    U.S. law pursuant to the Diplomatic Relations Act, 22 U.S.

3    Code, Section 254d, which states, quote, "Any action or

4    proceeding brought against an individual who is entitled to

5    immunity with respect to such action or proceeding under the

6    Vienna Convention," unquote, shall be dismissed.

7          As the preamble to the Vienna Convention recognizes,

8    the purpose of such immunity is not to benefit individuals, but

9    to ensure the efficient performance of the functions of

10   diplomatic missions as representing states.

11         The Second Circuit has recognized that under the

12   Vienna Convention, current diplomatic envoys enjoy absolute

13   immunity from civil and criminal process. *Brzak v. United*

14   *Nations*, 597 F.3d 107, 113; *see Tachiona v. United States*, 386

15   F.3d 205, 215, where the court said, quote, "With limited

16   exceptions, the Convention broadly immunizes diplomatic

17   representatives from the civil jurisdiction of the U.S.

18   Courts," unquote; and *Swarna v. Al-Awadi,* 622 F.3d 123, 137,

19   where the Circuit said sitting diplomats get near absolute

20   immunity in the receiving state to avoid interference with the

21   diplomat's service for his or her government.

22         Article 31 of the Convention provides narrow

23   exceptions to this diplomatic immunity, one of which –

24   commercial activity – is raised by plaintiffs here.

25         So, Article 31(1) and subsection (c) read as follows:

1   A diplomatic agent shall enjoy immunity from the criminal

2   jurisdiction of the receiving state.  He shall also enjoy

3   immunity from its civil and administrative jurisdiction, except

4   in the case of an action relating to any professional or

5   commercial activity exercised by the diplomatic agent in the

6   receiving state outside his official functions.

7           It seems the parties agree that defendant has shown in

8   the first instance that he is a diplomatic agent with the

9   position of Minister Plenipotentiary at Morocco's Permanent

10  Mission to the UN as accredited by the Ministry of Foreign

11  Affairs and International Cooperation of the Kingdom of

12  Morocco, as acknowledged by the UN, and as notified to the U.S.

13  through its Permanent Mission to the UN, see Benomar's

14  supplemental declaration, Exhibits 4 through 8, and thus, that

15  he is entitled to diplomatic immunity unless an exception

16  applies.

17          Indeed, before defendant had the blue-bordered

18  diplomatic identification card, plaintiffs had argued in their

19  opposition at page 4 that the State Department's immunity

20  determination controls what immunity status Benomar has and, at

21  page 9, that the Court should defer to the State Department's

22  determination.  Even the plaintiff's expert Professor Stewart

23  said that the identity card is the definitive document issued

24  by the State Department after its review of an application for

25  immunity.  That's in Paragraph 20 of his declaration.  And the

1   Restatement (Third) of Foreign Relations Section 464, which

2   plaintiffs cite at page 5, provides:  "In the United States, a

3   person's diplomatic status is established when it is recognized

4   by the Department of State."

5          The United States UN mission has now confirmed that

6   the U.S. has registered defendant with diplomatic privileges

7   and immunities in recognition of the fact that the Permanent

8   Mission of Morocco to the UN accredited Mr. Benomar with the UN

9   as a Minister Plenipotentiary.  See Exhibit B to Mr. Wolosky's

10  affidavit.  This recognition was followed by the United States

11  providing defendant with the blue ID card that plaintiffs

12  argued was necessary for him to have immunity.  The

13  accompanying letter says that he is entitled to the privileges

14  and immunities of a diplomatic envoy.  And plaintiffs

15  acknowledge in Document 53 at page 2, that the defendant's

16  presentation of the blue-bordered State Department diplomatic

17  ID card establishes that Benomar has been accredited as a

18  diplomatic agent and is entitled to status immunity.

19         And, quote, "In proceedings where a person's

20  diplomatic status is contested, courts generally consider the

21  State Department's determination to be conclusive," unquote.

22  *U.S. v. Khobragade*, 15 F. Supp. 3d 383, 385 n.16 (S.D.N.Y.

23  2014) (collecting cases*; see Gonzalez Paredes v. Vila,* 479

24  F. Supp. 2d 187, 194 (D.D.C. 2007) where the court said, quote,

25  "The Department of State certified the defendants' diplomatic

1  status, and it is not for this Court to revoke or question it,

2  but, rather, only to determine if an exception to diplomatic

3  immunity set forth in the Convention applies," unquote.

4          So, the questions remaining are whether the plaintiffs

5  have a meritorious argument that undermines Benomar's immunity.

6          They first raise the notice requirement.  Benomar

7  argues his immunity has been effective from the moment the

8  United States received notification of his appointment.  That's

9  in his brief at page 17.  Under Article 39 subsection (1) of

10  the VCDR, quote, "[e]very person entitled to privileges and

11  immunity shall enjoy them...if already in its territory, from

12  the moment when his appointment is notified to the Ministry of

13  Foreign Affairs," unquote.

14          Under Article 39, agents are entitled to immunity at

15  the moment of notification to the appropriate authorities of

16  the receiving state, even if they have already entered the

17  territory.  *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 297 n.171

18  (S.D.N.Y. 2001*), affirmed in part, reversed in part on other

19  grounds, and remanded*, 386 F.3d 205.

20          As plaintiffs' expert Professor Stewart explains in

21  paragraph 14 of his declaration, quote, "When the appropriate

22  authorities of the receiving state do accredit an individual as

23  a member of the sending state's diplomatic mission...that

24  individual's entitlement to immunity will be considered to have

25  commenced either upon the moment the individual enters the

1    country to take up the post, or if the individual is already in

2    the receiving state, when notice was made to the Ministry for

3    Foreign Affairs," unquote.

4          The defendant provided exhibits that reflect that no

5    later than September 21 or October 5, 2018, Morocco expressly

6    notified the U.S. of Benomar's appointment as a Minister

7    Plenipotentiary.  See Exhibits 4 and 5 to the defendant's

8    supplemental declaration.

9          Plaintiffs point to the language in Article 39, quote,

10   "if already in its territory," unquote, and note that Benomar

11   never stated in his declaration that he was in the United

12   States on either date.

13         In his supplemental declaration, Benomar avers that he

14   was in the U.S. on both dates and that he had returned from

15   international travel back into the U.S. on September 15 and has

16   remained in the U.S. continuously from that date through at

17   least the date of his declaration.  He provided a copy of the

18   U.S. Customs stamp he received on September 15 reflecting his

19   entry into the country that day.  That's Exhibit 1 to the

20   supplemental declaration.  I, therefore, find his immunity was

21   effective upon Morocco's notice of his appointment.

22         Further, even if he were not in the United States on

23   those dates, it seems clear, based on plaintiffs' expert report

24   and the language of the treaty, that the immunity is to be

25   effective from the time of notification if the person is

181221broidyD          Decision

1    already living here when appointed, or from the time of arrival

2    in the United States if the person is residing abroad when

3    appointed.  So, Benomar would be covered from the time of

4    notification, as long as he was living here – which he was –

5    even if he happened to be on a trip out of the United States at

6    that moment.

7          Turning now to the requirement of permanent residency.

8    Plaintiffs argue that a diplomat who is, quote, "permanently

9    resident in," unquote, the receiving state is not entitled to

10   full immunity.  That's in their brief at pages 11 to 12, citing

11   Article 38(1) of the VCDR, which provides that a diplomatic

12   agent who is, quote, "permanently resident in," unquote, the

13   receiving state, quote, "shall enjoy only immunity from

14   jurisdiction and inviolability in respect of official acts

15   performed in the exercise of its functions," unquote.

16         Plaintiffs argue that because Benomar has lived in the

17   United States with his family, all of whom are U.S. citizens,

18   on a continuous basis since the early 1990s, he is not entitled

19   to "full status immunity" but only "official acts" immunity.

20         There is not a lot of precedent with respect to

21   Article 38(1).  Both sides point to State Department documents.

22   While not binding, quote, "the meaning attributable to treaty

23   provisions by the government agencies charged with their

24   negotiation and enforcement is entitled to great weight."

25   *Sumitomo Shoji America v. Avagliano,* 457 U.S. 176, 184–85

1   (1982).

2           Plaintiffs point the Court to the State Department

3   Judicial Guidance and assert at page 11 of their brief that

4   being permanently resident in the United States for these

5   purposes is not the same as being a lawful permanent resident,

6   commonly known as a green card holder.  And they cite to a

7   Department of State publication from 2015 called "Diplomatic

8   and Consular Immunity: Guidance for Law Enforcement and

9   Judicial Activities."  And that you can find at the following

10  url:  Https://www.state.gov -- actually, I don't know if these

11  are slashes or back-slashes --

12  .gov/documents/organizations/150546.pdf.  And they quote to

13  page 9 of that document.

14          It may be so that being permanently resident in the

15  U.S. is not the same as being a green card holder, but that

16  does not really help plaintiffs with respect to this defendant.

17  That Guidance at page 9 says that the United States -- now I'm

18  quoting -- "the United States as a matter of policy does not

19  normally accept as diplomatic agents its own nationals, legal

20  permanent residents of the United States, or others who are

21  permanently resident in the United States," unquote.  That

22  suggests that because the United States has accepted the

23  defendant as a diplomatic agent, he is not considered to be,

24  quote, "permanently resident" in the United States.

25          Indeed, the Guidance goes on to say that police

1  officers, quote, "should not have to deal with this distinction

2  since the U.S. Department of State issues cards...with the

3  nationality principle in mind," unquote.

4       Because the Department of State has issued the

5  defendant a blue-bordered identity card which is for diplomatic

6  agents, it must not regard defendant as permanently resident in

7  the United States.

8       Plaintiffs also point to a page on the State

9  Department's website that discusses privileges and immunities

10  and says that they do not apply unless the employing foreign

11  state documents that it pays for the employee's travel to and

12  from the United States, which Morocco has not documented.

13  But as defendant correctly notes, the provision cited by

14  plaintiffs only applies to A-2 visa holders, but does not apply

15  to Benomar who holds the higher G-1 visa.  And that web page is

16  at

17  https://www.state.gov/ofm/accreditation/privilegesandimmunities

18  /index.htm.

19       The defendant's expert points to a Circular Note that the

20  State Department issued in 1991 that provides a definition of,

21  quote, "permanently resident," unquote, but only in regard to

22  administrative and technical and service staff.

23        The Circular Note, dated April 10, 1991, can be found

24  at https://www.state.gov/documents/organization/58891.pdf.  The

25  Circular Note states that, quote, "The United States has, for

181221broidyD          Decision

1   the sake of its own convenience, equated [the term 'permanently

2   resident in'] with the status of 'permanent resident alien'

3   as...employed in U.S. Immigration Law."  So it's saying that,

4   as of the date of that Circular Note, the U.S, for its own

5   convenience, equated permanent residency with being a green

6   card holder.

7          It then goes on to explain a change.  It says that "the

8   State Department has determined that members of the

9   administrative and technical and service staffs of diplomatic

10  missions...will be considered permanently resident in the

11  United States for purposes of the Vienna Convention, unless the

12  employing foreign state provides appropriate documentation,"

13  unquote, showing that it pays for travel and undertakes to

14  transfer the employee out of the U.S. within a specific time

15  frame consistent with the sending state's transfer policy."

16         So for administrative, technical, and service staffs,

17  there's a change in how the U.S. regards permanent residence,

18  but the absence of any such change with respect to diplomatic

19  agents like defendant suggests that no such documentation is

20  required for them to avoid being considered permanently

21  resident in the United States, and that with respect to

22  diplomatic agents, quote, "permanently resident in" the United

23  States continues to be equated with being a permanent resident

24  alien, a/k/a green card holder, which defendant is not.

25         Finding these sources to be suggestive of immunity but

1  not determinative, I am left with the facts and the burden of

2  persuasion.  From what I know from the record, Benomar was born

3  in Morocco, is a citizen of the UK, has no U.S. immigration

4  status, and has been in this country on visas at all relevant

5  times, albeit in jobs requiring frequent travel abroad.

6        The State Department has issued him a blue-bordered

7  identity card that reflects his entitlement to the privileges

8  and immunities of a diplomatic envoy.  The State Department was

9  no doubt aware of the amount of time Benomar has spent in the

10  United States.

11        Plaintiffs have provided no authority – and I know of

12  none – for the proposition that a career diplomat whose jobs

13  have led him to live in the U.S. for an extended period, is to

14  be considered the equivalent of a national or a lawful

15  permanent resident under the VCDR.

16        The State Department obviously does not interpret the

17  term, quote, "permanently resident in the United State,"

18  unquote, that way, and nobody else seems to, either.  So I find

19  that plaintiffs' argument in this regard unavailing.

20        Next, plaintiffs make two related arguments related to

21  Benomar's commercial activities.

22        First, they argue that under Article 42 of the Vienna

23  Convention, when a diplomat engages in, quote, "any

24  professional or commercial activity," unquote, the person is

25  not entitled to absolute immunity as a matter of both U.S. and

1  international law.

2          Under Article 42, quote, "[a] diplomatic agent shall

3  not, in the receiving state, practice for personal profit any

4  professional or commercial activity," unquote.  To supplement

5  this claim, plaintiffs cite to a Circular Note published by the

6  U.S. Mission to the UN in 2016, which can be found at

7  https://www.state.gov/documents/organization/58891.pdf.  That

8  Circular Note says that diplomatic privileges and immunities

9  would apply only to individuals who meet criteria, including

10  that they perform on behalf of the member state diplomatic

11  duties directly related to the work of the UN on a full-time

12  basis, which the Department of State describes as at least 35

13  hours each week at the Mission, and shall not practice for

14  profit any professional or commercial activity in the United

15  States.  And that is called U.S./UN Circular Note HC-01-06,

16  dated January 13, 2016.

17          Plaintiffs argue that defendant has failed to satisfy

18  these criteria and, therefore, is not entitled to diplomatic

19  immunity.  They argue he's provided no evidence that he works

20  at least 35 hours a week at the Mission, and because he engages

21  in for-profit professional and commercial activity, he is not

22  entitled to diplomatic immunity under Article 42.

23          The related argument is that the commercial activities

24  exception to full status immunity is applicable under VCDR

25  Article 31(1)(c), which, as I noted earlier, excepts from

181221broidyD          Decision

1    immunity, quote, "an action relating to any professional or

2    commercial activity exercised by the diplomatic agent in the

3    receiving state outside his official function," unquote.

4          As a preliminary matter, defendant has provided

5    evidence that his duties for Morocco are full time.  He has

6    provided his own declaration, see paragraph 31; and the

7    October 5, 2018 Moroccan Ministry of Foreign Affairs note,

8    which is Exhibit 5 to his supplemental declaration, both of

9    which say he works full time.

10          With respect to the commercial exception, quote,

11   "[T]here are few published decisions of U.S. courts

12   interpreting the 'commercial activity' exception found within

13   Article 31(1)(c) of the Vienna Convention," unquote.  *Gonzalez*

14   *Paredes*, 479 F. Supp. 2d at 192.

15          The most expansive decision on Article 31(1)(c) of

16   which I'm aware is from 1995, a case from the Eastern District

17   of Virginia, *Tabion v. Mufti*, 877 F. Supp. 285, 292 (E.D. Va.

18   1995), *affirmed*, 73 F.3d 535 (4th Cir. 1996).  In granting the

19   defendant's motion to quash a subpoena on the grounds of

20   immunity, Judge Ellis of the Eastern District of Virginia

21   assessed the meaning of the Vienna Convention's use of the

22   phrase, quote, "commercial activity," unquote, by analyzing the

23   negotiating and drafting history of the treaty which suggested

24   that the insertion of "commercial" after "professional" was

25   something of a redundant afterthought.  See 877 F. Supp. at 290

1   & n.10.

2       After his analysis, Judge Ellis made the following

3   observations about the Vienna Convention.  Now I'm quoting:

4       "At all stages, the treaties drafting and negotiating

5   history points persuasively to the conclusion that Article

6   31(1)(c) was not intended to carve out a broad exception to

7   diplomatic immunity for a diplomat's daily contractual

8   transactions for personal goods and services.  Activities such

9   as purchasing a car, sending clothing to a tailor, and hiring a

10  domestic servant certainly are not, quote, 'wholly

11  inconsistent,' unquote, with a diplomat's functions.  Nor are

12  such activities particularly 'unusual' or prohibited by Article

13  42.  Yet those involved in the drafting process consistently

14  questioned the need to provide an immunity exemption for

15  commercial activities when diplomats were already barred from

16  those activities.  Thus, it is evident that the phrase

17  'commercial activity' in the Vienna Convention means a business

18  or trade activity for profit and that Article 31(1)(c) was

19  intended to reach those rare instances where a diplomatic agent

20  ignores the restraints of his office and, contrary to Article

21  42, engages in such activity in the receiving state.

22  Accordingly, a diplomat who strays from his diplomatic

23  functions and runs a car business or becomes a tailor in the

24  receiving State cannot then shelter himself behind diplomatic

25  immunity when disputes arise out of that activity.  Not only is

1    this broader construction of immunity clearly consistent with

2    the drafters' intent, but it also follows the fundamental

3    principle that treaties should be liberally construed so as to

4    enlarge, rather than restrict, rights that signatory nations

5    may claim under them."

6            That's *Tabion*, 877 F. Supp. at 291.

7            Judge Ellis also state cited to the State Department's

8    written response to a question pertaining to the scope of

9    Article 31(1)(c) submitted to Congress during hearings on

10   diplomatic privileges and immunities in 1988.

11           The State Department wrote, quote, "The ideas of

12   remuneration and of a continuous activity are central to the

13   purpose of Article 31(1)(c)," unquote.  That's *Tabion* at 292

14   n.12, which contains the cite to that State Department

15   document.

16           Plaintiffs allege that Benomar was personally paid

17   millions of dollars in commercial fees and that his business

18   partner, Joseph Allaham, threatened to sue him for $5- to

19   $10 million for money Allaham earned from Qatar but did not

20   receive.  That's in plaintiffs' opposition at page 17 and

21   Mr. Wolosky's declaration, Exhibit A.

22           Plaintiff argues that Benomar was involved in the

23   hacking conspiracy as part of a commercial enterprise.  That's

24   at page 17.  And they further allege at pages 13 to 14 that his

25   position on the board of a multinational media company, called

181221broidyD          Decision

1   Lagardère SCA, constitutes commercial activity.

2          Defendant's arguments in response -- well, in his

3   first memorandum and in his response, in his reply memorandum,

4   can be boiled down to three assertions that address both of

5   plaintiffs' commercial activity arguments.

6          The defendant says he didn't engage in any systematic

7   trade or business activity within the U.S. for personal profit;

8   that the advice he provided to Qatar was at the request of

9   Morocco and part of his official functions; and that the

10  commercial activity exception has been used only where the

11  counter-party is commercially, quote, "across the table,"

12  unquote, from the defendant-diplomat.  That's at page 21 of the

13  defendant's brief.

14         I reject the third argument.  None of the cases cited

15  by defendant imposed an, quote, "across the table," unquote,

16  arrangement as a legal requirement to the commercial activity

17  exception, and I don't find such an arrangement necessary to

18  satisfy the exception.

19         In turning to the defendant's other two arguments, I

20  again find not a lot of helpful law.  Many of the cases deal

21  with extremes.  They contrast a diplomat's day-to-day, everyday

22  purchases at the retail level to a diplomat running a business

23  or practicing a profession at the other extreme.

24         I don't know if I said that right.

25         They compare a diplomat's everyday retail purchases to

1    a diplomat running a business or practicing a profession.

2          So, again, I look to the evidence in the record and

3    the burden of persuasion.  It was plaintiffs' responsibility to

4    bring to the table evidence to help me decide this

5    jurisdictional question.  This jurisdictional question,

6    plaintiffs' commercial activity arguments – under Article 31

7    and 42 – fall short because I do not find plaintiffs have

8    sufficiently provided evidence that Benomar has engaged in

9    commercial activities.

10          First, his position with the supervisory board of

11   Lagardère SCA is not commercial activity under the VCDR.

12   Plaintiffs have made no showing that this position involves any

13   activity within the United States as the VCDR requires.  The

14   only evidence I have on it is from Mr. Benomar's supplemental

15   declaration where he says the only requirements of the job are

16   attending a meeting every three months, which is hardly enough

17   to render him less than a full-time diplomat, which he asserts

18   he is.  He further says that he has not received any

19   remuneration for this position.  So, despite whatever ambiguity

20   there may be about what a commercial activity is under the

21   VCDR, at a minimum, the activity must take place, quote, "in

22   the receiving state," unquote.  That's from 31(1)(c).  And it's

23   unlikely the definition of commercial activity would include

24   non-profit-making work.  So, the only evidence of record is

25   that the board position does not bring Benomar within the

181221broidyD          Decision

1   exception.

2          Second, plaintiffs' bald allegations that Benomar

3   participated in (and was paid millions of dollars for)

4   participating in the scheme to illegally hack plaintiffs'

5   computers and distribute the results to the press, also does

6   not satisfy the commercial activities exception for the

7   following reasons:

8          Whatever the precise definition of commercial activity

9   under the VCDR is, it is obvious that paying cyberhackers to

10  hack plaintiffs' computers or getting paid to distribute stolen

11  material is not, quote, "professional or commercial," unquote,

12  as those terms are commonly understood.

13         Judge Ellis offered the examples of a diplomat running

14  a car dealership or being a tailor in *Tabion* at 291.  And in

15  *Barbata v. Latamie*, 2012 WL 2422740, at *2 (S.D.N.Y. June 26,

16  2012), Judge Cote found commercial activity outside of any

17  official functions regarding a diplomat who had made an

18  agreement to purchase a portfolio of art prints.  These

19  ordinary clearly commercial activities are of a different ilk

20  from the world of cybercrime and distribution of stolen

21  property.

22         Simply put, the complex hacking conspiracy described

23  in plaintiffs' complaint does not describe an example of the

24  common understanding of commercial activity, especially

25  considering that plaintiffs allege that this conspiracy was at

1   the direction of a foreign government.

2          While many crimes could be regarded as commercial

3   because they are designed to make money, here, the goal of the

4   defendant and his alleged co-conspirators is alleged to be

5   political, not monetary.

6          The Fourth Circuit, affirming Judge Ellis' decision in

7   *Tabion*, said that commercial activity does not include, quote,

8   "occasional service contracts," unquote, but did include,

9   quote, "trade or business activity, engaged in for personal

10  profit," unquote.  73 F.3d at 537.

11         Defendant's alleged assistance to Qatar strikes the

12  Court as closer to the former.  It is not a business or job

13  defendant is alleged to have set up alongside or in place of

14  his day job as a diplomat, but, rather, is alleged to be a

15  several-month international espionage project.  The State

16  Department, as indicated earlier, indicated that remuneration

17  and continuous activity are central to the purpose of 31(1)(c).

18  The activity alleged here is akin to a consulting gig doable in

19  one's spare time while working full-time as a diplomat.

20         In so construing the commercial activity exception, I

21  am mindful that, quote, "treaties are to be construed in a

22  broad and liberal spirit, and when two constructions are

23  possible, one restrictive of the rights that may be claimed

24  under it and the other favorable to them, the latter is to be

25  preferred," unquote.  That's *Asakura v. City of Seattle*, 265

1  U.S. 332, 342 (1924).  Interpreting, quote, "professional or

2  commercial activity," unquote, to exclude the time-limited,

3  illicit, foreign-directed, politically-motivated conduct

4  alleged to have occurred here is the interpretation that

5  enlarges the rights that may be claimed under the VCDR.  *See*

6  *Jordan v. K. Tashiro,* 278 U.S. 123, 127.

7          More fundamentally, however, even if cybercrime were

8  considered to be commercial activity, plaintiffs have not

9  established by a preponderance of the evidence that Benomar was

10  involved in the activity or did it for money.  Their

11  allegations regarding his participation are almost entirely on

12  information and belief, with no basis for that information and

13  belief stated.

14          The only evidence they provided was a few lines of a

15  deposition transcript in which Joseph Allaham states he is owed

16  $5- to $10 million by Qatar and was thinking of suing Benomar

17  over it because he could not get a straight answer about it.

18  This is in Exhibit A to Mr. Wolosky's declaration around pages

19  380 to 381.

20          This inscrutable excerpt does not show that Benomar

21  was paid anything, let alone that he was paid for participating

22  in the hacking conspiracy, or even that Allaham was; nor does

23  it show that Benomar was paid or agreed to pay anyone.  Maybe

24  this excerpt is more meaningful to the plaintiffs than it is to

25  me, but I can only go on the evidence provided.  And what is

181221broidyD          Decision

1    provided shows no more than that Allaham believed, until

2    disabused by his lawyers, that he could somehow, through

3    Benomar, get money that Qatar owed to him.  That hardly amounts

4    to evidence of the applicability of the commercial activity

5    exception.

6         Further, in the same excerpts, Allaham says he had no

7    agreement with Benomar.  And defendant provided the Court with

8    another excerpt from the same deposition during which Allaham

9    testified that he never discussed the hacking with Benomar.

10   That's defendant's reply Exhibit A at page 47.  In sum, the

11   transcript lines plaintiffs provide are, at best, unconvincing

12   and, at worst, out of context and potentially misleading.

13        I understand that plaintiffs are asking for

14   jurisdictional discovery to establish the facts I now find to

15   be unsupported by evidence, but whether to allow such

16   discovery, and if so, to what extent, is committed to my broad

17   discretion.  *In re Terrorist Attacks on September 11*, 689 F.

18   Supp. 2d 552, 566 (S.D.N.Y. 2010).  Where a plaintiff fails to

19   establish a *prima facie* case that a court has jurisdiction over

20   a defendant, it is within a court's discretion whether to allow

21   jurisdictional discovery.  *Togut v. Forever 21*, 285 F. Supp. 3d

22   643, 648 (S.D.N.Y. 2018).  And discovery need not be granted to

23   allow plaintiff to engage in an unfounded fishing expedition

24   for jurisdictional facts.  *Vista Food v. Champion Food Service*,

25   124 F. Supp. 3d 301, 315 (S.D.N.Y. 2015).  It was plaintiffs'

1  obligation to provide evidence to show the Court that it had

2  jurisdiction.  They seem to have taken their best shot, and

3  they have come up short.

4          Denying jurisdictional discovery is especially

5  appropriate here because plaintiffs have already taken

6  substantial discovery in the California action.

7          If the defendant is diplomatically immune, he is also

8  immune from discovery, and the concerns of international comity

9  that animated the VCDR would be undermined if diplomats had to

10  engage in discovery, even where plaintiffs made no showing of

11  subject matter jurisdiction.  So, I find that the defendant is

12  entitled to diplomatic immunity and decline to allow

13  jurisdictional discovery.

14          Although I need not address whether the defendant is

15  entitled to derivative sovereign immunity, I'll talk about it

16  for a couple of minutes because I tend to think that he does

17  have the better of the argument.

18          He claims he's entitled to derivative sovereign

19  immunity, also known as Foreign Official Immunity, because, to

20  the extent the plaintiffs' complaint is true, or must be taken

21  as true, he allegedly acted as an agent on behalf of both Qatar

22  and Morocco, both of which are immune under the Foreign

23  Sovereign Immunities Act.

24          Plaintiffs argue that derivative sovereign immunity

25  does not apply because Benomar is sued in his personal

1  capacity, and therefore, the FSIA, which only applies to

2  foreign sovereigns, doesn't apply to him.

3          The FSIA, 28 U.S. Code Section 1604, provides that a

4  foreign state shall be immune from the jurisdiction of the

5  courts of the United States and other States, except as

6  provided in Sections 1605 to 1607 of this chapter.

7          *In Samantar v. Yousef,* 560 U.S. 305, 320, the Supreme

8  Court clarified that the FSIA governed determinations of

9  sovereign immunity for foreign states, but not for current or

10  former foreign officials.  It pointed out, however, at page

11  324, that even if a suit is not governed by the FSIA, it may

12  still be barred by foreign sovereign immunity under common law.

13  The official's immunity is derivative of state immunity but is

14  not coextensive with the law of state immunity.  In other

15  words, in some circumstances, the immunity of the foreign state

16  extends to the individual for acts taken in his official

17  capacity.  That's *Samantar* at 320, 322.

18          The relevant inquiry focuses on the official's

19  conduct, not his status, and whether the act was performed on

20  behalf of the foreign state and is, thus, attributable to the

21  state.  *Moriah v. Bank of China*, 107 F. Supp. 3d 272, 277

22  (S.D.N.Y. 2015).

23          As one court has explained, the common law of foreign

24  sovereign immunity is perhaps uncharacteristically facile and

25  straightforward.  If the State Department submits a suggestion

181221broidyD          Decision

1    of immunity, then the district court surrenders its

2    jurisdiction.  *Tawfik v. al-Sabah,* 2012 WL 3542209, at *2

3    (S.D.N.Y. Aug. 16, 2012).  If, however, the State Department

4    declines the request or does not provide a response, the

5    district court has authority to decide for itself whether all

6    the requisites for such immunity exist.  *Moriah*, 107 F. Supp.

7    3d at 276.  When deciding for itself, a district court inquires

8    whether the ground of immunity is one which it is the

9    established policy of the State Department to recognize.

10   *Samantar* at 312.

11          To my knowledge, the State Department has not filed a

12   suggestion of immunity, so I'm authorized to decide whether

13   such immunity exists by inquiring whether the ground of

14   immunity asserted is one which it is the established policy of

15   the State Department to recognize.

16          But I must first determine the appropriate pleading

17   standards.  Although derivative sovereign immunity is based on

18   a foreign sovereign's immunity, it does not make much sense to

19   apply the procedural framework from an FSIA case here because

20   the Supreme Court has made clear that the FSIA does not apply

21   to individual foreign officials.  The motion before me is still

22   a challenge to subject matter jurisdiction on Rule 12(b)(1).

23   So, as before, I apply the standard principles that the burden

24   is on plaintiff to prove jurisdiction by a preponderance.  I'm

25   not required to presume the truthfulness of the complaint, and

181221broidyD          Decision

1   I may examine evidence.

2          Once again, it does not appear to me that plaintiffs

3   have satisfied their burden by a preponderance.  No evidence of

4   defendant's status has been provided, but even if I accepted

5   plaintiffs' allegations, plaintiffs would not prevail.  They

6   allege that Benomar acted as a Qatari official or agent in

7   hacking and disseminating plaintiffs' e-mails and sensitive

8   information.

9          They allege, on information and belief, that he,

10  quote, "serves as a secret and unregistered agent of a foreign

11  power and has significant responsibility for coordinating

12  Qatari influence operations in the United States," unquote.

13  That's Paragraph 9 of the complaint.  They further allege that,

14  in that capacity, he helped mastermind Qatar's strategy to

15  build influence in the U.S., that's Paragraph 30, through the

16  dissemination of stolen materials to the media and other third

17  parties, that's Paragraph 43.

18         Although I'm not required to presume the truthfulness

19  of plaintiffs' complaint, it seems to me unfair to allow

20  plaintiffs to disavow their own allegations.  To allow

21  plaintiffs to sue Benomar would be to allow a suit for conduct

22  that plaintiffs' claim was actually committed by the sovereign

23  or that Benomar committed at the sovereign's direction and on

24  the sovereign's behalf.

25         Because plaintiffs' own allegations suggest that he

1    acted on behalf of a foreign state and that his conduct is

2    attributable to it, if I had to reach the issue, I likely would

3    find that I lack subject matter jurisdiction on grounds of

4    derivative sovereign immunity.

5          Plaintiffs' arguments regarding government contractors

6    I find inapposite because plaintiffs allege not that the

7    defendant is a mere contractor, but that he is a secret and

8    unregistered agent of a foreign power.

9          Finally, I turn to leave to amend or stay.  Plaintiffs

10   have asked to amend in light of the issuance of a blue-bordered

11   ID card.  They did that in Document 53.  Under Rule 15(a)(2),

12   leave to amend should freely be given when justice so requires.

13   It's within the discretion of the district court to grant or

14   deny leave to amend.  *McCarthy v. Dun & Bradstreet*, 482 F.3d

15   184, 200.  Leave to amend, though liberally granted, may

16   properly be denied for undue delay, bad faith, or dilatory

17   motive on the part of the movant, repeated failure to cure

18   deficiencies by amendments previously allowed, undue prejudice

19   to the opposing party by virtue of allowance of the amendment,

20   futility of amendments, etc.  *Ruotolo v. City of New York*, 514

21   F.3d 184, 191.

22         The complaint in this case was filed on July 23, 2018.

23   Plaintiffs filed their opposition to the instant motion on

24   November 14, 2018.  Between those two dates, they had every

25   opportunity to gather evidence to show that Benomar was not

1  entitled to diplomatic immunity.  They were aware that he would

2  claim such entitlement at least as of September 28 when his

3  counsel raised it in a pre-motion letter, Document 25; and they

4  likely were aware of that possibility before that.

5          They were aware that Benomar could obtain a

6  blue-bordered identification card; they were aware of the

7  Vienna Convention's exceptions to diplomatic immunity; they

8  intended, at least as of October 4, 2018, to raise the

9  commercial activity exception because they mentioned it in

10  their pre-motion letter, Document 27 at page 2.  They were

11  aware, because the Court pointed it out at the October 10, 2018

12  status conference, and, undoubtedly, apart from that, that

13  material outside the complaint would be considered on the

14  defendant's Rule 12(b)(1) motion.  And they were, or should

15  have been aware, that they would have to present concrete facts

16  and evidence to overcome diplomatic immunity, or to establish

17  an exception to it.

18          I think what I have before me is plaintiffs' best shot

19  at establishing that Benomar is not entitled to diplomatic

20  immunity.  Not only is the blue card not really a surprise to

21  plaintiffs, but plaintiffs stated in Document 47 that they

22  believe that their opposition brief already addressed the

23  issues raised by its issuance.

24          Further, plaintiffs have not suggested that they are

25  in possession of facts that would cure the deficiencies

181221broidyD            Decision

1   identified in this ruling.  They've presented a proposed

2   amended complaint, which is attached to Document 53, that

3   includes allegations.  If those allegations were proven, they

4   could possibly establish the commercial activity exception, but

5   they are just that, allegations.  They are not evidence.

6         Even if I allowed plaintiffs to file the amended

7   complaint, a renewed motion would come out the same way because

8   plaintiffs have not claimed to have any evidence not already

9   available to them.  So amendment would be futile because the

10  problem here is not a pleading deficiency that plaintiffs can

11  fix.  It's an absence of evidence.

12        See Raj v. Société General, 2016 WL 354033 – it might

13  be 354133 – at *2 (S.D.N.Y. Jan. 21, 2016), where the court

14  found amendment would be futile if the amended complaint would

15  be subject to dismissal for lack of subject matter

16  jurisdiction, so I decline to permit leave to amend.

17        Finally, plaintiffs invoke the 1956 decision at page 4

18  of their opposition, footnote 3, to argue that I should stay

19  the case while Benomar serves out his diplomatic assignment,

20  but defendant is correct that that case was decided more than a

21  decade before the ratification of the VCDR and the enactment of

22  the Diplomatic Relations Act, which requires courts to dismiss

23  cases brought against diplomats immune under the VCDR.  See 22

24  U.S. Code Section 254d.  Therefore, the request for the stay is

25  also denied.

1          Despite the gravity of the allegations made by the

2    plaintiffs in this case, the diplomatic immunity mandated by

3    Section 254d precludes me from considering the merits of

4    plaintiffs' claims, at least while Mr. Benomar is cloaked with

5    immunity as a diplomat.

6          I understand the frustration, particularly because the

7    diplomatic status was not documented until after the alleged

8    conduct, but the purpose of that immunity, quote, "is not to

9    cover up heinous deeds from coming to the light of day, or to

10   protect a nation's leaders from accountability for their acts,"

11   unquote, *Tachonia*, 169 F. Supp. 2d at 317, but, rather, to

12   protect the interests of comity and diplomacy among nations and

13   to ensure the protection of our own diplomats abroad, *see*

14   *Tabion,* 877 F. Supp. at 292-93.

15         Because Benomar is entitled to immunity under Section

16   254d, I lack subject matter jurisdiction over the claims

17   against him, and the motion to dismiss is granted.

18         If plaintiff wants to sue additional defendants, as he

19   indicated at one point, he should start a new case in whatever

20   court is appropriate.

21         The clerk of court should terminate Document 37.

22         I will do a written order incorporating my ruling so

23   that if anybody wants to appeal, they can do so.

24         I think that takes care of our business.

25         MR. WOLOSKY:  Your Honor, may I.  Just two points.

181221broidyD          Decision

1       First, to make the record clear, and to preserve our

2  rights for appeal, we would like to make an offer of proof that

3  we sought to file the amended complaint that is docketed as

4  ECF 53.

5       Second, we wish to make an offer of proof and provide

6  to the Court the request for production of documents that we

7  would have sought in the context of jurisdictional discovery.

8       May I approach the bench to provide to your Honor the

9  second document, the request for production?

10      MR. LOWELL:  I don't see a procedure vehicle for what

11 he wants to do.  He has taken his shot in the pleadings that

12 you have now ruled upon, and having been ruled upon, he wants

13 to put something else in the record.  It doesn't occur that way

14 when you just come to court saying, By the way, here's what I'd

15 like the record to be.

16      Given that he did not have those documents properly

17 filed at a time and in a vehicle, then what it does is put in

18 the record things that I cannot respond to, that the Court has

19 already ruled against, and basically it has no legal effect for

20 what he might want to do, which is, appeal your decision based

21 on what you have just spent a considerable amount of time

22 explaining.

23      THE COURT:  Sounds right to me.

24      Look, the Circuit could tell me I'm wrong, but I don't

25 think they should do it on the basis of information that was

1  not in front of me.

2          The proposed amended complaint is already in the

3  record, but I'm not going to add anything after I've ruled.

4          MR. DWYER:  Your Honor, just one thing.

5          We were going to file these before, and you ordered

6  the parties not to submit any more filings.  We think --

7          THE COURT:  And I did that for a reason.

8          MR. DWYER:  Right.  We think it's unfair for us to be

9  denied both the opportunity to do it when Mr. Lowell would

10  concede it was timely, and now because it's now not timely

11  because you wouldn't let us file anything.

12          THE COURT:  But you had the opportunity to request --

13  the document we're talking about is the request for

14  jurisdictional discovery.  You talked about that in your motion

15  papers.

16          MR. WOLOSKY:  No, your Honor --

17          THE COURT:  There was nothing stopping you from

18  expanding on that.

19          What I didn't like was the nasty grams that you guys

20  were sending back and forth, and I'd heard enough on leave to

21  amend.  The issue of jurisdictional discovery was something

22  raised in the motion papers, and you certainly had the option

23  to say, If we were allowed jurisdictional discovery, here's

24  what we would have asked for.  So, when I said stop sending me

25  letters, that was about amending -- it didn't seem to have

181221broidyD          Decision

1    anything to do with jurisdictional discovery.

2            MR. DWYER:  With deference, you said, Stop sending me

3    letters.  You didn't say, Stop sending me nasty grams.  Not

4    sending you --

5            THE COURT:  Nasty gram is my shorthand for letters

6    where the lawyers are taking shots at each other, and I've

7    heard enough on the subject.

8            The subject was the amendment.  The issue of

9    jurisdictional discovery, I don't even think was mentioned in

10   those letters, but as I said a moment ago, the opportunity to

11   elaborate on what jurisdictional discovery you wanted or might

12   be helpful, was when you opposed the motion.  So I'm not going

13   to accept anything else into the record after I've ruled.

14           If the Circuit says that I should have been

15   clairvoyant enough to know that you wanted to say something

16   about what jurisdictional discovery you would seek and that

17   when I said enough with the nasty grams, I shouldn't have done

18   that because I should have somehow known that you might have

19   had something else you wanted to put in on jurisdictional

20   discovery, they'll tell me.

21           MR. WOLOSKY:  Different subject, your Honor.  This

22   goes to the evidence that we do have.

23           THE COURT:  I don't want to hear it.  Whatever

24   evidence is in the record, I looked at.

25           You know, one can't --

181221broidyD          Decision

1          MR. WOLOSKY:  Your Honor --

2          THE COURT:  I've ruled.

3          MR. WOLOSKY:  I understand.  It goes to the evidence

4    that's not in the record and the reason why --

5          THE COURT:  That's all the more reason why it

6    shouldn't come into the record.  I've looked at what's in the

7    record, and whatever -- if there's more, it's not something I

8    can consider.  I've ruled.

9          MR. WOLOSKY:  I understand.

10          THE COURT:  And I'm not going to --

11          MR. WOLOSKY:  May I just offer two sentences or three

12    sentences on this, your Honor.

13          Your Honor, at the last hearing, there was an extended

14    colloquy with Mr. Dwyer about our efforts to submit materials

15    to you that had been taken in discovery in the California case,

16    including discovery of the individuals that we allege were

17    Mr. Benomar's business partners and co-conspirators.

18          We had an extended discussion about why we couldn't

19    submit those on the public record and why we needed to file

20    them, if at all, under seal, because they were protected.  They

21    were designated in the California case.  That discussion ended

22    with Mr. Lowell saying that he didn't want to receive any

23    documents.

24          What we would like to submit to you, your Honor, is

25    that just because Mr. Lowell does not want to receive the

181221broidyD          Decision

1   documents, which are dispositive -- the documents that we have,

2   which are accessible from Mr. Benomar's files, are dispositive

3   of the commercial relationship.  We would like the submit that

4   to your Honor for in-camera review in connection with our

5   forthcoming motion for reconsideration.  It is one document,

6   one document.

7          THE COURT:  Let me tell you something.  You know as

8   well as I do that you cannot submit new material on a motion

9   for reconsideration, so save your client's money if that's what

10  you're planning to do.  You know what a motion for

11  reconsideration is.  A motion for reconsideration is for

12  something that was before me that I overlooked.

13         I don't remember the ins and outs of the conversation

14  we had last time except that it sounded like I was being asked

15  to mess with the protective order issued by another judge, and

16  I was not inclined to do that.  And that was the last I heard

17  of it.  So, I cannot help you with that subject.  But really,

18  if your basis for a motion for reconsideration is going to be

19  that you had more evidence that you could have put in, that is

20  not a basis for reconsideration, and it, frankly, would be

21  frivolous.

22         If there's something that you would put in a motion

23  for reconsideration, I don't know why it wasn't put in your

24  opposition.

25         Thank you, all.  Have a nice break.  I hope you'll all

181221broidyD                 Decision

1   get one.

2             MR. LOWELL:  Thank you, Judge.

3             MR. WOLOSKY:  Thank you, your Honor.

4             (Adjourned)

5                           - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25